UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

United States of America,
     *Plaintiff-Appellee*,

v.

                                 Sixth Circuit No. 23-3566

Matthew Borges,
     *Defendant-Appellant*.

---

United States' Response in Opposition to
Defendant's Motion for Release Pending Appeal

---

The United States opposes Defendant-Appellant Borges's motion for release pending appeal. Borges has not raised a substantial issue sufficient to rebut the presumption of detention under 18 U.S.C. § 3143(b). The motion should be denied.

Factual Background

In 2020, a grand jury returned a single-count indictment, charging Defendants Matthew Borges, Larry Householder, Jeffrey Longstreth, Neil Clark, Juan Cespedes, and Generation Now (a 501(c)(4) organization) with participating in a Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(c), (d). (R. 22, indictment, 1247-1289.) The

1

indictment alleged that the defendants constituted an enterprise, as defined under 18 U.S.C. § 1961(4), and conspired to engage in a pattern of racketeering activity consisting of multiple acts of the following offenses: public official honest services wire fraud and private honest services wire fraud, in violation of 18 U.S.C. §§ 1343 & 1346; extortion under color of official right, in violation of 18 U.S.C. § 1951; interstate travel and use of interstate facilities in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952 ("the Travel Act"); money laundering, in violation of 18 U.S.C. § 1956; engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957; and bribery in violation of Ohio Rev. Code § 2921.02. The indictment alleged that the purpose of the enterprise was to grow and preserve Householder's political power, enrich the enterprise and its members and associates, and conceal these activities. (*Id*.)

During the relevant periods, Householder was Speaker of the Ohio House of Representatives, Longstreth was Householder's campaign and political strategist, Borges and Cespedes were lobbyists for FirstEnergy Solutions, and Clark, also a lobbyist, was one of Householder's closest political advisors. (*Id*.)

Defendants Longstreth, Cespedes, and Generation Now pleaded guilty.[1]

---

[1] Clark died and the case against him was dismissed.

Defendants Householder and Borges proceeded to trial.

The evidence presented over seven weeks included roughly 1,000 exhibits (including recordings, text and email messages, and bank records) and 25 witnesses (including Longstreth and Cespedes) and proved a RICO conspiracy in which conspirators received and laundered approximately $60 million in bribe payments from FirstEnergy and its affiliates (collectively, "FirstEnergy"). Through these payments, FirstEnergy bought the passage and preservation of a sweeping piece of corrupt legislation—House Bill 6 ("H.B. 6")—which provided a billion-dollar nuclear bailout, among other things.

The charged RICO conspiracy began in 2016, when Householder started planning his ascension to Speaker of the House. To support his plan, the enterprise created an entity called Generation Now. The organization's 501(c)(4) status allowed it to receive undisclosed bribe payments from FirstEnergy in return for Householder's agreement to help pass legislation to bail out FirstEnergy's nuclear power plants. FirstEnergy's payments were funneled through corporate entities controlled by the enterprise. In recorded conversations, a conspirator referred to FirstEnergy as "the bank" and characterized Householder as "pay to play." (R. 22, indictment, 1269; 1276)

The enterprise's scheme succeeded. Householder was elected Speaker and

H.B. 6 became law. The legislation secured over $1 billion in subsidies for the nuclear plants and approximately $20 to $50 million per year in fixed revenue for FirstEnergy through the legislation's "decoupling" mechanism—all at the expense of Ohio's ratepayers.

H.B. 6 was unpopular, and opponents immediately organized a ballot campaign to repeal it. The ballot campaign, Ohioans Against Corporate Bailouts, hired Advanced Microtargeting ("AMT") to collect signatures and qualify the referendum effort as a ballot initiative.

In response, and in continuation of their corrupt agreement, the conspirators devised a multi-prong plan to defeat the ballot campaign and prevent Ohioans from exercising their constitutional right to a citizens' veto. FirstEnergy paid the enterprise over $38 million through Generation Now to keep H.B. 6 law and secure Householder's additional official action.

Borges played an integral role in the plan to defeat the citizens' veto, but his knowledge of the corrupt bargain dated back to 2018, when Cespedes described the details of the agreement to him. By April 2019, before H.B. 6's passage, Borges served as Cespedes's "sounding board" for all matters relating to the bill. (R. 211, tr., 6820.) At that time, Cespedes told Borges that FirstEnergy had to make a $15 million payment to Generation Now in order to secure "continued support . . . of

4

[H.B. 6]." (*Id.*, 6811-28.)

Approximately two weeks after H.B. 6 passed the legislature, the conspirators began funneling $1.6 million of the FirstEnergy-to-Generation Now payments into an account Borges created called 17 Consulting Group LLC. Borges was the sole signatory on the account. Borges knew the origins of the money: that FirstEnergy and its affiliates were paying Householder through Generation Now to defeat the ballot campaign. He also knew that Householder was prepared to introduce alternate legislation as part of the agreement.

Borges agreed to work to help the enterprise defeat the ballot campaign. Borges's own words reveal his thinking at this time. He called the relationship between FirstEnergy and Householder "an unholy alliance." (Gov. Ex. 616C.) He characterized the FirstEnergy bribe payments as "Monopoly money." (*Id.*) And he explained that, if "people are going to get fat off of this, . . . [w]hy the fuck not [us]." (Gov. Ex. 615C.)

One prong of the plan involved Borges and Householder working together to persuade the Ohio Attorney General to reject the proposed ballot language and to interpret H.B. 6 as a "tax" not subject to referendum. Borges was close to the Attorney General, and he coordinated with Householder to pressure the Attorney General to take favorable official action.

Borges also solicited and bribed Tyler Fehrman, a manager for AMT, for inside information about the signature collection efforts to help the enterprise stymie the ballot campaign.[2] The enterprise sought this non-public information so that it could allocate efforts and resources accordingly and anticipate whether alternate legislation was needed.

Borges ultimately paid Fehrman $15,000 in exchange for signature count information.[3] Borges paid the bribe money from the 17 Consulting account, which was funded exclusively by Generation Now.

Borges also used money from FirstEnergy to pay private investigators to follow Fehrman and to make thousands of dollars in political contributions to public officials who helped with the H.B. 6 referendum, including the Attorney General, the Secretary of State, and Householder himself. Borges paid himself as well, to the tune of over $366,000.

Based on this evidence and much more, the jury convicted Borges and Householder of RICO conspiracy. Borges did not file any post-trial motions. After the Supreme Court decided *Ciminelli v. United States* and *Percoco v. United*

---

[2] Unbeknownst to Borges, Fehrman contacted the FBI about his solicitation. Thereafter, their communications were recorded and Fehrman acted at the FBI's direction.
[3] When Borges requested specific information from Fehrman following the payment, Fehrman evaded answering Borges's questions.

*States*, however, he moved for leave to file a motion based on those cases. The district court denied Borges's motion for leave because "neither Supreme Court case ha[d] any bearing on [his] conviction, and any argument to the contrary would be frivolous." (R. 265, order, 10656.)

The court sentenced Borges to five years' imprisonment. At the conclusion of the sentencing hearing, Borges requested "a stay pending appeal." (R. 286, tr., 11281.) The district court denied the request, finding that the appeal would not raise a substantial question of law or fact likely to result in reversal, a new trial, or a reduced or noncustodial sentence. (*Id.*, 11282 (citing 18 U.S.C. § 3143(b)).)[4]

After judgment, Borges filed a timely notice of appeal. Borges has now filed a motion for release pending appeal with this Court pursuant to Federal Rule of Appellate Procedure 9.

<u>Standard</u>

The Bail Reform Act of 1984 creates a presumption that a convicted defendant shall be incarcerated. *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002). Under the Act, a person who is found guilty of an offense and

---

[4] Defendants must first move for release in the district court before seeking "review of [the] district court order." *See* Fed. R. App. Proc. 9(b); *see also id.*, Advisory Committee Notes (1994). Although Borges did so, he did not identify any specific reasons supporting his release, and the district court's oral order contains correspondingly little detail.

sentenced to imprisonment, and who files an appeal, shall be detained, unless: (1) the defendant demonstrates by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of others; and (2) the defendant establishes that the appeal is not for purposes of delay and "raises a substantial question of law or fact likely to result in reversal [or] an order for a new trial . . . ." 18 U.S.C. § 3143(b). An appeal raises a substantial question of law when it "presents a 'close question or one that could go either way'" and when the question is "'so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor.'" *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985).

<u>Argument</u>

Borges was convicted of conspiring to violate RICO. 18 U.S.C. § 1962(d). RICO makes it unlawful for any person who is employed by or associated with an enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). A "'pattern of racketeering activity' requires at least two acts of racketeering activity," which the statute defines as acts chargeable under a list of specified state and federal criminal provisions. *See* 18 U.S.C. § 1961(1), (5). RICO conspiracy does not require that a defendant himself committed or agreed to

8

commit two racketeering acts; it is enough that he agreed that a coconspirator would do so.

In this case, the government alleged a pattern of racketeering activity including acts indictable under seven different listed criminal provisions. (R. 22, indictment, 1256-57.) Borges's motion attacks two of them: private honest services fraud and the Travel Act. His arguments do not present substantial issues of law or fact, nor can he show that they would warrant a new trial given his commission of (and agreement that other coconspirators commit) many unchallenged racketeering acts of the other five types.

## I.      Borges does not raise a substantial issue.

### A.      Private Honest Services Fraud

Borges's challenge to the private honest services fraud instruction is long on general rhetoric, but short on specifics. That is because the instructions given by the district court hewed carefully to governing Supreme Court and Sixth Circuit authority. Consistent with *Skilling v. United States*, 561 U.S. 358, 401 (2010), the instructions defined the offense as requiring a *quid pro quo* bribery scheme involving the intended breach of a fiduciary duty. (R. 237, tr., 9431-32.) And, consistent with *United States v. Frost*, 125 F.3d 346, 353 (6th Cir. 1997), the instructions required that "the defendant or conspirator foresaw or reasonably

9

should have foreseen that the employer might suffer economic harm as a result of the scheme." (R. 237, tr., 9431.)

Borges does not claim to the contrary, but nonetheless argues that the district court's instructions were flawed based on two Supreme Court cases decided after the verdict, *Ciminelli v. United States,* 598 U.S. -- , 143 S.Ct. 1121 (2023), and *Percoco v. United States*, 598 U.S. -- , 143 S.Ct. 1130 (2023). Neither case helps him.

The holding in *Ciminelli* was already Sixth Circuit law at the time of trial. *See Ciminelli*, 143 S.Ct. at 1127 n.3 (citing *United States v. Sadler*, 750 F.3d 585, 590–592 (6th Cir. 2014)). Borges never argued that the jury instructions here conflicted with *Sadler*, so this Court would review any argument based on *Ciminelli* for plain error. *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021); *see also United States v. Fabode*, No. 21-1491, 2022 WL 16825408, at *7 (6th Cir. Nov. 8, 2022).

Borges's claim that the instructions here "suffered from the same infirmity" as in *Ciminelli* (Mot. at 13) fails at the outset. *Ciminelli* and *Sadler* addressed whether the "right to control" theory of wire fraud was a valid basis of liability under 18 U.S.C. § 1343 for "obtaining money or property" through fraud. Borges's case did not involve "money or property" wire fraud under § 1343, but rather

10

"intangible right of honest services" wire fraud under § 1346. And the government never argued, and the jury was never instructed, that any defendant could be convicted based on the "right to control" theory at issue in *Ciminelli*. Indeed, the situation here was quite distinct from that in *Ciminelli*: the claim there was that the scheme deprived the victim-business of information unknown to it that it might have found valuable in making economic decisions; the claim here, in contrast, was that the defendant's scheme sought access (by bribing an employee) to signature information that the victim had developed as part of its business. Borges can show no instructional error, let alone plain instructional error, based on *Ciminelli*.

*Percoco v. United States* also provides Borges no help. The issue there was whether a private citizen with influence over government decision-making could be convicted for public official honest services wire fraud under § 1346. No such conduct was charged here. The jury was instructed regarding a private citizen's (Borges's) involvement in private honest services fraud through bribery; and a public official's (Householder's) involvement in public official honest services fraud through bribery. The government never argued, and the jury was never instructed, that Borges's conduct as a private citizen constituted public official

honest services fraud. Borges cannot show any instructional error, let alone plain

instructional error, based on *Percoco*.

Nor can Borges otherwise demonstrate error in the private honest services

instructions. Borges appears to challenge two aspects of the instructions: the

instruction's reference to information an employer "intended to keep secret" in

describing the required breach of fiduciary duty, and its use of the word "might" in

describing the foreseeability of economic harm to the employer whose information

was shared. (Mot. at 7, 10; *see* R. 237, tr., 9430-34.)

As to the first point, the instruction given provided that:

> [t]he actual or intended breach of the fiduciary duty must be by
> participation in a bribery scheme involving the actual, intended, or
> solicited exchange of a thing of value in exchange for the employee
> improperly providing information that the employer intended to keep
> secret.

(R. 237, tr., 9432.) Borges argued below for language requiring that the

information provided by the employee in exchange for the bribe be limited to

"confidential business information." (R. 193, objections, 4708; R. 237, tr., 9362–

63.)

Borges cannot show that the court's failure to use his wording presents a

substantial issue on appeal because "the charge, taken as a whole, fairly and

adequately submits the issues and applicable law to the jury.'" *United States v.*

*Hendrickson*, 822 F.3d 812, 818 (6th Cir. 2016). Borges notes that a district court case mentioned briefly by the Supreme Court in *Skilling* "concerned payments by a business competitor in exchange for trade secrets and confidential information, that could be used by a business competitor to gain an advantage in the marketplace." (Mot. at 11.) That is true, but uninformative. Borges does not claim that that case or any other holds that a private honest services instruction must be framed in terms of "confidential business information."

On the contrary, actions depriving a victim of the right to honest services in the private sector may take varying forms. *See, e.g., Frost*, 125 F.3d at 367 (defendant professors deprived university of their right to honest services by allowing students to pass off plagiarized work because "[a]warding degrees to [unqualified] students . . . will decrease the value of degrees in general"). The scope of the offense is constrained not by any across-the-board requirement that a disclosure of "confidential business information" be involved, but by the requirements that the scheme involve bribes or kickbacks, *see Skilling*, 561 U.S. at 404, breach of a fiduciary duty, *see Frost*, 125 F.3d at 366, and foreseeable economic harm to the victim, *id.* at 368.

In any event, Borges fails to explain what difference the jury would have perceived between the court's "information that the employer intended to keep

secret" and his suggested "confidential business information."[5] That is particularly true given the nature of the evidence presented at trial. The AMT CEO testified that the ballot campaign did not allow "anyone outside of AMT management" to have real-time signature information, that it took steps to provide "around-the-clock security," and that failing to collect enough signatures was "costly" and bad for the company's reputation. (R. 216, Roberson, 7497-7506; *see also* R. 224, Fehrman, 8124, 8194-96 (testifying that he was trained to protect signatures gathered by collectors, and he would not provide signature-count information because he "didn't want to give him information that would betray my team").

The evidence further showed that the secret signature count information was obtained by AMT pursuant to its contract, constituting the value and service AMT was contractually obligated to provide. (*See* R. 216, Roberson, 7492.) And the ballot campaign protected this information from dissemination because the "last thing they would ever want" was "for real-time numbers to become public." (*Id.*, 7503–04 (explaining that AMT would never allow the opposition to know their real-time signature count).)[6]

---

[5] Borges acknowledged below that the "intended to keep secret" phrasing "actually better define[d] the scope than just simply leaving it at improper disclosure of business information." (R. 237, tr. at 9365.)

[6] The situation here, involving *disclosure* of an employer's private business information in exchange for a bribe, has nothing to do with the Court's concern in

As to the second instructional issue—the "might" wording regarding foreseeability—Borges fails to mention that he initially proposed this very instruction. *Compare* (R. 174, inst., 4063) (requiring that "the defendant(s) foresaw or reasonably should have foreseen that [name of employer] might suffer economic harm as a result of the scheme") *with* (R. 237, tr., 9431) (requiring "that the defendant or conspirator foresaw or reasonably should have foreseen that the employer might suffer economic harm as a result of the scheme").[7] That is unsurprising since the instruction comported with this Court's binding decision in *Frost*. (*See* Mot. at 15-16.) And neither *Ciminelli* nor *Percoco*—which concerned

---

*Ciminelli* regarding extending the money or property provision to include *non-disclosure* of information *to* a victim. The Court's concern in *Ciminelli* about that use of "mere information" sweeping in "almost any deceptive act"—like an undisclosed conflict of interest (*see* 143 S.Ct. at 1128)—is not present here. *See, Skilling*, 561 U.S. at 409–10 (§ 1346 does not include liability for "conflict of interest" or "undisclosed self-dealing").

[7] Borges argues in passing that the government's evidence did not meet this standard. (Mot. at 11–12 (arguing that the signature tallies "did not present an economic harm to the corporation hired to collect voter signatures" because the corporation "was paid in full for its efforts").) The record shows otherwise. Roberson testified that AMT failed to gather enough signatures to qualify the referendum because of the enterprise's efforts, which was costly to the campaign and to AMT's business and reputation. (R. 216, Roberson, 7496–97, 7507–08; R. 224, Fehrman, 8167–68 (the tactics used by the enterprise to prevent the campaign from collecting signatures made it "exponentially more difficult" to gather signatures).) In any event, any sufficiency argument regarding an honest services theory as to the Fehrman bribe would not, in itself, demonstrate any error in the conspiracy conviction given the numerous other racketeering acts.

different conduct and different theories than those charged here—altered that binding precedent.

### B.    Travel Act

Borges argues that the Travel Act instruction presents substantial questions of law and fact likely to result in a new trial. Again, he is wrong.

First, Borges argues—as he did below (R. 193, objections, 4606–07)—that the Travel Act jury instruction involving acts of bribery under Ohio Rev. Code § 3517.22(a)(2) was broader than the generic definition of bribery, and that it was thus error to include it.[8] (Mot. at 17.) This argument has no merit.

The Travel Act criminalizes using "any facility in interstate or foreign commerce, with intent to:  . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," to include, "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952 (a), (b)(i)(2). The Ohio provision states that no person with intent to affect the outcome of a ballot referendum campaign may:

> (A)(2) Promise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue, for the purpose of influencing the employee or agent with respect to the improper discharge of the

---

[8] Borges filed a motion to strike on this score as well, which the court denied. (R. 104, motion, 1749–52; R. 284, order, 1164–66.)

16

> employee's or agent's campaign duties or to obtain information
> about the committee's campaign organization.

Ohio Rev. Code § 3517.22(A)(2).

The Supreme Court addressed Travel Act violations involving state law commercial bribery in *Perrin v. United States*, 444 U.S. 37 (1979), and held that "Congress intended 'bribery . . . in violation of the laws of the State in which committed' as used in the Travel Act to encompass conduct in violation of state commercial bribery statutes." *Id*. at 50 (quoting § 1952). In doing so, the Court defined "generic bribery," which included "the bribery of individuals acting in a private capacity," as "payments to private persons to influence their actions." *Id*. at 43–45. Courts look to *Perrin*'s generic definition of bribery to determine whether a state court violation is a Travel Act predicate. *See, e.g., United States v. Smilowitz*, 974 F.3d 155, 163 (2d Cir. 2020) (vote buying under New York statute); *United States v. Welch*, 327 F.3d 1081, 1090–91 (10th Cir. 2003) (Utah misdemeanor commercial bribery statute); *see also United States v. Bowling*, 2010 WL 5067698, at *2–8 (E.D. Ky. Dec. 7, 2010), *aff'd sub nom.*, *United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) (applying *Perrin* and finding Kentucky vote-buying statute a RICO predicate).

Comparing the elements, § 3517.22(A)(2) fits the definition of generic bribery: generic bribery includes *offering payment* (to private persons) "*to*

*influence their actions*," *Perrin*, 444 U.S. at 43 (emphasis added); while

§ 3517.22(a)(2) criminalizes *offering payment* (to a private employee or agent of a

ballot campaign) "*for the purpose of influencing*" their actions, either "with respect

to the improper discharge of the employee's or agent's campaign duties" or "to

obtain information about the committee's campaign organization," Ohio Rev. Code

§ 3517.22(A)(2) (emphasis added). Bribery under § 3517.22(A)(2) thus qualifies as

bribery under the Travel Act. And the jury instruction, which tracked the language

of § 3517.22(A)(2), was proper.[9] (R. 237, tr., 9435-36.)

Second, Borges argues that the government presented insufficient evidence

to support instructing on the Travel Act predicate because the individual Borges

bribed was not an "employee or agent" of the ballot campaign. (Mot. at 19.) As

with private honest services fraud (*see supra* note 6), Borges again ignores the fact

that the numerous other racketeering acts would prevent him from demonstrating

any sufficiency-based error in the conspiracy conviction through such an argument.

In any event, the evidence showed that Fehrman was employed by, and was an

---

[9] The evidence established that Borges paid money to Fehrman—an employee and
agent of the ballot campaign—to influence him to provide signature information
collected by the campaign that the enterprise would use to defeat the campaign.
This conduct tracks Ohio Rev. Code § 3517.22(A)(2) (and the district court's
instruction) and satisfies the elements of generic bribery: Borges made "payment[]
to private person[] to influence [his] actions," *Perrin*, 444 U.S. at 43.

agent of, Ohioans Against Corporate Bailouts, the committee formed to defeat H.B. 6 through a ballot referendum. To achieve its goal, the committee hired AMT to collect signatures and qualify the referendum effort as a ballot initiative. (R. 216, Roberson, 7492.) AMT was employed by and working at the direction of the committee. (*Id*., 7492, 7497.) As a manager for AMT, Fehrman worked to further the committee's and AMT's joint effort to qualify the initiative by collecting signatures to put the referendum on the ballot for Ohio voters, which included working closely with—and taking direction directly from—the committee. (*Id*., 7502, 8122.) Through his employment with AMT, Fehrman was thus employed by and an agent of the committee working to qualify the initiative for a ballot referendum.

Finally, although entirely undeveloped, Borges suggests that predicating the Travel Act on the Ohio statute "upsets the delicate balance between state and federal powers" because the statute "governs an inherently intrastate activity." (Mot. at 17–18.) But this is the purpose of the Travel Act. *Perrin* explained that Congress enacted the Travel Act "to aid state and local governments which were no longer able to cope with the increasingly complex and interstate nature of large-scale multiparty crime." 444 U.S. at 41. Specifically, "Congress employed its now familiar power under the Commerce Clause of the Federal Constitution to prohibit

activities of traditional state and local concern that also have an interstate nexus."
*Id*. at 42. In fact, the Court expressly rejected a federalism challenge to Travel Act
violations involving a state commercial bribery statute. *Id*. at 49–50; *see Welch*,
327 F.3d at 1093 ("Because the Travel Act was within Congress' constitutional
prerogative to enact, commercial bribery coupled with a sufficient interstate nexus
is a matter of federal concern.").[10]

## II.    The issues would not warrant a new trial, in any event.

Even if Borges could present a substantial issue of law or fact, he cannot
show that such issues would warrant a new trial. Borges attempts to minimize his
involvement with the criminal enterprise to include only the Fehrman bribe
payment. (Mot. at 20–21.) This he cannot do. Borges's conviction stands even if
the Court were to accept his arguments related to the Fehrman bribe because the

---

[10] Contrary to Borges's contention (Mot. at 18), the fact that § 3517.22(a)(2) is a
state misdemeanor is irrelevant. *See Perrin*, 444 U.S. at 39 n.3, 50 (affirming
Louisiana commercial bribery under La. Rev. Stat. § 14.73 as Travel Act
predicate) and *United States v. Perrin*, 580 F.2d 730, 739 (5th Cir. 1978) (noting
Louisiana statute at issue in *Perrin* was misdemeanor carrying maximum six
months imprisonment) (J. Rubin, dissenting)); *Welch*, 327 F.3d at 1090–93
(reversing dismissal of Travel Act counts that relied on misdemeanor commercial
bribery statute as predicate). Rather, the RICO statute notes specifically when a
felony is required for a predicate offense, which it does not do for the Travel Act.
*See, e.g.,* 18 U.S.C. § 1961(1)(B) (defining as "racketeering activity" a violation of
"section 659 (relating to theft from interstate shipment) if the act indictable under
section 659 is felonious" while listing the Travel Act as a violation of "section
1952 (relating to racketeering)" without reference to nature of offense).

evidence indisputably established other racketeering acts that Borges himself committed, in addition to the other acts he agreed that his coconspirators would commit. As Borges himself appears to recognize (Mot. at 20), money laundering provides a prime example. *See* 18 U.S.C. §§ 1956, 1957.

Borges was a member of the enterprise. He knew that FirstEnergy and Householder were involved in a corrupt bargain to exchange money for official action related to H.B. 6, a relationship he called an "unholy alliance." He also knew that the payments from FirstEnergy through Generation Now were the proceeds of that corruption. He then agreed to further the corrupt bargain through coordination with enterprise members. Indeed, at sentencing, the district court held Borges accountable for approximately $38 million (spread across fourteen separate bribe payments) that FirstEnergy paid to Generation Now to defeat the ballot campaign. (R. 286, tr., 11240–41.)

Generation Now paid $1.6 of the $38 million in bribe payments to Borges's 17 Consulting account via nine wire transactions, fully funding Borges's account. Borges then engaged in more than a dozen transactions of over $10,000 to further the enterprise. Borges did not challenge these transactions at trial, and he does not challenge the money laundering offenses implicated by these undisputed transactions now. Nor could he.

Finally, contrary to Borges's suggestion (Mot. at 20), this Court's decision in *Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989), does not foreclose this kind of inquiry. Attorney Callanan—the defendant Borges argues is relevant here—was convicted of multiple counts of mail fraud, a substantive RICO count, and RICO conspiracy. The substantive RICO charge alleged a pattern of racketeering consisting of three acts of mail fraud and one act of obstruction. This Court vacated the mail fraud convictions and, thus, vacated the substantive RICO conviction. Unlike here, the RICO conspiracy count enumerated 12 specific predicate acts (four acts of mail fraud, one of obstruction, and seven of bribery). The government argued that, despite the flaws in the mail fraud predicates, the RICO conspiracy conviction should nevertheless stand based on the other acts of bribery. This Court disagreed because it had no basis for knowing whether the jury found that Attorney Callanan assented to the commission of those other acts. *Id*. at 235. Here, of course, there is not such a limited universe of specific enumerated racketeering acts at issue in the RICO conspiracy count. In addition, the record contains overwhelming evidence establishing the racketeering acts Borges committed (separate and apart from the Fehrman bribe) and agreed his coconspirators would commit. Indeed, Borges does not—and cannot—challenge

the other racketeering acts that the undisputed evidence establishes that he, himself, committed.[11]

Conclusion

The Court should deny the motion for release pending appeal.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/Alexis J. Zouhary
ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth St., Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
alexis.zouhary@usdoj.gov

---

[11] The absence of special interrogatories, which the government argued (and the district court agreed) would have confused the jury, likewise does not prevent the Court from making this determination. *Cf. United States v. Skilling*, 638 F.3d 480 (5th Cir. 2011), (on remand, affirming conspiracy conviction based on general verdict, despite Supreme Court's invalidation of one of the objects of the conspiracy), *cert. denied* 566 U.S. 956 (2012).

## Certificate of Service

I certify that the foregoing Response complies with the 5,200 word limitation provided in Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure. This response was filed with the Court's CM/ECF system this 3rd day of August 2023 and served electronically on all parties of record.

s/Alexis J. Zouhary
ALEXIS J. ZOUHARY
Assistant United States Attorney
