IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**UNITED STATES OF AMERICA,**         :

      **Plaintiff-Appellee,**         :

**vs.**         :         **Case No. 23-3566**

**MATTHEW BORGES,**         :

      **Defendant-Appellant.**         :

Direct Appeal from a Criminal Judgment
Entered In the United States District Court for the
Southern District of Ohio (Cincinnati)
Docket No.1:20-cr-00077-4
(Timothy S. Black, District Judge)

---

# BRIEF OF DEFENDANT-APPELLANT

---

DENNIS C. BELLI
536 South High St. Fl. 2
Columbus, Ohio 43215-5785
Phone:(614) 300-2911
Fax: (888) 901-8040
Email: bellilawoffice@yahoo.com
ATTORNEY FOR DEFENDANT-
APPELLANT MATTHEW BORGES

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT IN SUPPORT OF ORAL ARGUMENT. . . . . . . . . . . . . . . . v

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    BORGES' CONVICTION FOR CONSPIRACY TO PARTICIPATE
          IN A RACKETEERING ENTERPRISE IS NOT SUPPORTED BY
          SUFFICIENT EVIDENCE TO SATISFY THE DUE PROCESS
          CLAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          A.    The Government Failed to Offer Sufficient Proof for a
               Rational Jury to Infer That Borges' Payment of $15,000 to
               Tyler Fehrman Violated the Travel Act.. . . . . . . . . . . . . . 18

          B.    The Government Failed to Offer Sufficient Proof for a
               Rational Jury to Infer that Borges' Payment of $15,000 to
               Tyler Fehrman Violated the Wire Fraud Statute. . . . . . . . 22

          1.    The government failed to demonstrate that the object of the
               alleged bribe was a traditionally recognized property interest.
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          2.    The government failed to demonstrate that Borges' payment
               to Fehrman for the signature counts would have resulted in a
               breach of a fiduciary duty to his employer. . . . . . . . . . . 28

3.      The government failed to demonstrate that Borges intended to injure Fehrman's employer, or that he  reasonably could have foreseen an economic risk to the employer. . . . . . . . . . . .   30

C.      The Government Failed to Offer Sufficient Proof for a Rational Jury to Infer That Diversion of Generation Now Money Through Borges' Business Checking Account Violated the Money Laundering Statute.. . . . . . . . . . . . . . . . . . . . . .   33

II.     THE DENIAL OF BORGES' MOTION TO STRIKE THE TRAVEL ACT AND PRIVATE SECTOR HONEST SERVICES FRAUD ALLEGATIONS FROM THE INDICTMENT WAS ERROR THAT DEPRIVED HIM OF HIS DUE PROCESS RIGHT TO A FAIR JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

A.      The Travel Act Language in the Indictment Violates Principles of Federalism by Elevating an Alleged Violation of the Ohio Infiltration Statute to the Status of a RICO Predicate Act.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

B.      The Factual Allegations in the Indictment Are Insufficient as a Matter of Law to Support a Predicate RICO Act Based on Honest Services Fraud under 18 U.S.C. §1346 . . . . . . . .   41

C.      Borges' Was Prejudiced by the District Judge's Denial of His Motion to Strike the Travel Act and Honest Services Fraud Language from the Indictment . . . . . . . . . . . . . . . . . . . . .   42

III.    ERRONEOUS JURY INSTRUCTIONS DEPRIVED BORGES OF HIS DUE PROCESS RIGHT TO A FAIR JURY TRIAL.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

A.      The Travel Act Language in the Jury Charge Violated Principles of Federalism and Lacked an Evidentiary Basis for Submitting the Predicate Act to the Jury . . . . . . . . . . . . .   46

B.    The Private Sector Honest Services Fraud Language in the Jury Charge Lacked an Evidentiary Basis for Submitting the Predicate Act to the Jury and Improperly Permitted the Jury to Find Borges Guilty of Committing or Agreeing to Commit Wire Fraud on the Basis of Conduct That Does Not Violate the Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

C.    The Instructional Error in Borges' Trial Was Not Harmless Beyond a Reasonable Doubt. . . . . . . . . . . . . . . . . . . . . . .  51

IV.    THE DISTRICT COURT'S ERRONEOUS EVIDENTIARY RULINGS DEPRIVED BORGES OF HIS DUE PROCESS RIGHT TO A FAIR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

A.    An Absolute Ban Against Background Testimony Regarding the Retention and Use of Attorneys Created a False Narrative That the House Bill 6 Proponents Conducted Business in a Manner Inconsistent with That of Persons Engaged in a Legitimate Pursuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

B.    Incompetent Testimony Created an Unfair and Unsubstantiated Inference That the House Bill 6 Proponents Engaged in Gangster-Style Behavior to Defeat the Voter Referendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

C.    The Erroneous Admission of the Cooperating Codefendants' Guilty Pleas Prejudiced Borges by Creating a Substantial Likelihood That the Jury Would Use the Pleas as Proof That a RICO Conspiracy Existed . . . . . . . . . . . . . . . . . . . . . . .  56

D.    The Combined Effect of the Erroneous Evidentiary Rulings Was So Prejudicial as to Render Borges' Trial Fundamentally Unfair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS. . . 62

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989) . . . . . . . . . . .  43-44

*Carpenter v. United States*, 484 U.S. 19 (1987) . . . . . . .  23, 25, 29, 42, 47-48

*Ciminelli v. United States,* 598 U.S. 306, 143 S. Ct. 1121  (2023)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 23-25, 27, 42, 48, 51,59

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) . . . . . . . . . .  19

*Coast Candidates PAC v. Ohio Elections Comm'n,* 543 Fed. Appx. 490 (6th Cir.
2013), *vacated on other grounds*, 573 U.S. 928 (2014) . . . . . . . . . . . . . . . .  39

*Councell v. Douglas*, 126 N.E.2d 597 (Ohio 1955). . . . . . . . . . . . . . . . .  20-21

*Dimora v. United States*, 973 F. 3d 496 (6th Cir. 2020) . . . . . . . . . . . .  45, 51

*Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991)  . .  23-24

*In Re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Jones v. United States*, 529 U.S. 848 (2000) . . . . . . . . . . . . . . . . . . . . . . .  40

*Marotto v. Ohio State Univ. Med. Ctr.*, 21 N.E.3d 643 (Ohio App. 2014) . .  20

*McNally v. United States*, 483 U.S. 350 (1987). . . . . . . . . . . . . . . . . . . . . .  26

*Middleton v. McNeil*, 541 US 433 (2004) . . . . . . . . . . . . . . . . . . . . . . . . .  45

*Musacchio v. United States*, 577 U.S. 237 (2016). . . . . . . . . . . . . . . . . . . .  16

*Old Chief v. United States*, 519 U.S. 172 (1997). . . . . . . . . . . . . . . . . . . . .  54

*Percoco v. United States*, 598 U.S. 319, 143 S. Ct. 1130 (2023)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28, 30, 49-51

*Perrin v. United States*, 444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . 37-38

*Rewis v. United States*, 401 U.S 808 (1971) . . . . . . . . . . . . . . . . . . . . . . . 37

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) . . . . . . . . . . . . . . . 23, 25

*Skilling v. United States*, 561 U. S. 358 (2010) . . . . . . . . 23, 26, 28, 30, 49, 51

*State v. Massien*, 926 N.E.2d 1282 (Ohio 2010) . . . . . . . . . . . . . . . . . . . . . 29

*State v. Pendergrass*, 164 N.E.3d 306 (Ohio 2020). . . . . . . . . . . . . . . . . . . 22

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023). . . . . . . . . . . . . . . . . 23

*United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) . . . . . . . . . . . 52, 57-58

*United States v. Clark*, No. 1:19-cr-148, 2020 U.S. Dist. LEXIS 28815 (N.D. Ohio Feb. 20, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Doggart*, 906 F.3d 506 (6th Cir. 2018) . . . . . . . . . . . . . . . 51

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27-30, 32, 42, 47-49

*United States v. Full Play Grp.*, S.A., No. 15-CR-252, 2023 U.S. Dist. LEXIS 155565 (E.D.N.Y. Sept. 1, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Garcia*, 143 F. Supp. 2d 791 (E.D. Mich. 2000) . . . . . 36, 40

*United States v. Hardy*, 228 F.3d 745 (6th Cir. 2000). . . . . . . . . . . . . . . . . 54

*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022) . . . . . . . . . . . . . . . . . 17

*United States v. Hofstetter*, 31 F.4th 396 (6th Cir. 2022) . . . . . . . . . . . . . . 17

*United States v. Kilpatrick*, 798 F.3d 365 (6th Cir. 2015). . . . . . . . . . . . . . . 57

*United States v. Lawson*, 535 F.3d 434 (6th Cir. 2008). . . . . . . . . . . . . . 17, 35

*United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983) . . . . . . . . . . . . . . 50

*United States v. Levin*, 973 F.2d 463 (6th Cir.1992) . . . . . . . . . . . . . . . 35, 41

*United States v. Lopez*, 514 U.S. 549 (1995)  . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Margiotta*, 688 F.2d 108 (2nd Cir. 1981) . . . . . . . . . . . . . 49

*United States v. Morrison*, 529 U.S. 598 (2000) . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Nedelcu*, 46 F.4th 446 (6th Cir. 2022). . . . . . . . . . . . . . . . . 33

*United States v. Pacchioli*, 718 F.3d 1294 (11th Cir. 2013) . . . . . . . . . . . . 34

*United States v. Parker*, No. 80-5093, 1980 U.S. App. LEXIS 11061,  642 F.2d 453 (Table) (6th Cir. Dec. 29, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57

*United States v. Procter & Gamble Co.*, 47 F. Supp. 676 (D. Mass. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014). . . . . . . . . . . . . . . . . . 30

*United States v. Smith*, 516 Fed. Appx. 592 (6th Cir. 2013) . . . . . . . . . . . . 55

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) . . . . . . . . . . . . . . . . . 26

*United States v. Wang,* 222 F.3d 234 (6th Cir. 1999) . . . . . . . . . . . . . . . . . 40

*United States v. Yu Zhou*, No. 2:19cr163, 2020 U.S. Dist. LEXIS 24311 (S.D. Ohio Feb. 12, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*United States v. Zheng*, No. 22-5516, 2023 U.S. App. LEXIS 31374, 87 F.4th 336  (6th Cir. Nov. 28, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 52

*Wagner v. Higgins*, 754 F.2d 186 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 36

**Statutes:**

Ohio Revised Code §2901.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ohio Revised Code §3517.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19, 39

Ohio Revised Code §§3519.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ohio Revised Code §§3519.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23, 26, 30

18 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 40

18 U.S.C. §1952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. §1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. §1961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Other Authorities:**

Fed. R. Crim. P. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed. R. Crim. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36, 41-42

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . 16, 40, 45

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant-Appellant believes oral argument should be heard because the issues raised in this appeal require further explication beyond the written brief, and oral argument will facilitate the decision-making process. Wherefore, Defendant-Appellant prays that this Court will grant oral argument pursuant to Local Rule 9.

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of Ohio (at Cincinnati) acquired subject matter jurisdiction in Docket No. 1:20-cr-00077-4 on July 21, 2020 when a Special Agent of the Federal Bureau of Investigation ("FBI") filed a criminal complaint charging Defendant-Appellant Matthew Borges ("Borges") with conspiracy to engage in a racketeering enterprise. Jurisdiction was based on 18 U.S.C. §3231, which grants federal district courts exclusive original jurisdiction over all offenses against the laws of the United States.

The district court filed a judgment of conviction and sentence on July 6, 2023. Borges filed a timely notice of appeal from the judgment on July 12, 2023. The notice of appeal was docketed in this Court under Case No. 23-3566.

This Court's appellate jurisdiction is derived from 28 U.S.C. § 1291, which grants circuit courts of appeals authority to review a judgment of a district court.

## <u>STATEMENT OF THE ISSUES</u>

I. Whether Borges' conviction for conspiracy to participate in a racketeering enterprise is supported by sufficient evidence to satisfy the Due Process Clause?

II. Whether the district court's denial of Borges' motion to strike the Travel Act and private sector honest services fraud language from the indictment was error that deprived him of his due process right to a fair jury trial?

III. Whether erroneous jury instructions deprived Borges of his due process right to a fair trial and reliable jury verdict?

IV. Whether the district court's erroneous evidentiary rulings rendered Borges' jury trial fundamentally unfair in violation of his right to due process?

## STATEMENT OF THE CASE

FirstEnergy Corp. ("FEC" or "the Company") is an Akron, Ohio-based public utility holding company that generates and transmits electricity to approximately 6 million customers in seven states. (Staub Tr., R 194, Page ID##4751, 4755) In 2016, the company faced substantial economic strain due to two aging, financially unsustainable, nuclear power plants in northern Ohio. (*Id.* at 4769-71) The Company decided its best option was to pursue a legislative solution to the problem in the Ohio General Assembly. (*Id.* at 4777)

FEC executives met with Larry Householder ("Householder") in January 2017, shortly after he was elected to the Ohio House of Representatives. (Longstreth Tr., R. 217, Page ID#7638) According to the government, the Company promised to give millions of dollars in campaign contributions to Householder to support his bid for Speaker of the Ohio House of Representatives in exchange for his cooperation in securing a legislative "bailout" for the cash-bleeding nuclear plants. (*Id.* at 7638-41)

Jeffrey Longstreth, a Columbus-based political consultant and strategist, formed a non-profit Internal Revenue Code §501(c)(4) entity known as Generation Now as a conduit for the contributions from FEC and its subsidiaries.(*Id.* at 7643-46, 7663) Approximately $64.4 Million of the

3

Company's money flowed through the Generation Now bank account between 2018 and 2019. (Hartzel Tr., R. 214, Page ID#7237) A substantial portion of this money was used to fund the election campaigns of individuals who were expected to be supportive of Householder for the Speaker of the House position. (Longstreth Tr., R. 217, Page ID##7647-50)

Householder succeeded in his bid for Speaker. He introduced the so-called "bailout" legislation, known as House Bill 6 ("HB 6") or the Ohio Clean Air Act, in January 2019. It  would create a ratepayer-funded subsidy for clean energy generation. (Tully Tr., R. 217, Page ID##7549-50)

A primary beneficiary of HB 6 was FirstEnergy Solutions ("FES"), a FEC corporate subsidiary that was formed to own and operate the two nuclear power plants. (Cespedes Tr., R. 211, Page ID##6802-04) HB 6 was passed and signed into law by the Ohio Governor in July 2019. (Wetzel Tr., R. 202, Page ID##5714-15)

The enactment of HB 6 generated substantial controversy. In August 2019, a group calling itself Ohioans Against Corporate Bailouts ("OACB") initiated a campaign to place the legislation for a voter referendum on the 2020 ballot. (Wetzel Tr., R. 202, Page ID##5699-70) OACB hired Advanced Micro Targeting

4

("AMT"), a for-profit contractor, to collect the requisite number of voter signatures. (*Id.* at 5741)

Householder and the HB 6 proponents mobilized forces to defeat the referendum campaign. FEC disbursed an additional $38 million through Generation Now and other organizations for this purpose. (Cespedes Tr., R. 211, Page ID##6847-50) Most of this money was allocated for the purchase of media advertising and mailers designed to persuade individuals to oppose the referendum initiative. (Cespedes Tr., R. 212, Page ID#7000-01) A smaller portion of the funds was directed to "black op" efforts to impede the collection of the voter signatures. (*Id.* at 7019)

Borges, a lobbyist and political consultant, agreed to assist in the plan to defeat the referendum. (Cespedes Tr., R. 211, Page ID#6858) He formed a limited liability company, 17 Consulting Group, and opened a bank account in the company's name. (Wetzel Tr., R. 201, Page ID##5663-65) Generation Now made periodic deposits totaling $1.6 Million into this account during the Fall of 2019 to help fund the plan. (Hartsel Tr., R.214, Page ID#7248)

The referendum opponents desired real-time data regarding the number of signatures being collected by AMT in order to best allocate their resources.

Borges said he could help secure this information. (Cespedes Tr., R. 211, Page ID#6882-92)

Borges was personally acquainted with AMT's project manager in the Columbus region, Tyler Fehrman. He arranged a meeting with Fehrman and offered to pay him for the signature tallies. The young man initially declined the offer. (Fehrman Tr., R.224, Page ID##8125-27)

Fehrman subsequently discussed Borges' offer with a friend, who advised him to contact the FBI. (*Id.*) Fehrman followed his advice and ultimately agreed to work for the agency as an informant. (*Id.* at 8129-30)

At the direction of the case agent, Fehrman set up a meeting with Borges on September 10, 2019 to discuss the proposal. He recorded it with a hidden device. (Wetzel Tr., R. 202, Page ID##5744-47)

During the meeting, Borges is overheard telling Fehrman "the information we really need to know is how many signatures are you getting." (*Id.* at 5747, Gov. Ex. 615C, at 12) Fehrman feigned interest in the financial arrangement proposed by Borges. (*Id.*)

The two men met again three days later. Borges handed Fehrman a check from the 17 Consulting Group account for $15,000. (Wetzel Tr., R. 202, Page

ID##5758-64) Borges reached out to Fehrman periodically for updated information regarding the number of signatures collected by ATM. Fehrman offered a host of excuses for being unable to provide the data. (Fehrman Tr., R. 224, Page ID##8154-58, 8186-89)

Borges' lack of success in obtaining the signature counts from Fehrman proved inconsequential.  Juan Cespedes, an FES lobbyist and organizer of the "black ops" scheme, shrugged it off, remarking "it didn't happen, didn't work out, not a problem." (Cespedes Tr., R. 211, Page ID#9050)

AMT ultimately failed to collect the requisite number of signatures to place the issue on the ballot.  (Roberson Tr., R. 216, Page ID#7505) HB 6 went into effect in December 2019.

The FBI's Public Corruption Squad in Cincinnati opened a formal investigation into the use of FEC funds to facilitate passage of HB 6. (Wetzel Tr., R. 194, Page ID#4821) Its principal target was Householder. Other individuals within the investigators' cross hairs included Longstreth, the two self-employed lobbyists, Cespedes and Neil Clark, and Borges.[1]

---

[1]The Holder Doctrine is the name given to official policy of the Department of Justice under a prior administration that discouraged prosecution of executives out of a concern for the stability of corporations and financial markets. The New York Times reported that the Doctrine "has finally been

A federal grand jury in the Southern District of Ohio returned a single count indictment charging these individuals with participating in a RICO conspiracy. (Indictment, R. 22, Page ID#1247) The 43-page document alleges that Householder, Longstreth, Cespedes, Clark, Borges, and Generation Now, conspired with each other, as part of a criminal enterprise identified as the "Householder Enterprise," to commit a pattern of criminal acts that included public and private sector honest services wire fraud ("HSF"), interference with commerce by extortion, Travel Act violations, money laundering, and state law bribery. (*Id.* at 1256-57)

The accusations against Borges are confined to three paragraphs appearing in a section entitled "Defeating the HB 6 Ballot Campaign." (*Id.* at 1281-84) Those paragraphs allege that Borges agreed to assist the Householder Enterprise by 1) permitting Generation Now to use his company's bank account to launder approximately $1.6 Million in funds "to pay for services to defeat the Ballot

---

relegated to the dustbin of history where it belongs." Cohan, William D., Justice Dept. Shift is Long Overdue, https://www.nytimes.com/2015/09/12/business/dealbook/justice-dept-shift-on-white-collar-crime-is-long-overdue.html, accessed on Dec. 16, 2023.

The obituary may have been premature. The executives of FEC who approved the expenditure of moneys to fund Generation Now have been spared the inconvenience and indignity of criminal prosecution. The indictment in this case does not even mention them by name.

Campaign," and 2) using $15,000 of those funds to bribe Tyler Fehrman for "inside information about the ballot campaign." (*Id.* at 1250, 1283-84)

Longstreth and Cespedes pled guilty to the indictment pursuant to plea agreements reached with the government. (Cespedes Tr., R. 211, Page ID##6747-48; Longstreth Tr., R. 217, Page ID##7493-95) Clark died during the pendency of the proceedings. Householder and Borges exercised their right to a jury trial.

Prior to trial, Borges' attorneys attempted to persuade the district judge that the government's theory that their client's payment of $15,000 to Fehrman violated the wire fraud and Travel Act statutes was invalid. They filed a pretrial motion to strike the HSF and Travel Act language from the indictment. (Motion to Strike, R. 104, Page ID#1734)

The district judge orally denied the motion on the first day of trial (Day 1 Tr., R. 182, Page ID##4375-76) He issued a written order explaining his ruling after the trial had concluded. (Order, R. 284, Page ID#11157)

A *Laffler* hearing was conducted immediately prior to jury voir dire. The government stated it had offered Borges a recommended sentence not exceeding six months imprisonment in exchange for a guilty plea and substantial assistance.

Borges confirmed his rejection of the offer. (Voir Dire Tr., R. 298, Page ID##11671-73)

The 27-day joint trial of Householder and Borges was a plodding and pedantic affair. The prosecutors too often immersed themselves in the most trivial of minutiae. Complications stemming from the Covid-19 pandemic contributed to the slow pace of the trial.

The district judge denied Borges' motions for a judgment of acquittal at the close of the prosecution's case-in-chief and at the close of all the evidence. (Day 19 Tr., R. 224, Page ID##8200-01; Day 22 Tr., R. 228, Page ID#8816) The jury returned guilty verdicts against both defendants. (Verdict, R. 263, Page ID#10648)

During pendency of the presentence investigation, the Supreme Court announced its decisions in *Ciminelli v. United States,* 598 U.S. 306, 143 S. Ct. 1121 (2023) and *Percoco v. United States*, 598 U.S. 319, 143 S. Ct. 1130 (2023). Borges' attorneys promptly filed a request for an extension of time to file post-trial motions premised on this new authority. (Motion for Leave, R. 258, Page ID#10563)

The motion asserted that *Ciminelli* and *Percoco* "stab directly at the heart of the government's case against Borges, the private-sector honest services wire

fraud predicate relating to [Tyler Fehrman]." (*Id*.) The district judge issued an order denying an extension ostensibly because "neither Supreme Court case has any bearing on Defendant's conviction, and any argument to the contrary would be frivolous." (Order, R. 265, Page ID#10656)

Following completion of the presentence report, the district judge sentenced Borges to a five-year prison term and three-year term of supervised release. (Judgment, R. 290, Page ID#11319) This timely appeal followed. (Notice of Appeal, R. 295, Page ID#11652)

## SUMMARY OF THE ARGUMENT

Under **Issue I**, Borges challenges the sufficiency of the evidence to support his conviction for participating in a RICO conspiracy. The "pattern" element of the offense required the government to prove an agreement between Borges and one or more members of the alleged conspiracy to commit at least two predicate racketeering acts. The government prosecuted Borges on a theory that his commission of two racketeering acts proved an agreement on his part to engage in such conduct.

Evidence from the FBI undercover sting operation disclosed that Borges paid money to an employee of a signature collection company for information about the number of signatures collected during various points in time during the effort to put HB 6 on the ballot. However, the government failed to offer evidence that the employee worked for a political committee formed to advocate for the voter referendum, that the signature tallies qualified as a traditionally recognized property interest, that the disclosure of the information would have breached a fiduciary duty between employee and employer, or that disclosure of the signature tallies would have posed an economic risk to the employer. Due to these omissions, Borges' payment did not violate the federal Travel Act or the wire fraud statute.

Although the evidence showed that Borges used a checking account of his consulting business to receive and disburse funds that were allocated for the efforts to defeat the HB 6 voter referendum campaign, this money did not constitute proceeds of specified unlawful activity, to wit, bribery.

Even when viewed from a perspective most favorable to the prosecution, the evidence was insufficient for a rational trier of fact to find that Borges had committed, or agreed that someone in the alleged conspiracy would commit, at least two racketeering acts. The district court should have granted his motions for a judgment of acquittal.

Under **Issue II**, Borges challenges the district judge's denial of his pretrial motion to strike the Travel Act and private sector HSF predicate act language from the indictment. The criminal rules permit a defendant to obtain a pretrial adjudication of any objection, defense or request that is capable of being determined without a trial of the merits of the charge. Borges' motion satisfied this criteria.

The Travel Act language accused Borges of violating a narrowly-drafted state statute that prohibits payments to an employee or agent of a political advocacy committee for the purpose of influencing him or obtaining information about the committee's organization. The intricate enforcement structure of this

statute indicates that Ohio considers regulation of political campaigns, including voter referendums, as strictly a local matter. The government's effort to use Borges' alleged violation of this statute as a Travel Act predicate violated constitutional principles of federalism.

The wire fraud language plainly identifies the object of Borges' alleged bribe as the voter signature count tallies. As a matter of law, this data did not qualify as a traditionally recognized property interest. It therefore was insufficient to form a basis for a private sector HSF wire fraud violation.

The government based its presentation of evidence and arguments to the jury on a theory that Borges agreed to a pattern of two or more racketeering acts by personally engaging in violations of the Travel Act and wire fraud statute. The denial of Borges' motion to strike the offending language from the indictment was not harmless beyond a reasonable doubt.

Under **Issue III**, Borges challenges the charge to the jury. The Travel Act and private sector HSF language should have been omitted from the jury instructions due to the government's failure to offer evidence to support Borges' commission of the alleged acts. In addition, the government's Travel Act theory violated principles of federalism, and the HSF language was based on Sixth Circuit precedent that is inconsistent with more recent Supreme Court rulings

curtailing the reach of the HSF statute. For reasons similar to those stated in support of Issue II, the jury instructional error was not harmless beyond a reasonable doubt.

Under **Issue IV**, Borges contends he was deprived of his right to a fair trial due to the cumulative effect of the district judge's erroneous evidentiary rulings. The judge abused his discretion by excluding testimony regarding the routine use of attorneys and law firms during the political process, by admitting incompetent second-hand testimony that was intended to link Borges to unlawful bullying tactics, and by admitting the cooperating codefendants' pleas of guilty to the same RICO conspiracy charges against Borges. When considered in the aggregate, the erroneous rulings were not harmless.

# ARGUMENT

Borges challenges his RICO conspiracy conviction on grounds of evidentiary insufficiency, a defective indictment, erroneous jury instructions, and erroneous evidentiary rulings. His arguments and points of authority follow.

## I.     BORGES' CONVICTION FOR CONSPIRACY TO PARTICIPATE IN A RACKETEERING ENTERPRISE IS NOT SUPPORTED BY SUFFICIENT EVIDENCE TO SATISFY THE DUE PROCESS CLAUSE.

● *Standard of Review*: A defendant's challenge to the sufficiency of the evidence to support his conviction requires a reviewing court to conduct a *de novo* examination of the evidence in a light most favorable to the prosecution for the purpose of determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Musacchio v. United States*, 577 U.S. 237, 243 (2016).

The Due Process Clause forbids the criminal conviction of any person "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). A sufficiency review requires an appellate court to assess the evidence against the elements of the crime. *Musacchio,* 577 U.S. at 243.

It was the government's burden to prove that Borges agreed to enter into an endeavor which, if completed, would have satisfied all the elements of a substantive RICO criminal offense. *United States v. Hofstetter*, 31 F.4th 396, 423 (6th Cir. 2022). The elements of a substantive RICO offense are: 1) the existence of an enterprise affecting interstate commerce; 2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4)  the participation occurred through a "pattern of racketeering activity." *Id*.

The "pattern" element of a RICO conspiracy charge requires proof of an agreement between the defendant and one or more members of the conspiracy to commit at least two predicate acts listed in 18 U.S.C. §1961(1). *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022). This Court has held that a defendant's commission of two or more predicate RICO acts provides a sufficient evidentiary basis for a rational jury to infer that he agreed "either he or someone else would commit at least two RICO predicate acts." *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008). This is the methodology that the government pursued against Borges.

The government portrayed Borges as a late entrant into the Householder Enterprise. (Day 1 Tr., R. 191, Page ID##4546-47) According to the indictment,

his role was to assist the Enterprise through conduct intended to defeat the HB 6 ballot referendum. (Indictment, R. 22, Page ID##1283-84)

The prosecutors asserted that Borges engaged in two categories of racketeering acts during the voter referendum period. (Day 24 Tr., R. 238, Page ID#9521-23) Specifically, they maintained that Borges violated 1) the Travel Act and/or the wire fraud statute by attempting to bribe Tyler Fehrman, a project manager for AMT, for the registered voter signature tallies, and 2) the money laundering statute by using the business checking account of his consulting firm to receive funds routed through Generation Now to defeat the referendum campaign. (*Id.*) Borges submits the government's evidence fell short of satisfying the demands of due process for the following reasons.

### A.   The Government Failed to Offer Sufficient Proof for a Rational Jury to Infer That Borges' Payment of $15,000 to Tyler Fehrman Violated the Travel Act.

The Travel Act prohibits the use of a facility of interstate commerce to promote or carry on certain unlawful activities, including "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. §1952(b)(2). The indictment alleges that Borges committed "bribery under Ohio Revised Code §3517.22(a)(2)." (Indictment, R. 22, Page ID#1257).

The cited paragraph of the state code is known as the Ohio Infiltration Statute. Subsection (A)(2) prohibits any person from "[p]romis[ing], offer[ing], or giv[ing] any valuable thing or valuable benefit to any person *who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue*, for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization."(Emphasis supplied).

The government presented evidence that Borges offered the AMT employee, Tyler Fehrman, a "valuable thing or benefit" – specifically money. The transaction is documented by text messages, audio recordings, and Fehrman's testimony. But notably absent from the government's proof is any evidence that Fehrman was an *employee* or *agent* of OACB, the committee formed to advocate for adoption of the HB 6 ballot referendum.

The Supreme Court has stated that absent a contrary indication in the statute, it is presumed that a legislature intends the term "employee" to mean "the conventional master-servant relationship as understood by common-law agency doctrine." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989). Ohio courts routinely cite the rule in *Reid* when interpreting the term "employee"

19

in state statutes. *See e.g. Marotto v. Ohio State Univ. Med. Ctr.*, 21 N.E.3d 643, 653 (Ohio App. 2014) (physician's appointment to courtesy medical staff of state-run hospital "failed to establish that he was an agent or employee of the state").

Fehrman's employment contract identifies AMT as his "employer." ( Gov. Ex. 624B, at 1, identified at Fehrman Tr., R. 224, Page ID##8120-21)  AMT is a *for-profit* corporation. (Roberson Tr., R. 216, Page ID#7501) The CEO of AMT testified "[a]ll of our employees are W-2 employees." (*Id.* at 7495) An AMT consultant confirmed that Fehrman was an employee of the corporation. (Gray Tr., R. 216, Page ID#7523)

Nor could the government plausibly argue that Fehrman was an agent of OACB by virtue of his employment with AMT. The Supreme Court of Ohio has explained that an agency relationship arises when the hiring party retains "the right to control the mode and manner of doing the work contracted for." *Councell v. Douglas*, 126 N.E.2d 597, 599 (Ohio 1955). Accord  *United States v. Frost*, 125 F.3d 346, 366-67 (6th Cir. 1997) (creation of agency relationship requires "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.") In contrast, if the hiring party "is interested

20

merely in the ultimate result to be accomplished, the relation is that of employer and independent contractor." *Councell,* 126 N.E.2d at 599.

The CEO of AMT testified that OACB retained his company to collect the minimum number of "valid signatures from registered voters in the State of Ohio to qualify the referendum." (Roberson Tr., R. 216, Page ID#7492) He insisted "we run petitions, we don't have any relationship with the funders." (*Id.* at 7510) He stated his company exercised exclusive control over the manner in which the signature collection effort was organized, staffed, and executed. (*Id.* at 7495-99). Fehrman's contract states that AMT reserved the right "in its sole discretion [to] unilaterally and significantly change the Employee's job title and duties." (Gov. Ex. 624B, at 2, identified at Fehrman Tr., R. 224, Page ID##8120-21,)

The CEO's testimony confirmed that the ballot committee was interested "merely in the ultimate result to be accomplished" by its contract with AMT. (Roberson Tr., R. 216, Page ID#7492)  AMT therefore was an independent contractor for OACB. It logically follows that if AMT was not an "agent" of the ballot committee, then Fehrman, its employee, could not be considered an agent of OACB.

This Court should reject any overture by the government for a more liberal interpretation of the scope of the Ohio Infiltration Statute. The Ohio General

Assembly has directed that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." Ohio Revised Code §2901.04(A). And the Supreme Court of Ohio has declared that "when interpreting criminal statutes, . . .we don't default to interpreting the statute so as to allow the state to punish more rather than less. Indeed, the exact opposite is true." *State v. Pendergrass*, 164 N.E.3d 306, 310 (Ohio 2020).

Even when the testimony of AMT's CEO is considered in a light most favorable to the prosecution, no rational trier of fact could have found that Borges violated the plain language of the Infiltration Statute by paying a bribe to an "employee" or an "agent" of the ballot committee seeking to place HB 6 on the ballot. The government therefore failed to produce sufficient evidence that Borges committed (or agreed with others to commit) a violation of the Travel Act.

> **B.    The Government Failed to Offer Sufficient Proof for a Rational Jury to Infer that Borges' Payment of $15,000 to Tyler Fehrman Violated the Wire Fraud Statute.**

The federal wire fraud statute proscribes the use of an instrumentality of interstate commerce to further "any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §1343. The government asserted that Borges' payment of $15,000 to Fehrman violated this statute.

1. **The government failed to demonstrate that the object of the alleged bribe was a traditionally recognized property interest.**

The traditional form of wire fraud under §1343 "requires the government to prove that the object of the fraud was money or property in the victim's hands." *United States v. Abdelaziz*, 68 F.4th 1, 33 (1st Cir. 2023) (cleaned up). In a typical case, "the victim's loss of money or property supplie[s] the defendant's gain, with one the mirror image of the other[.]" *Skilling v. United States*, 561 U. S. 358, 400 (2010).

"Money or property" under the statute includes intangible property interests – such as "confidential business information" – that have "long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Confidential business information" encompasses interests such as proprietary "news matter," *Carpenter*, at 25, "research and test data," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984), and intellectual property. *United States v. Yu Zhou*, No. 2:19cr163, 2020 U.S. Dist. LEXIS 24311, *3-4 (S.D. Ohio Feb. 12, 2020). Raw data does not qualify. Cf. *Feist Publications, Inc. v.*

23

*Rural Tel. Serv. Co.,* 499 U.S. 340, 362-63 (1991) ("raw data does not satisfy the originality requirement" for copyright protection.)

The standard for determining the existence of a protected property interest is objective. The Supreme Court reiterated this point in its recent opinion in *Ciminelli* . Mr. Ciminelli was convicted of wire fraud based on his procurement of construction  contracts for a large-scale development project in Buffalo, New York administered by a nonprofit entity.

At trial, federal prosecutors presented evidence that Ciminelli had engaged a lobbyist to pay off a board member of the non-profit entity so that the board of directors would develop metrics for the bid process favoring Ciminelli's construction company. *Id.* 143 S.Ct. at 1125. The prosecution pursued a theory that, by rigging the bid process, Ciminelli deprived the non-profit entity of "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Id.* at 1126.

Unanimously voting to reverse Ciminelli's conviction, the justices emphasized that "the wire fraud statute reaches only traditional property interests." *Id.* at 1128.  The lead opinion, authored by Justice Thomas, points out that the Second Circuit line of cases adopting a right-to-control theory "could

24

cite no authority that established 'potentially valuable economic information' as a traditionally recognized property interest." *Id.* at 1127.

The Court reasoned that by treating "*mere information* as the protected interest, almost any deceptive act could be criminal." *Id.* at 1128 (emphasis supplied) It ruled that in the absence of a "clear statement by Congress" that the wire fraud statute extends to schemes involving interests other than traditionally recognized property interests, – "the right to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.*

The government failed to prove that Borges paid Fehrman for the purpose of obtaining an interest that has "long been recognized as property." The registered voter signature counts consisted of raw data or "mere information" required by state law to place the initiative on the ballot. See Ohio Revised Code §§3519.01, 3519.04. This data bore no similarity to a news article or column, *Carpenter*; scientific research and testing data, *Ruckelshaus*; or intellectual property (patents and trade secrets), *Yu Zhou*.

Even the employment contract between Fehrman and his employer recognized this point. It explicitly excludes from the category of "confidential information" any data that will "subsequently become[] generally available to the

25

public." (Gov. Ex. 624B, at 4, identified at Fehrman Tr., R. 224, Page ID##8120-21)

The government hoped to sidestep the "money or property" element of §1343 by proceeding under an alternate theory that Borges' conduct deprived AMT of the honest services of its employee pursuant to 18 U.S.C. §1346,which. This statute states that a "scheme or artifice to defraud" under the mail and wire fraud statutes includes "a scheme or artifice to deprive another of the intangible right of honest services." The statute is Congress' legislative response to the Supreme Court decision in *McNally v. United States*, 483 U.S. 350 (1987), which held that the mail fraud statute (and by extension the wire fraud statute) does not embrace honest services theories of fraud. *Skilling,* 561 U. S. at 402.

The government's reliance on §1346 was misplaced. Courts have held that the statute does not spare the prosecution from having to prove that a fraudulent scheme (even one involving a deprivation of honest services) implicates a recognized property interest. In *Skilling*, the Supreme Court upheld the statute against a void for vagueness challenge by making clear that the "intangible right" under §1346 "covers only schemes in which the defendant deprives another of his honest services by participating in a bribery or kickback scheme." *United States v. Terry*, 707 F.3d 607, 611 (6th Cir. 2013).

26

The *Skilling* majority cited *United States v. Procter & Gamble Co.*, 47 F. Supp. 676 (D. Mass. 1942) as "perhaps the earliest application of the theory to private actors." *Skilling*, at 401. The opinion in *Procter & Gamble* recognizes that the bribery scheme must be directed to obtaining a property interest belonging to the victim.

The indictment in that case alleged the defendants paid gratuities and bribes to employees of a business competitor in exchange for "secret processes" and "formulas." *Id.* 47 F. Supp. at 678. In denying a defense demurrer to the sufficiency of the indictment, the district court was satisfied that the object of the alleged bribery scheme involved "money or property belonging to [the business competitor] within the meaning of [the statute]." *Id.* at 679.

Sixth Circuit case law is consistent with this understanding. In a pre-*Skilling* case, this Court emphasized that "the intangible right to honest services in the private sector [is] ultimately dependent upon the property rights of the victim." *Frost*, 125 F.3d at 369.

Borges' prosecutors were unable to cite any legal or historical source for their claim that the signature counts constituted property. As in *Ciminelli*, they insisted that "mere information" was a protected interest. The evidence was thus

27

insufficient for a rational juror to find that the prosecution had satisfied the property element of private sector HSF.

### 2. The government failed to demonstrate that Borges' payment to Fehrman for the signature counts would have resulted in a breach of a fiduciary duty to his employer.

In *Skilling*, the majority indicated that the HSF doctrine's "solid core" requires proof that the employee's acceptance of a bribe violated a fiduciary duty to his employer. *Id.* 561 U.S. at 408. Justice Scalia's concurring opinion expressed a concern regarding the lack of agreement in the case law as to "the source of the fiduciary obligation[.]" *Id.* at 417 (Scalia, J., concurring).

The Supreme Court addressed this concern in the recent opinion in *Percoco*, 143 S. Ct. at 1137-38. According to one district court decision, "*Percoco* requires that the fiduciary duty's existence (source of the duty) be established separately from the bribery or kickbacks scheme (type of conduct); and moreover, that the existence of the fiduciary duty must be established by more than a 'smattering' of pre-*McNally* cases." *United States v. Full Play Grp.*, S.A., No. 15-CR-252, 2023 U.S. Dist. LEXIS 155565, *70, n. 25 (E.D.N.Y. Sept. 1, 2023).

In the pre-*Skilling* opinion in *Frost*, the appellate panel declared "[i]t is axiomatic that an employee has a fiduciary duty to protect the property of his employer." *Id.* 125 F.3d at 366. Citing the Supreme Court opinion in *Carpenter,* the panel indicated that the property interest must be one that is protected by law, such as "confidential business information." *Id.* 484 U.S. at 27. The government was unable to prove that Borges' offer to Fehrman implicated a traditionally recognized property interest that Fehrman had a fiduciary duty to protect.

The government's proof fares no better under state law. In Ohio, a fiduciary relationship requires "more than the ordinary relationship of employer and employee." *State v. Massien*, 926 N.E.2d 1282 (Ohio 2010).

The CEO of AMT testified that as project manager of the Columbus hub, Fehrman was expected to "supervise the operation in that region of the state, manage petition circulators, manage the office, [and] coordinate with me and others in management on a daily basis." (Roberson Tr., R. 216, Page ID#7501) This testimony describes a prototypical relationship between an employer and a supervisory-level employee. This testimony was insufficient to carve out an exception to the Ohio rule that an employee generally does not owe a fiduciary duty to his employer.

29

### 3. The government failed to demonstrate that Borges intended to injure Fehrman's employer, or that he reasonably could have foreseen an economic risk to the employer.

In a prosecution for traditional wire fraud under §1343, the government must prove the defendant intended to injure the victim. *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014). In *Frost,* the panel adopted a lower standard for proving criminal intent in a prosecution for honest services fraud under §1346:

> Unlike a defendant accused of scheming to defraud another of money or property, [] a defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim. Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim.

*Id.* 125 F.3d at 369.[2]

Fehrman testified that Borges asked him for a copy of his employment contract with AMT. (Fehrman Tr., R. 224, Page ID#8133) On cross-examination,

---

[2]In the argument under Issue III, Borges explains why this diluted standard for proving *mens rea* in a private sector HSF prosecution is no longer valid in light of *Skilling* and the recent Supreme Court ruling in *Percoco*. For purposes of his sufficiency challenge, Borges contends the government's proof on mens rea fell short even under the *Frost* standard.

he agreed with defense counsel that Borges did not want him to breach a duty to his employer under a non-disclosure agreement ("NDA") in the contract:

> Q.    Well, this was a topic that was brought up several times during these conversations with Matt, right, your NDA?
>
> A.    Yes.
>
> Q.    And Matt had told you he did not want you to violate your NDA, right?
>
> A.    He stated that during one of our conversations, yes.
>
> Q.    Actually stated on that second call on September 5th: If you can be bought out and you can and you have a nondisclosure that you would not violate; do you recall that?
>
> A.    I do.

(*Id*. at 8179-80)

The CEO of AMT was unable to identify a genuine "business risk" that his company would have suffered in the event that Borges' effort to obtain the signature counts had been successful. He testified OACB agreed to waive any penalties for not collecting enough signatures for placing the referendum on the ballot. He attributed this accommodation to the ballot committee's desire for AMT to hire "additional sub vendors."(Roberson Tr., R. 216, PageID#7511)

Over objection, the CEO stated that "failing to qualify" for the ballot was "costly" in the sense that it was a "bad result." (*Id.* at 7508) But on cross-

examination, he conceded his company was paid in full, and suffered no financial loss under its contract with OACB. (*Id.* at 7511) At one point, he even bragged about "qualif[ying] more state-wide initiatives than any company in the country last year." (*Id.* at 7516)

Counsel for the government attempted to conflate OACB and AMT as being one and the same actor. Yet, in a moment of candor, he admitted that Borges contemplated that the foreseeable harm was to the ballot campaign, not the signature collection firm:

> And so the actions of Mr. Borges and his attempts to get the signature information, to get that information and then use it for purposes of the enterprise so they could use that to keep them -- the ballot campaign from collecting enough signatures, *doing that was -- that was harmful to the ballot campaign*, *and they know it.* That's the reason that they wanted to do it. That's the reason why they wanted the information.

(Day24 Tr., R. 238, Page ID#9528, emphasis supplied)

Thus, even under *Frost*'s more benign *mens rea* standard, the government failed to demonstrate that Borges "reasonably contemplated" that Fehrman's employer "would suffer a concrete business harm" if his attempt to obtain the signature counts had succeeded. *Id.* 125 F.3d at 369.

32

In sum, Borges' payment for the signature tallies did not provide a valid basis for a rational trier of fact to find that he committed (or agreed with others to commit) a violation of the wire fraud statute under an HSF theory.

### C.    The Government Failed to Offer Sufficient Proof for a Rational Jury to Infer That Diversion of Generation Now Money Through Borges' Business Checking Account Violated the Money Laundering Statute.

18 U.S.C. §1956(a)(1)(v)(i) criminalizes the laundering of proceeds of specified unlawful activity to conceal its unlawful source. *United States v. Nedelcu*, 46 F.4th 446, 450 (6th Cir. 2022). The government contended that the flow of Generation Now money into and out of Borges' business checking account violated this statute.

Even assuming the government produced sufficient evidence that Borges knew the use of his checking account was to conceal the source of funds from FEC, it still needed to establish that those funds were proceeds of unlawful activity specified in the money laundering statute. *Nedelcu*. It failed in this regard.

Counsel for the government told the jury in closing argument that 17 Consulting was "the recipient of the bribe money." (Day 24 Tr., R. 238, Page

ID#9535) But he never articulated a legal or factual basis for making this absolute statement.

The government had pursued a theory that FEC (and its subsidiaries) paid millions of dollars to Householder and members of his enterprise as a bribe for introducing and passing HB 6. (Tr., R. 238, Page ID#9266) A bribery scheme ends when the bribe money has been paid for the official act. *United States v. Pacchioli*, 718 F.3d 1294, 1302 (11th Cir. 2013).

The Ohio Governor signed HB 6 into law on July 23, 2019. (Wetzel Tr., R. 201, Page ID#5659) By this time, FEC had disbursed the last of the alleged bribe money in exchange for the legislation.

The case agent testified that Borges' first communication regarding his willingness to assist in defeating the referendum campaign  was a text message to a business associate dated August 4, 2019. Borges wrote: "Generation Now (Householder) wants to bring us on to help run part of the anti-referendum campaign. I was on a conference call a little bit ago  and believe we have the green light to move forward." (*Id.* at 5660)

The purpose of the deposits of Generation Now money into 17 Consulting's bank account was to defeat the referendum. However one may feel about the appropriateness of expending corporate funds for this purpose, the

deposits did not involve proceeds of bribery. Therefore, the 17 Consulting bank account transactions did not constitute money laundering.

In sum, the government prosecuted Borges for a RICO conspiracy on a theory that his commission of two predicate acts supplied the factual basis for a rational juror to infer that "either he or someone else would commit at least two RICO predicate acts." *Lawson*, 535 F.3d at 445. The evidence fell well below the legal threshold for proving that Borges committed predicate violations of the Travel Act, the wire fraud statute, or the money laundering statute.

The district court therefore erred in denying Borges' motions for acquittal on the single charge of the indictment. For these reasons, Borges asks this Court to grant him relief upon his first issue presented for review.

**II.    THE DENIAL OF BORGES' MOTION TO STRIKE THE TRAVEL ACT AND PRIVATE SECTOR HONEST SERVICES FRAUD ALLEGATIONS FROM THE INDICTMENT WAS ERROR THAT DEPRIVED HIM OF HIS DUE PROCESS RIGHT TO A FAIR JURY TRIAL.**

● *Standard of Review*: A denial of a pretrial motion raising an objection or defense to the indictment pursuant to Fed. R. Crim. P. 12(b)(1) is reviewed *de novo*. *United States v. Levin*, 973 F.2d 463, 470 (6th Cir.1992) (by implication).

Rule 12(b)(1) permits a defendant to obtain a pretrial ruling "when there is under consideration a threshold issue, as to which the facts are uncontested, which comprise questions of law and not fact." *United States v. Garcia*, 143 F. Supp. 2d 791, 796 (E.D. Mich. 2000) (cleaned up). "A district court may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *Id.* (cleaned up).

Borges' pretrial motion asked the district judge to strike the "specific allegations of private sector honest services fraud and the Travel Act" from the indictment. (Motion to Strike, R. 104, Page ID#1737)[3] The denial of the motion was error for the following reasons.

### A.    The Travel Act Language in the Indictment Violates Principles of Federalism by Elevating an Alleged Violation of the Ohio Infiltration Statute to the Status of a RICO Predicate Act.

---

[3]Although styled as a "motion to strike prejudicial surplusage" pursuant to Fed. R. Crim. P. 7(d), the pleading asserts that the indictment alleges conduct that on its face is not a racketeering act under the RICO statute. "[A]n incorrect reference to the Rules is not fatal where the substance of the motion is plain." *Wagner v. Higgins*, 754 F.2d 186, 188 (6th Cir. 1985) The motion is therefore appropriately considered as one seeking a ruling pursuant to Rule 12(b)(1).

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law. . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *United States v. Lopez*, 514 U.S. 549, 561, n. 3 (1995) (cleaned up).

The Supreme Court has cautioned that an unduly expansive enforcement of the Travel Act "would alter sensitive federal-state relationships. . . . and might well produce situations [that] would transform relatively minor state offenses into federal felonies." *Rewis v. United States*, 401 U.S 808, 812 (1971). Borges' pretrial motion asserted that the  indictment violates this principle of federalism by elevating an alleged violation of a unique statute in Ohio's election laws to the status of a RICO predicate act. (Motion to Strike, R. 104, Page ID#1751-52)

In a post-trial order explaining his oral denial of Borges' motion, the district judge cited the Supreme Court opinion in *Perrin v. United States*, 444 U.S. 37 (1979) as supporting his belief that "the Travel Act's application here is precisely what Congress intended the Travel Act to accomplish." (Order, R. 284, Page ID#11167) The legislative history recited in *Perrin* does not support this view.

One of the questions in *Perrin* was whether the federal government could use a state statute proscribing commercial bribery of private employees as a predicate for a Travel Act prosecution. The Court noted that "Congress recognized [] that bribery of private persons was widely used in highly organized criminal efforts to infiltrate and gain control of legitimate businesses, an area of special concern of Congress in enacting the Travel Act." *Id.* 444 U.S. at 48. This history indicated "beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." *Id.* at 42.  Against this backdrop, the Court concluded that "Congress intended 'bribery . . . in violation of the laws of the State in which committed as used in the Travel Act to encompass conduct in violation of state commercial bribery statutes." *Id.* at 50.

The Infiltration Statute has nothing to do with commercial bribery or economic regulation. The Ohio General Assembly did not contemplate federal enforcement assistance when it passed the statute. On the contrary, the statutory scheme reveals that state legislators were unwilling to give even state prosecutors discretion to investigate and prosecute crimes defined in Chapter 3517 of the Ohio Revised Code, dealing with elections, initiatives and voter referendums.

An opinion of this Court summarizes the procedural maze that an aggrieved party must navigate to bring a criminal charge for a violation of §3517.22:

> No person can be prosecuted for violating Section 3517.22 unless a complaint first has been filed with the [Ohio Elections] Commission. A complaint may be filed by the secretary of state, an official at the board of elections, or any person who submits an affidavit based on personal knowledge. If a complaint alleging a violation of Section 3517.22 is filed ninety or fewer days before a general election, a panel of at least three members of the Commission must hold an expedited hearing in order "to determine whether there is probable cause to refer the matter to the full commission for a hearing."
>
> At the expedited hearing, the panel can take one of three actions. It can (1) dismiss the complaint, (2) find that there is probable cause to refer the matter to the full Commission for further consideration, or (3) find that the evidence is insufficient for the panel to make a probable cause determination, in which case it must request that an attorney further investigate the complaint and refer the matter to the full Commission for a hearing. If the matter is referred to the full Commission, it must hold a hearing to "determine whether . . . the violation alleged in the complaint has occurred." If the Commission finds that a violation of section 3517.22 has occurred, it must refer the matter to the county prosecutor. . . . A party may appeal an adverse determination of the Commission to the county's court of common pleas.

*Coast Candidates PAC v. Ohio Elections Comm'n,* 543 Fed. Appx. 490, 492 (6th Cir. 2013) (cleaned up), *vacated on other grounds*, 573 U.S. 928 (2014).

It is reasonable to infer from this tangled statutory procedure that Ohio views regulation of political campaigns, including referendums, as strictly a local matter. The legislative history of the Travel act does not support the district judge's conclusion that Congress intended to intrude on an individual state's enforcement of election crimes.

The jurisprudential landscape regarding the reach of federal jurisdiction under the Commerce Clause over non-economic crimes has changed significantly since *Perrin.* See *Garcia*,  143 F. Supp. 2d at 798, citing  *United States v. Morrison*, 529 U.S. 598 (2000) (invalidating the Violence Against Women Act which provided a federal civil remedy for victims of gender-motivated violence) and  *Jones v. United States*, 529 U.S. 848 (2000) (holding that the federal arson statute cannot be applied to the arson of an owner-occupied dwelling that was not used in commerce or in an activity affecting commerce.)

This Court has acknowledged the importance of the principle that "[t]he Constitution requires a distinction between what is truly national and what is truly local." *United States v. Wang,* 222 F.3d 234, 240 (6th Cir. 1999), quoting *Morrison*, 529 U.S. at 617. To paraphrase language in *Wang*, "[d]ue regard for this admonition require[d] that [Borges'] case" as to an alleged violation of a state political prohibition "be heard in state court." *Id.*

### B. The Factual Allegations in the Indictment Are Insufficient as a Matter of Law to Support a Predicate RICO Act Based on Honest Services Fraud under 18 U.S.C. §1346.

The indictment alleges that Borges attempted to pay Fehrman for "inside information" consisting of "the total number of signatures the Ballot Campaign had collected." (Indictment, R. 22, Page ID#1283, at ¶¶126-27) Borges' motion to strike asserts that voter signature tallies do not qualify as a "protected property interest," and that "[t]he Government's attempt to expand §1346 through a novel theory using the amorphous term 'inside information' must fail." (Motion to Strike, R. 104, Page ID##1747-48)

The district judge's post-trial order does not address this objection. In a footnote, it explains: "Given the timing of Defendant's motion, i.e. pretrial, the Court need not further address, in this Order, the peripheral arguments as to the legal sufficiency of the government's theory of the case." (Order, R. 284, Page ID#11163, n. 5)

This Court has stated that a district court should exercise its authority under Rule 12(b) if undisputed facts demonstrate that the government will be incapable as a matter of law of proving an essential element of the charged

41

offense. *Levin*, 973 F.2d at 469. The district judge's belief that the issue was not ripe for pretrial adjudication is incorrect.

This Court has held that in a prosecution for private sector HSF, the government must prove that the bribe was offered in exchange for a recognized property interest of the employer. *Frost,* 125 F.3d at 366. In the argument under Issue I of this brief, Borges explains why the registered voter counts do not qualify as property under *Carpenter* and *Ciminelli*. This was clearly an "objection, defense or request" that the "the court c[ould] determine without trial of the merits" pursuant to Rule 12(b)(1). The district judge erred as a matter of law when he denied Borges a favorable pretrial ruling on this important issue.

> ### C.    Borges' Was Prejudiced by the District Judge's Denial of His Motion to Strike the Travel Act and Honest Services Fraud Language from the Indictment.

The district judge's denial of Borges' motion to strike the Travel Act and private sector HSF language from the indictment was prejudicial. Although the indictment was not submitted to the jury, the government based its presentation of evidence and arguments on a theory that Borges conspired to commit two or more predicate RICO acts by personally committing the requisite number of predicate acts.

The closing arguments focused almost entirely on the payment to Fehrman. The opening portion of the government's argument consumes ten transcript pages discussing the "Fehrman bribe" and the reasons why the prosecution believed the conduct amounted to private honest services fraud ("HSF") and a Travel Act violation. (Day 24 Tr., R. 238, Page ID##9521-23, 9526-32) As for Borges' alleged involvement in money laundering – one paragraph. (*Id*. at 9535)

The rebuttal argument is slightly less lopsided. Four transcript pages of argument are directed to the "Fehrman bribe" (Day 25 Tr., R. 239, Page ID##9640-44); two paragraphs to money laundering. (*Id.* at 9638)

This Court's decision in *Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989) supports Borges' position that the denial of his motion to strike was not harmless. A federal jury had convicted Attorney Callanan and Judge Callanan, his father, of a RICO conspiracy count that alleged multiple predicate acts of mail fraud, bribery, and obstructing justice. The jury also convicted Attorney Callanan of several substantive counts of mail fraud and one count of obstructing justice. *Id.* at 231.

A panel of this Court reversed both defendants' mail fraud convictions that were based on a prohibited tangible rights theory. *Id.* at 233-34. The government argued that the reversal of those convictions should not undermine Attorney

Callanan's RICO conspiracy conviction because the jury could have found that he had agreed to the commission of at least two <u>non</u>-mail fraud acts of racketeering. *Id.* at 235.

The appellate panel was unwilling to indulge in this leap of conjecture. It agreed that the guilty verdict on a companion obstructing count supplied a basis for inferring that the jury found Attorney Callanan had agreed to commit at least one <u>non</u>-mail fraud racketeering act. But it said it had "no basis for knowing what other predicate act or acts the jury found Attorney Callanan assented to in joining the conspiracy." *Id.* It therefore reversed his conviction on the RICO conspiracy count. *Id.*

The government successfully opposed Borges' request for interrogatories directed to identifying the jury's findings of the predicate acts attributable to each defendant. (Day 23 Tr., R. 237, Page ID#9386) Thus, this Court has no basis for knowing whether the jury found an agreement on his part to commit two or more acts of money laundering.

Accordingly, it must be presumed that the error associated with the refusal to strike the HSF and Travel Act language in the indictment adversely affected or influenced the jury's verdict, and was not harmless beyond a reasonable doubt.

For these reasons, Borges asks this Court to grant him relief upon his second issue presented for review.

### III.   ERRONEOUS JURY INSTRUCTIONS DEPRIVED BORGES OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND RELIABLE JURY VERDICT.

● *Standard of Review*: This Court reviews the legal accuracy of jury instructions de novo, and a district court's refusal to give a proposed instruction for an abuse of discretion. *United States v. Zheng*, No. 22-5516, 2023 U.S. App. LEXIS 31374, *8, 87 F.4th 336 (6th Cir. Nov. 28, 2023).

A trial court's instructions "must, as a whole, accurately reflect the law." *Dimora v. United States*, 973 F. 3d 496, 502 (6th Cir. 2020) (cleaned up). A jury instruction violates a defendant's constitutional right to due process if it: 1) fails to require the government to prove each essential element of a criminal charge, *Middleton v. McNeil*, 541 US 433, 437 (2004), or 2) allows the jury to convict him for conduct "that was not unlawful." *Dimora*, 973 F. 3d at 502.

The instructions in Borges' trial failed to supply the jurors with accurate guidance for deciding whether the government had satisfied its burden of proving the "pattern" element of the RICO conspiracy charge. The instructions also allowed the jury to convict Borges for predicate conduct that did not violate the

Travel Act or the wire fraud statute. Taken as a whole, the errors in the instructions rose to the level of a due process violation for the following reasons.

**A.    The Travel Act Language in the Jury Charge Violated Principles of Federalism and Lacked an Evidentiary Basis for Submitting the Predicate Act to the Jury.**

Over defense objection, the district judge gave the jurors an instruction permitting them to find a Travel Act violation based on a violation of the Ohio Infiltration Statute. (Day 23 Tr., R. 237, Page ID##9374-75, 9436-37) There are two reasons why the inclusion of any Travel Act instruction was error.

First, as discussed in Borges' argument under Issue II, the government's attempt to premise a Travel Act violation on the basis of a violation of the Ohio Infiltration Statute violated principles of federalism. Second, aside from this constitutional impediment, the government simply failed to offer evidence from which a rational juror could find that Fehrman was an employee or agent of a ballot campaign within the scope of the Infiltration Statute.

**B.    The Private Sector Honest Services Fraud Language in the Jury Charge Lacked an Evidentiary Basis for Submitting the Predicate Act to the Jury and Improperly Permitted the Jury to Find Borges Guilty of Committing or Agreeing to Commit Wire Fraud on the Basis of Conduct That Does Not Violate the Statute .**

Over defense objection, the district judge gave the jurors an instruction permitting them to find a predicate RICO act on the basis of a private sector HSF violation. (Day 23 Tr., R. 237, Page ID#9366, 9430-34) As discussed in the argument under Issue I, the evidence at trial was insufficient for a rational juror to find that the voter signature counts qualified as a traditionally recognized property interest, or that a fiduciary relationship existed between employer and employee, or that Borges intended to injure the employer even under *Frost*'s more lenient foreseeability of harm standard. Therefore, an HSF instruction should not have been given to the jury.

Alternatively, Borges submits that even if the evidence supported a theory of honest services fraud, the instruction was inaccurate. Borges' attorneys filed a written request for an instruction tracking the Supreme Court's language in *Carpenter* to the effect that  an employee's fiduciary duty to his employer is limited to protecting "confidential business information." The request incorporated a definition of that term derived from the opinion in *Carpenter*. (Request for Instructions, R. 174, Page Id##4064-65) Defense counsel reiterated this request during the jury charge conference. (Day 23 Tr., R. 237, Page ID##9361-63)

The district judge declined to give the proposed instruction. Instead he told the jury that "[t[he actual or intended breach of the fiduciary duty must be participation in a bribery scheme involving the actual, intended, or solicited exchange of a thing of value in exchange for the employee improperly providing *information that the employer intended to keep secret*[.]" (*Id.* at 9432, emphasis supplied) This standard has no support in any Supreme Court or Sixth Circuit case law.

The opinion of the Supreme Court in *Ciminelli* expressly rejects the idea that the existence of a protected property interest is determined according to the subjective expectations of the alleged victim.  The Court stated that the object of the fraudulent scheme must be "an interest that ha[s] long been recognized as property when the wire fraud statute was enacted." *Id.* 143 S.Ct. at 1127 (cleaned up)

*Carpenter* defined  "confidential business information" as "a species of property to which the [business] has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy." *Id.* 484 U.S. at 26 (cleaned up). Borges' proposed instruction was consistent with this understanding. The district judge abused his discretion when he declined to give it.

The instruction that was given to Borges' jury defined the protected property interest as any information the employer subjectively desired to keep "secret." This statement conflicts with *Ciminelli* and *Carpenter,* and is inaccurate as a matter of law.

The HSF instruction incorporated *Frost*'s forseeability of economic harm language by telling the jurors that:

> When the defendant or conspirator is the bribe payor, it is sufficient if the defendant or conspirator intends or solicits the employee to violate his duty of honest services to the employer in exchange for a thing of value and that the defendant foresaw, or should have foreseen, that the employer might suffer economic harm as a result of the intended or solicited breach of fiduciary duty.

(Day 23 Tr., R. 237, Page ID#9433)

This language is inconsistent with *Skilling* and the recent ruling of the Supreme Court in *Percoco.* The latter directs that honest services fraud "must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a *smattering* of pre-*McNally* decisions." *Id.* 143 S. Ct. at 1137 (emphasis supplied).

The "smattering" of case law in *Percoco* consisted of a Second Circuit opinion, which held that a private individual "owes a fiduciary duty to the general citizenry" if he has a "special relationship with the government" or

exercises "de facto control" over government decisions. *Id.* at 1136, quoting *United States v. Margiotta*, 688 F.2d 108 (2nd Cir. 1981). The Court concluded that the *Margiotta*-based jury instructions in Percoco's trial did not "define "the intangible right of honest services with sufficient definiteness that ordinary people can understand what conduct is prohibited, or in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 1138 (cleaned up).

*Percoco*'s "smattering" limitation applies here. The foreseeability standard in *Frost* relied on a single pre-*McNally* decision from the District of Columbia Court of Appeals, which held that "an employee deprives his employer of honest services when the defendant might reasonably have contemplated some concrete business harm to his employer stemming from his failure to disclose the conflict along with any other information relevant to the transaction." *Id.* 125 F.3d at 368, quoting *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C. Cir. 1983) (cleaned up).

*Frost* weakened the already-murky language from *Lemire* by substituting foreseeability of harm ("the employee foresaw or reasonably should have foreseen") for "contemplated" harm, and by substituting possibility of harm ("might suffer an economic harm") for "concrete business harm." The end result is a nebulous theory of HSF that fails to  provide "ordinary people" with an

understanding of the prohibited conduct, yet succeeds in encouraging the federal government to engage in arbitrary and discriminatory enforcement.

An exception to the Law of the Circuit doctrine permits a panel of this Court to disregard antiquated Circuit precedent when the passage of time and intervening Supreme Court decisions require a reassessment and different approach. *United States v. Doggart*, 906 F.3d 506, 512 (6th Cir. 2018). The intervening Supreme Court precedent in *Skilling, Ciminelli* and *Percoco,* rather than *Frost,* should control this Court's assessment of the correctness of the HSF instruction given to the jury in Borges' trial. The foreseeability of harm standard is wholly inconsistent with this line of authority. Even when the HSF instruction is viewed "as a whole," it improperly permitted the jury to convict Borges on the basis of conduct "that was not unlawful." *Dimora*, 973 F. 3d at 502.

### C.    The Instructional Error in Borges' Trial Was Not Harmless Beyond a Reasonable Doubt.

Borges has already explained how the district judge's denial of his motion to strike the Travel Act and private sector HSF language from the indictment prejudiced him by opening the door to the government to present evidence and to argue that his payment to Fehrman constituted proof that he conspired to commit at least two predicate RICO act. He has also explained why the failure

51

to submit special interrogatories to the jury makes it impossible for a reviewing court to conclude that the erroneous ruling is harmless.

An error in instructing the jury in a criminal trial is not harmless unless a reviewing court is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the alleged instructional error in the trial. *Zheng*, 2023 U.S. App. LEXIS 31374, at *12. The errors in instructing the jury regarding the Travel Act and private sector HSF predicate acts prejudiced Borges for reasons analogous to those given in the argument under Issue II. The instructional error was not harmless beyond a reasonable doubt.

For these reasons, Borges asks this Court to grant him relief upon his third issue presented for review.

## IV. THE DISTRICT COURT'S ERRONEOUS EVIDENTIARY RULINGS DEPRIVED BORGES OF HIS DUE PROCESS RIGHT TO A FAIR JURY TRIAL.

● *Standard of Review*: This Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013).

The district judge precluded defense counsel from developing testimony concerning the retention and use of attorneys and law firms by the HB 6 proponents, permitted the CEO of the voter signature collection firm to testify

about the use of bullying tactics which he did not witness, and denied the defense's request to exclude testimony about the cooperating codefendant's guilty pleas to the same RICO conspiracy count. Borges contends that he was deprived of his due process right to fair trial by these erroneous evidentiary rulings.

> **A.    An Absolute Ban Against Background Testimony Regarding the Retention and Use of Attorneys Created a False Narrative That the House Bill 6 Proponents Conducted Business in a Manner Inconsistent With That of Persons Engaged in Legitimate Pursuit.**

Prior to opening statements, the government made a belated objection to the defense raising "an advice of counsel type defense which would be inapplicable to the charge in this case." (Day 1 Tr., R. 191, Page ID#4517) Defense counsel assured the district judge this was not their intent.

Instead they wished to elicit testimony about the routine retention and use of attorneys in order for the jury to have an understanding of the full narrative of events. (*Id.* at 4519-20) The judge did not issue a ruling, explaining "that's a closer question I need to look at [] carefully." (*Id.* at 4521)

Somehow this cursory exchange morphed into an *absolute* ban on such testimony.  The government lodged hair-trigger objections whenever an attorney

or law firm was mentioned during the trial. The district judge promptly sustained the objections, almost always without entertaining argument. (Day 1 Tr., R. 191, Page ID#4609; Wetzel Tr., R. 206, Page ID##6261-67; Wetzel Tr., R. 208, Page ID##6529-32, 6548-49; Cespedes Tr., R. 212, Page ID#6935, 6991-93; Longstreth Tr., R. 219, Page ID##7837-38)

Background or res gestae evidence is admissible if it concerns "those acts, the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). The testimony was expected to show that the HB 6 proponents routinely consulted with legal counsel in the ordinary course of organizing their fund raising activities. The district judge's rulings were clearly erroneous.

The exclusion of the testimony was prejudicial. Justice Ginsburg has explained that "[e]vidence has force beyond any linear scheme of reasoning, its pieces come together as a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Old Chief v. United States*, 519 U.S. 172, 187 (1997). The district judge's ruling contributed to the jury being fed a false narrative that Borges and the HB 6

proponents conducted business like gangsters, rather than in a manner that would be expected of individuals engaged in a lawful pursuit.

### B. Incompetent Testimony Created an Unfair and Unsubstantiated Inference That the House Bill 6 Proponents Engaged in Gangster-Style Behavior to Defeat the Voter Referendum.

Over defense objection, the CEO of AMT testified about physical and psychological bullying tactics by unidentified "opposition" members to disrupt his company's efforts to collect voter signatures. He claimed his employees were harassed, followed, screamed at, and stalked. (Roberson Tr., R. 216, Page ID##7498-7500) An AMT consultant gave similar testimony, again over objection. (Gray Tr., R. 216, Page ID#7525) Defense counsel complained "[i]t's all predicated on hearsay." (*Id.*) The district judge overruled the objections. (*Id.*)

Fed. R. Evid. 602 directs that a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. A witness lacks personal knowledge if it is apparent that his testimony is based upon what others have told him. *United States v. Smith*, 516 Fed. Appx. 592, 595 (6th Cir. 2013).

The two AMT witnesses did not claim that they observed the alleged incidents. The context of their answers plainly indicated they were relying on

hearsay accounts of employees. The district judge's evidentiary ruling was an abuse of discretion.

The testimony was prejudicial. It created an unsubstantiated and unfair inference that Borges and the pro-HB 6 faction had engaged in gangster-style conduct that the average juror would associate with racketeering.

### C. The Erroneous Admission of the Cooperating Codefendants' Guilty Pleas Prejudiced Borges by Creating a Substantial Likelihood That the Jury Would Use the Pleas as Proof That a RICO Conspiracy Existed.

Borges joined in Householder's pretrial motion to exclude the guilty pleas of government witnesses Longstreth and Cespedes. (Motion to Join, R. 183, Page ID#4462, joining Motion to Exclude, R. 181, Page ID#4360) The district judge orally denied the motions (Voir Dire Tr., R. 298, Page ID##11667-68), and permitted the witnesses to disclose to the jury the fact that they pled guilty to participating in the same conspiracy charged against Borges and Householder. (Cespedes Tr., R. 211, Page ID##6747-48; Longstreth Tr., R. 217, Page ID##7493-95)

It is error for the government to elicit testimony from a cooperating witness that he has pled guilty to a conspiracy count in the same indictment against a defendant. *United States v. Parker*, No. 80-5093, 1980 U.S. App. LEXIS 11061,

*2, 642 F.2d 453 (Table) (6th Cir. Dec. 29, 1980). This rule rests on the premise that "the jury could logically conclude that a conspiracy must have existed if the co-defendant has already admitted a conspiracy existed." *United States v. Clark*, No. 1:19-cr-148, 2020 U.S. Dist. LEXIS 28815, *35 (N.D. Ohio Feb. 20, 2020) (cleaned up).

Borges stipulated in writing that he was "willing to forgo a cooperating guilty plea agreement . . . based attack" on the cooperating witnesses. (Motion to Join, R. 183, Page ID#4462) The denial of his motion to exclude Longstreth's and Cespedes' guilty pleas was therefore an abuse of discretion.

In this prosecution, the existence of a RICO conspiracy was genuinely in dispute. The government elicited testimony from the cooperating witnesses in a manner plainly designed to convey to the jury that they would not have pled guilty unless a conspiracy actually existed. Under the circumstances, the erroneous ruling was prejudicial.

### D. The Combined Effect of the Erroneous Evidentiary Rulings Was So Prejudicial as to Render Borges' Trial Fundamentally Unfair.

Evidentiary errors are subject to harmless error review. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). The government "must show by a preponderance of the evidence that the error did not materially affect the

verdict." *Id.* When multiple errors are asserted, a reviewing court must assess whether "the combined effect of individually harmless errors was so prejudicial as to render [the] trial fundamentally unfair." *Adams*, 722 F.3d at 832.

The *Adams* case is instructive. The defendants appealed their RICO conspiracy convictions relating to a local vote-buying and vote-rigging enterprise. The hearing panel determined that the district court abused its discretion by admitting testimony about the defendants' alleged connection to unrelated drug trafficking activity, a highly inflammatory tabloid television story about the enterprise, and unsubstantiated hearsay testimony regarding witness intimidation.

The panel was unable to say that any one of the identified errors warranted reversal "on its own." It nevertheless granted the defendants a new trial due to the cumulative effect of the individual errors. It reasoned that the inadmissible evidence enabled the government to "to paint an unfair picture of defendants." *Id.* at 833.

Borges has recited the reasons why he was prejudiced by each category of erroneous rulings. The combined effect of the prejudice stemming from the first two categories (the exclusion of testimony regarding legal counsel and admission of hearsay about bullying tactics) was to "to paint an unfair picture" of Borges.

The admission of the codefendants' guilty pleas compounded the prejudicial impact by inviting the jury to infer the existence of a conspiracy by virtue of their willingness to admit participating in a conspiracy. Considered in the aggregate, the errors were not harmless.

For these reasons, Borges asks this Court to grant him relief upon his fourth issue presented for review.

## **CONCLUSION**

> To this day, no one knows what "honest-services fraud" encompasses. And the Constitution's promise of due process does not tolerate that kind of uncertainty in our laws—especially when criminal sanctions loom.

*Ciminelli,* 143 S. Ct. at 1139 (Gorsuch, J., concurring).

During the sentencing hearing, counsel for the government framed "the central issue at trial" as "the purpose of the $15,000 that [Borges] paid to Mr. Fehrman." He insisted that "the evidence at trial was clear that he paid this money for inside information that he could use to defeat the ballot campaign." (Sent. Tr., R. 286, Page ID##11248-49)

If Fehrman had been an employee or agent of the ballot campaign (he was not), a prosecution of Borges in the state courts would have exposed him to possible conviction and sentence for a relatively minor misdemeanor offense.

Instead the federal government prosecuted Borges for participating in a RICO conspiracy principally based on the accusation that the payment to Fehrman for "inside information" violated the honest services fraud statute.

This flimsy theory of guilt exposed Borges to "the kind of uncertainty in our laws" that the Constitution does not tolerate. He is serving a lengthy prison term as a consequence of the government's abuse of its charging and prosecuting authority.

Borges asks the Court to remedy this travesty of justice by issuing a finding that the evidence against him is legally insufficient to support a federal racketeering conviction, and by remanding his case to the district court for entry of a judgment of acquittal. Alternatively, he asks the Court to reverse his conviction due to evidentiary and instructional trial error, and to remand his case for a new trial.

s/Dennis C. Belli
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief has been produced in 14-point Times New Roman font and consists of 12,344 words. It therefore complies with the 13,000-word limit of Fed. R. App. P. 32 for opening briefs.


s/Dennis C. Belli_____
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT


CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, I electronically filed this document with the Clerk of this Court using the ECF system, which will send notification and a copy of such filing to Alexis Zouhary, Assistant United States Attorney, Attorney for Plaintiff-Appellee United States of America.


s/Dennis C. Belli_____
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Defendant-Appellant designates the following district court documents that

are relevant to this appeal:

| Description of Document | Date Filed | Record No. | Page ID# Range |
|---|---|---|---|
| Docket Sheet | N/A | N/A | N/A |
| Indictment | 07/30/2020 | 22 | 1247-89 |
| Motion to Strike Surplusage | 02/01/2022 | 104 | 1734-53 |
| Day 1 Trial Transcript | 01/25/2023 | 191 | 4512-4677 |
| Day 2 Trial Transcript | 01/27/2023 | 194 | 4713-4926 |
| Day 6 Trial Transcript | 02/06/2023 | 201 | 5500-5692 |
| Day 7 Trial Transcript | 02/08/2023 | 202 | 5693-5825 |
| Day 9 Trial Transcript | 02/11/2023 | 206 | 6066-6269 |
| Day 10 Trial Transcript | 02/13/2023 | 208 | 6474-6639 |
| Day 11 Trial Transcript | 02/21/2023 | 211 | 6642-6853 |
| Day 12 Trial Transcript | 02/21/2023 | 212 | 6854-7037 |
| Day 14 Trial Transcript | 02/21/2023 | 214 | 7113-7264 |
| Day 15 Trial Transcript | 02/24/2023 | 216 | 7415-7542 |
| Day 16 Trial Transcript | 02/24/2023 | 217 | 7543-7736 |
| Day 17 Trial Transcript | 02/26/2023 | 219 | 7804-7980 |
| Day 19 Trial Transcript | 03/02/2023 | 224 | 8110-8258 |
| Day 22 Trial Transcript | 03/05/2023 | 229 | 8613-8818 |
| Day 23 Trial Transcript | 03/09/2023 | 237 | 9342-9462 |

| Day 24 Trial Transcript | 03/09/2023 | 238 | 9463-9618 |
|---|---|---|---|
| Day 25 Trial Transcript | 03/09/2023 | 239 | 9619-9662 |
| Verdict | 03/09/2023 | 263 | 10648 |
| Presentence Investigation Report | 06/14/2023 | 274 | 10854-95 |
| Motion for Leave to File Post-Trial Motions | 05/15/2023 | 258 | 10563-65 |
| Order Denying Motion for Leave | 05/22/2023 | 265 | 10650-57 |
| Order Denying Motion to Strike | 06/27/2023 | 284 | 11157-67 |
| Sentencing Transcript | 07/06/2023 | 286 | 11226-11284 |
| Judgment | 07/06/2023 | 290 | 11319-25 |
| Notice of Appeal | 07/12/2023 | 294 | 11652 |
| Voir Dire Transcript | 08/31/2023 | 298 | 11661-11893 |