No. 23-3566

In the
# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MATTHEW BORGES,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:20-cr-77 (Black, J.)

## BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES

For the Appellee:

KENNETH L. PARKER
United States Attorney

ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ................................................................. v

Statement Regarding Oral Argument ..................................... ix

Statement of Jurisdiction......................................................... 1

Issues Presented ...................................................................... 2

Statement of the Case ............................................................. 3

    I. Factual Background ................................................... 5

        1. Householder sets his sights on Speaker of the House ....... 5

        2. FirstEnergy needs a billion-dollar bailout......................... 6

        3. Householder seeks a major benefactor. ............................. 7

        4. Householder and FirstEnergy make a secret deal ............. 7

        5. Generation Now is created to accept unlimited and undisclosed payments from FirstEnergy ........................... 8

        6. Generation Now recruits Team Householder candidates and runs their campaigns.................................................. 9

        7. FirstEnergy continues to fund Generation Now .............. 10

        8. FES funnels an additional half million into Generation Now, despite declaring bankruptcy ................................. 11

        9. Cespedes on-boards Borges ............................................. 13

      10. Householder is elected Speaker ....................................... 14

i

11. FES retains Borges to help secure passage of HB 6 ........ 14

12. HB 6 encounters opposition, and more money is funneled into Generation Now ........................................... 15

13. Cespedes tells Borges about the additional millions FirstEnergy paid to Generation Now .............................. 17

14. The House passes HB 6, and Borges puts the referendum on the Attorney General's radar .................. 17

15. The legislature passes HB 6, and opponents pursue a referendum to repeal it ....................................... 19

16. Borges contacts officials who could impact the referendum ........................................................... 20

17. OACB hires a signature-collection company .................... 20

18. FirstEnergy pays Householder to preserve the bailout ... 21

19. Borges receives payment from Generation Now ............. 23

20. Borges helps devise a multi-prong plan to preserve the bailout .......................................................... 24

    a. Pressuring Attorney General Yost ............................... 25

    b. Bribing Fehrman ........................................................ 26

    c. Thwarting the signature-collection effort .................... 30

    d. Drafting new legislation ............................................. 31

21. Borges receives $1.6 million from FirstEnergy through Generation Now to fund the plan .................................... 32

22. The ballot referendum fails .............................................. 33

II. Federal Proceedings ...................................................... 33

    1. Trial Proceedings ................................................. 34

    2. Jury Instructions................................................. 35

    3. Closing Arguments and Verdict ......................... 36

    4. Post-Trial Proceedings ....................................... 38

Summary of the Argument ................................................. 39

Argument ........................................................................ 40

    I.   The evidence showed that Borges conspired to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity that involved at least two legally valid predicate racketeering acts ........................ 40

       A.  The Fehrman Bribe Violated the Travel Act and the Private Honest Services Fraud Statutes ......................... 42

         1.  The Travel Act................................................ 42

            i.  The Travel Act predicate did not constitute surplusage, nor did its application violate principles of federalism ........................................... 43

            ii. Sufficient evidence supported the Travel Act predicate ................................................................ 46

         2.  Private Honest Services Fraud ................................... 50

            i.   Property Interest.................................................... 51

               a. Indictment...................................................... 51

               b. Jury Instructions & Evidence ........................... 55

       ii.  *Frost*'s Foreseeability-of-Harm Standard ............. 59

       iii. Fiduciary Duty ....................................................... 62

  B.  There Was Sufficient Evidence to Support the "Pattern" Element, Wholly Apart from the Fehrman Bribe ............ 63

      i.   Money Laundering ..................................................... 64

      ii.  Public Official Bribery ................................................ 70

  C.  Even if Borges Could Establish a Legal Error as to the Fehrman Bribe, the Error Would Be Harmless .............. 71

II.  The district court's evidentiary rulings were not erroneous and were harmless, in any event ........................................... 77

  A.  Evidence Regarding Use of Attorneys ............................. 77

  B.  Testimony by AMT Witnesses ........................................... 81

  C.  Evidence that Co-Conspirators Pleaded Guilty .............. 82

  D.  No Cumulative Error ....................................................... 84

Conclusion ................................................................................. 85

Certificate of Compliance ...................................................... 86

Designation of Relevant District Court Documents ............................. 87

Certificate of Service ............................................................. 89

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989) ...................... 75

*Carpenter v. United States,* 484 U.S. 19 (1987) ................................ 57, 59

*Ciminelli v. United States,* 598 U.S. 306 (2023) ............................... 57, 58

*Greer v. United States*, 141 S. Ct. 2090 (2021) ....................................... 57

*Griffin v. United States*, 502 U.S. 46 (1991) ..................................... 63–64

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008) .................................................. 71

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................. 46, 50, 62, 63

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ....................................... 54

*McDonnell v. United States*, 579 U.S. 550 (2016) .................................. 68

*Neder v. United States,* 527 U.S. 1 (1999). ...................................... 72, 73

*Percoco v. United States,* 598 U.S. 319 (2023) ....................................... 60

*Perrin v. United States*, 444 U.S. 37 (1979) ..................................... 44–45

*Rewis v. United States*, 401 U.S. 808 (1971) .......................................... 44

*Salinas v. United States*, 522 U.S. 52 (1997) ......................................... 71

*Skilling v. United States,* 561 U.S. 358 (2010) ............................... passim

*Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759
    (6th Cir. 1999) ................................................................................... 48

*Stone v. Davis*, 66 Ohio St.2d 74 (1981) .................................................. 62

*United States v. Anderson*, 67 F.4th 755 (6th Cir. 2023) ........................ 56

*United States v. Barrow*, 118 F.3d 482 (6th Cir. 1997) ........................... 60

*United States v. Browne*, 505 F.3d 1229 (11th Cir. 2007) ..................... 64

*United States v. Bruner*, 616 F. App'x 841 (6th Cir. 2015) .................. 78

*United States v. Clark*, No. 1:19-cr-148, 2020 U.S. Dist. LEXIS 28815 (N.D. Ohio Feb. 20, 2020) .................................................... 82

*United States v. Cor-bon Custom Bullet*, 287 F.3d 576 (6th Cir. 2002) ................................................................................. 55

*United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015) .......................... 64

*United States v. Deitz*, 577 F.3d 672 (6th Cir. 2009) .............................. 85

*United States v. Douglas*, 398 F.3d 407 (6th Cir. 2005) ................. 54, 55

*United States v. Emmons*, 8 F.4th 454 (6th Cir. 2021). .......................... 46

*United States v. Evans*, 883 F.2d 496 (6th Cir. 1989) ............................. 81

*United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008) ........................... 41

*United States v. Freeman*, 70 F.4th 1265 (10th Cir. 2023) .................... 73

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) ............ 51, 53, 61, 62

*United States v. Hickey*, 917 F.2d 901 (6th Cir. 1990) ........................... 81

*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022) ....................... 41, 71

*United States v. Iossifov*, 45 F.4th 899 (6th Cir. 2022) ........................... 40

*United States v. Jefferson*, 674 F.3d 332 (4th Cir 2012) ........................ 73

*United States v. Lindo*, 18 F.3d 353 (6th Cir. 1994) .............................. 79

*United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) .................. 83, 84

*United States v. Moss*, 9 F.3d 543 (6th Cir. 1993).................................. 44

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013)............................. 63

*United States v. Parker*, No. 80-5093, 1980 U.S. App. LEXIS
11061 (6th Cir. 1980)................................................................ 82, 83

*United States v. Paulus*, 894 F.3d 267 (6th Cir. 2018) ......................... 77

*United States v. Phillips*, 872 F.3d 803 (6th Cir. 2017) ........................ 40

*United States v. Ragsdale*, 426 F.3d 765 (5th Cir. 2005)................. 78, 79

*United States v. Rayborn*, 491 F.3d 513 (6th Cir. 2007) ....................... 66

*United States v. Rich*, 14 F.4th 489 (6th Cir. 2021).................. 41–42, 71

*United States v. Saadey,* 393 F.3d 669 (6th Cir. 2005).......................... 41

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) .......................... 57

*United States v. Sanders*, 95 F.3d 449 (6th Cir. 1996) ......................... 82

*United States v. Skilling* (Skilling II), 638 F.3d 480 (5th Cir. 2011) ..... 72

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) ............................ 68

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) ......................... 85

*United States v. Universal Rehab. Servs.*, 205 F.3d 657
(3d Cir. 2000) .................................................................... 82–83, 84

*United States v. Wilson*, 579 F. App'x 338 (6th Cir. 2014) ...................... 64

Statutes:

18 U.S.C. § 1343................................................................................ passim

18 U.S.C. § 1346................................................................ 52, 53, 68

18 U.S.C. § 1951.............................................................................. 68

18 U.S.C. § 1952.............................................................................. 42

18 U.S.C. § 1956.............................................................................. 65

18 U.S.C. § 1957........................................................................ 65, 70

18 U.S.C. § 1961.............................................................................. 40

18 U.S.C. § 1962.............................................................................. 40

Other Authority:

Fed. R. Evid. 403............................................................................. 79

Fed. R. Evid. 602............................................................................. 81

Ohio Rev. Code § 2921.02.............................................................

Ohio Rev. Code § 3517.22.................................................. 42, 43, 47, 48

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record. Oral argument is therefore unnecessary.

## STATEMENT OF JURISDICTION

The United States concurs in Appellant's jurisdictional statement.

## ISSUES PRESENTED

1. Whether Borges conspired to participate in the conduct of the affairs of an enterprise that involved two legally valid predicate racketeering acts.

2. Whether the district court made erroneous evidentiary rulings that affected the outcome of the trial.

## STATEMENT OF THE CASE

A jury convicted lobbyist Matthew Borges and former Speaker of the Ohio House of Representatives Larry Householder of Racketeer Influenced and Corrupt Organizations (RICO) conspiracy. The evidence presented over six weeks proved a public-corruption conspiracy unprecedented in scope and sophistication—involving nearly $60 million in bribes paid by FirstEnergy Corp. and its affiliates into a web of 501(c)(4) organizations and other entities controlled by Householder, but not publicly linked to him, in exchange for official action benefitting the company.

For all of the scheme's sophistication, the corrupt bargain underlying it was simple: Householder wanted to be Speaker of the House; FirstEnergy wanted a taxpayer-funded subsidy for two failing nuclear plants. FirstEnergy agreed to bankroll Householder's bid for Speaker. In exchange, Householder agreed to use his position to help the company secure a billion-dollar bailout.

The plan worked. Householder was elected Speaker and, months later, he introduced the bailout legislation, known as House Bill 6 (HB 6). Following introduction of the legislation, Householder received

3

millions more from FirstEnergy. In exchange, Householder ensured that HB 6 passed the legislature.

Opponents of HB 6 organized a ballot referendum campaign seeking to repeal the legislation. In response, Householder and FirstEnergy continued their arrangement, with Householder promising to use his position as Speaker to preserve the bailout in exchange for millions more from FirstEnergy.

Again, the plan worked. The ballot referendum campaign failed, and HB 6 became law.

Householder did not act alone. His political strategist and three lobbyists helped him. These co-conspirators had different roles and entered the conspiracy at different times. But all of them knew about the bribery scheme with FirstEnergy, worked to advance it, and were enriched by it.

Borges, a lobbyist for a FirstEnergy affiliate, was the last to join the conspiracy. After learning the details of Householder's corrupt bargain with FirstEnergy, Borges joined what he called an "unholy alliance." Borges joked that the seemingly limitless bribe payments

were like "Monopoly money" and said that he too wanted to "get fat off this."

Borges and his co-conspirators furthered the conspiracy by carrying out an aggressive plan to prevent HB 6 from being subject to referendum. For his part, Borges helped Householder pressure a state officeholder to take action adverse to the ballot referendum campaign, bribed the project manager overseeing the campaign's signature-collection effort for information he could use to hinder the collection, and engaged in illegal transactions involving over $1 million in bribe proceeds to further the conspiracy. And Borges ultimately did "get fat"—pocketing $366,000.

I.   *Factual Background*[1]

1. Householder sets his sights on Speaker of the House.

In November 2016, the citizens of a rural district near Columbus elected Householder as their state representative. (R.228, tr.,8493–94.) Householder had previously represented the same district—a tenure that included a two-term stint as Speaker of the House. (*Id.*,8485–8490.)

---

[1] For a timeline of relevant dates, see Exhibit 6. (R.302, Ex.6,12152.)

Householder was not satisfied with winning back his seat. He returned to politics intending to reclaim the speakership. (R.217, tr.,7583–84.) But party leadership now considered Householder a "political outsider." (R.219, tr.,7870.)

Householder came up with an aggressive—and expensive—two-year re-ascension plan. The plan involved recruiting and helping elect candidates who would then back him for Speaker over then-current leadership. (R.217, tr.,7584.)

2. <u>FirstEnergy[2] needs a billion-dollar bailout.</u>

While Householder sought funds to finance his bid for Speaker, FirstEnergy Corp., an Ohio-based public utility holding company, sought a solution to its nuclear generation problem. (R.194, tr.,4751–52.) FirstEnergy was reporting a net loss of hundreds of millions of dollars due to poor performance by FirstEnergy Solutions (FES), a wholly owned subsidiary that was "bleeding cash" due to the unprofitability of its two nuclear power plants. (*Id*.,4770–72.)

---

[2] "FirstEnergy" refers collectively to FirstEnergy Corp. and its subsidiaries, FES and FirstEnergy Service Co. Until February 2020, all three entities shared a common first name and the defendants often referred generically to the "company" or to "FirstEnergy."

FirstEnergy's 2016 annual report disclosed that it was seeking a legislative solution—a taxpayer-funded bailout—for the nuclear plants. (*Id*.,4777.) The taxpayer subsidy would provide a guaranteed payment and make the plants "very attractive to investors." (*Id*.,4780.) To secure passage of the legislation, the company first needed the support of House leadership, which it lacked.  (R.219, tr.,7944–46.)

3.  Householder seeks a major benefactor.

Householder asked longtime political strategist Jeffrey Longstreth "to help him get elected Speaker." (R.217, tr.,7585.) Longstreth agreed. Householder and Longstreth wanted to "hit the ground running" with a 501(c)(4) organization "working as the recruitment and fundraising arm." (*Id*.,7630.) They discussed finding a "benefactor" to finance the operation. (*Id*.,7630–31.)

4.  Householder and FirstEnergy make a secret deal.

Householder found his benefactor in FirstEnergy. (*Id*.,7631.) In January 2017, Householder joined FirstEnergy Corp. CEO Chuck Jones and Vice President Michael Dowling in Washington, D.C. to celebrate the presidential inauguration. (*Id*.,7631–32.) Over several days of socializing, Householder outlined his plan to retake the speakership

7

and his need for funding, while the executives explained their need for a bailout. (*Id.*,7635–39.) A secret deal was struck: FirstEnergy would fund Householder's bid for Speaker in exchange for Householder's help passing a legislative bailout. (*Id.*,7623–25, 7635–39; R.194, tr.,4898–4922; R.197, tr.,4956–5002.)

5. <u>Generation Now is created to accept unlimited and undisclosed payments from FirstEnergy.</u>

During the trip, Dowling instructed Longstreth to set up an organization that could receive "undisclosed and unlimited contributions." (R.217, tr.,7636.) A 501(c)(4) organization was the perfect vehicle to receive payments from FirstEnergy. (R.194, tr.,4719, 4723.) Unlike campaign or PAC contributions, money paid to a 501(c)(4) is not regulated and not subject to public scrutiny. (*Id.*,4733–34.)

Once home, Householder and Longstreth created a 501(c)(4) called Generation Now, which purported to be a social welfare organization but actually functioned as a repository for FirstEnergy's bribe payments. (R.217, tr.,7593, 7636, 7643–45; R.302, Ex.16,12254, Ex.17,12255.) Lobbyist Neil Clark, who became a trusted ally during Householder's bid for Speaker, explained that "Generation Now" was "[Householder's] account" and was "controlled by his people." (R.302,

8

Ex.522B,12416.) Clark emphasized that Householder's "(c)(4) [was] secret." (*Id*.,12415–16.) Because Householder's name was not publicly associated with Generation Now, FirstEnergy "could give as much or more to the (c)(4) and nobody would ever know" the money went to Householder. (*Id*., Ex.271B,12340.)

Jones told Householder that FirstEnergy would pay him $1 million—through Generation Now—that year. (R.217, tr.,7624–25, 7640–41.) Householder relayed the million-dollar pledge to Longstreth and instructed him to "work out the details" with Dowling. (*Id*.,7640.) Longstreth emailed Dowling wiring instructions for Generation Now, writing: "This is the organization that Chuck [Jones] and Larry [Householder] discussed." (R.217, tr.,7641–42.) Shortly thereafter, in March 2017, Householder received the first of four $250,000 installments from FirstEnergy into the Generation Now bank account. (R.302, Ex.15,12253; R.217, tr.,7625.)

6.  <u>Generation Now recruits Team Householder candidates and runs their campaigns.</u>

The money from FirstEnergy to Generation Now funded Householder's plan. (R.211, tr.,6664; R.214, tr.,7149.) In addition to paying Householder's staff, the money was funneled through a web of

entities and used to recruit and elect candidates—collectively known as Team Householder—who would vote for Householder as Speaker and then vote for the bailout. (R.211, tr.,6664; R.214, tr.,7149). Householder also used the money to pay off a judgment from a civil lawsuit. (R.303, Ex.818,12654 (listing payments made).)

### 7. FirstEnergy continues to fund Generation Now.

During the 2018 general election cycle, Householder continued to demand and receive money from FirstEnergy when Generation Now bank accounts ran low. (R.217, tr.,7659; R.302, Ex.15,12253; *e.g.*, Ex.286A–C,12344–48.) Clark called FirstEnergy "the bank" because, whenever Householder needed money, FirstEnergy disbursed it. (R.302, Ex.527B,12438.)

Getting FirstEnergy to give money was easy; but shielding such large amounts from public scrutiny was complicated. Sometimes Generation Now received payments from FirstEnergy Service Co., which handled financial transactions for FirstEnergy. (R.194, tr.,4759.) Other times, Generation Now received payments through a 501(c)(4) called Partners for Progress, which was fully funded by FirstEnergy. (R.194, tr.,4914–15.) Upon receipt, Generation Now would wire money

10

to a web of other entities controlled by Householder, but not publicly

attributable to him, to further conceal the source of the payments.

(R.302, Ex.180,12334, Ex.352,12354.)

    8.  <u>FES funnels an additional half million into Generation Now,
despite declaring bankruptcy.</u>

While FirstEnergy was bankrolling Householder's bid for Speaker,

FES declared bankruptcy and hired lobbyist Juan Cespedes to work on

the bailout issue. (R.211, tr.,6745–50.) Cespedes's "first order of

business" was to have FES contribute to Team Householder candidates.

(*Id*.,6764–75.)

In August 2018, Cespedes, fellow FES lobbyist Robert Klaffky,

and FES executives met with Householder to discuss the bailout

legislation. (*Id*.,6766–77.) Householder "had previously been educated

on [the issue] by the parent company," so the executives "g[ot]

granular." (*Id*.,6767–6800.) After the meeting, Householder called

Klaffky and said that he "expect[d]" FES to make "a multiple hundred-

thousand-dollar contribution." (*Id*.,6768.) Klaffky and Cespedes initially

"pushed back" because their client was in bankruptcy. (*Id*.)

During a subsequent call with company executives, it was decided

that FES would contribute $500,000 to Householder to support his

preferred candidates. (*Id.*,6783.) To get "maximum impact," the contribution was divided into two checks. (*Id.*,6783–84.)

During an October meeting, Klaffky slid a $400,000 check across the table to Householder and said: "Our client care[s] very much about our issue." (*Id.*,6781.) Householder opened the envelope and remarked: "Well, yes, they do." (*Id.*) Householder called Longstreth into the room and handed him the check. (*Id.*,6782.) Householder then talked about "the state of the races" and how he would support the bailout if he became Speaker. (*Id.*,6781–83.) Cespedes, who was present, explained that the purpose of the meeting was to establish that the financial support "was specifically tied to the legislation . . . ." (*Id.*,6786.)

The check was made out to Generation Now because that was "the only way . . . [to] support the Speaker with a contribution th[at] large." (*Id.*,6785.) Jones and Dowling knew about the meeting—and the check—ahead of time; and Householder thanked them for the $400,0000 afterwards. (R.302, Ex.290B–C,12349–51).

Cespedes delivered the second check—for $100,000—to Longstreth because Householder was away supporting his candidates. (R.211, tr.,6788–90.) Cespedes requested that Householder call the FES

president to thank him because Cespedes wanted "to make sure that [Householder] understood where . . . the money was coming from" so that there would be "accountability." (*Id*.,6791.)

9. Cespedes on-boards Borges.

Cespedes and Borges were "long-time political and personal friend[s]." (*Id*.,6786.) Borges was "one of the few people [Cespedes] trusted" in the political world. (*Id*.,6788.) As the 2018 general election approached, Cespedes began to "on-board" Borges. (*Id*.,6788.) Borges was working as a lobbyist but had previously served as Chair of the Ohio Republican Party. Given his past role, Borges had "extremely good relationships" with elected officials like Attorney General Dave Yost, who had the potential "to be impactful on [the bailout] issue." (*Id*.,6820–21, 6839; R.217, tr.,7696.)

Cespedes relayed "real-time" information to Borges and "didn't leave anything out." (R.211, tr.,6788.) This information included the $400,000 check FES provided to Householder in October 2018. (*Id*., 6787–88.) For example, the day after Householder received the check, Cespedes texted Borges about the meeting, describing it as a "good day." (R.302, Ex.291B,12352.) Borges responded: "Great!" (*Id*.)

13

10.  Householder is elected Speaker.

All but one of the Team Householder candidates won their races. (R.214, tr.,7159; R.198, tr.,5345–46.) These new representatives then voted for Householder, who won the speakership. (R.198, tr.,5346.)

The day Householder was elected Speaker, Cespedes texted Klaffky: "That 500K investment seems very wise right now . . . this is a good day." (R.303, Ex.748,12644.) Klaffky responded: "High risk, high reward." (*Id.*) With Householder in charge, it became a "matter of when, not if," the bailout legislation would be introduced. (R.211, tr.,6801.)

11. FES retains Borges to help secure passage of HB 6.

In April, a company executive gave Cespedes "the green light to onboard [Borges] fully." (R.212, tr.,7010; R.302, Ex.437A,12355.) FES retained Borges and his firm to help secure passage of the bailout legislation, known as HB 6. (R.211, tr.,6822.) Borges's firm was "conveniently located across the street from the State House" and served as the "headquarter[s]" for company lobbyists while the legislation was being drafted and considered. (*Id.*)

Borges served as "a sounding board" for Cespedes, with the two "sp[eaking] every day about the bill." (*Id.*,6820.) Cespedes often sought

14

Borges's guidance. (R.302, Ex.441B,12359 (texting Borges list of legislators who were "immediate targets" and asking if Borges had "any unique relationships or suggestions based on those involved"); Ex.441D,12362 (seeking Borges's "guidance on breaking out responsibilities").) Borges knew what FirstEnergy and Householder were doing to advance the legislation and participated in those efforts. (*Id.*, Ex.442C,12365, Ex.442E,12368.)

12. <u>HB 6 encounters opposition, and more money is funneled into Generation Now.</u>

The proposed legislation encountered immediate opposition. The bill became known as a "tough vote," meaning that supporting it could carry consequences at the ballot box. (R.217, tr.,7680.) FES hired a media consultant, planning to spend "less than a million" on the effort. (R.211, tr.,6811–12, 6827.)

Householder upended that plan. (R.217, tr.,7681; R.211, tr.,6830.) After reading a negative article about HB 6, Householder texted Jones that "the first shot was fired at us tonight" and "[n]obody screws with my members." (R.302, Ex.460A,12388.) Householder and Jones discussed FirstEnergy making additional payments to Householder, to

which Jones stated: "I would say you're a bargain – not cheap." (*Id.*, Ex.460C,12392.)

Longstreth and Clark met with Cespedes and company executives to discuss the media campaign. (R.211, tr.,6813.) On Householder's behalf, Longstreth instructed the company to pay Householder through Generation Now "if [it] expected to . . . have continued support" of the legislation. (*Id.*,6812.) The company "had no choice," and Cespedes advised his client "to do whatever Generation Now and the Speaker said to do." (*Id.*,6811–15.)

From April 30 to July 5, 2019, FirstEnergy deposited $15 million into Generation Now. (R.302, Ex.15,12253.) In early April, before HB 6 was introduced, the Generation Now balance had fallen below $13,000. (*Id.*, Ex.14C,12206.) Householder and his team used the infusion to fund Householder's political operation and to fund an aggressive media strategy that provided Team Householder legislators supporting HB 6 "cover." (R.217, tr.,7681.) In return for the money, FirstEnergy received

"the full support of the Speaker, [who would] make sure th[e] [bailout] legislation was passed."[3] (R.211, tr.,6817.)

> 13. Cespedes tells Borges about the additional millions FirstEnergy paid to Generation Now.

Cespedes continued to keep Borges updated. Borges already knew about Householder's relationship with Generation Now. (*Id.*,6827–28.) And Cespedes told Borges about the specific circumstances under which the company was paying millions to Householder through Generation Now. Cespedes texted Borges: "Who would ever assume a bankrupt company [would be] willing to spend 15 million. What a joke[.] lol." (R.302, Ex.461D,12400.) Borges knew that the company had no choice but to pay Householder through Generation Now to ensure the legislation passed. (R.211, tr.,6826–28.)

> 14. The House passes HB 6, and Borges puts the referendum on the Attorney General's radar.

The House passed HB 6, with the Team Householder candidates voting in its favor. (R.211, tr.,6828.) While others focused on passing the bill in the Senate, Borges began to look ahead.

---

[3] Among other things, Householder personally pressured representatives to support the legislation. (*E.g.*, R.219, tr.,7952–63.)

The prospect of a ballot referendum posed a "very big concern," and Borges explored "how to craft [the] final language to make it referendum-proof." (R.211, tr.,6836.) In June 2019, Borges texted Cespedes that if the bill could be interpreted as a tax, it would not be subject to referendum. (*Id*.,6835–37; R.302, Ex.451A,12377.) Cespedes "passed on" Borges's message to "the speaker's team" and to FES's "executive team." (R.211, tr.,6837.)

While the legislation was pending, Borges "had dinner with [Attorney General] Yost to put the referendum issue on his radar." (*Id*.) As Attorney General, Yost would need to approve the language of any ballot referendum petition. (R.216, tr.,7474–75.) Following the dinner, Borges told Cespedes, "don't repeat this," and then represented that Yost "would be out front opposing [the legislation] if it weren't for FE's support and [Borges's] involvement." (R.302, Ex.451C,12379.) Borges told Cespedes he thought Yost would reject the proposed ballot language "[i]f there's any way the law will allow him to." (*Id*.) Borges also represented that the Attorney General was open to interpreting the legislation as a tax, so the decision was made "to put a lot of effort into trying to make that happen." (R.211, tr.,6841.)

18

15. <u>The legislature passes HB 6, and opponents pursue a referendum to repeal it.</u>

In July 2019, the legislature passed HB 6, and the governor signed it. The legislation secured over $1 billion in subsidies for the nuclear plants and an additional $20 to $50 million per year in fixed revenue for FirstEnergy. (R.194, tr.,4784; R.211, tr.,6760; R.216, tr.,7448.) Jones texted Dowling: "We made a bbiiiiiig bet and it paid off." (R.302, Ex.517B,12406; *see also* Ex.525B,12423 (Clark recording: Householder "went to war for" FirstEnergy and the relationship was "pay to play"); Ex.528B,12454 (Clark recording: "FirstEnergy got $1.3 billion in subsidies. . . . [S]o what d[id] they care about putting in $20,000,000 a year for this thing").)

But there was "no time to celebrate." (R.211, tr.,6844.) Opponents immediately organized a committee—Ohioans Against Corporate Bailouts (OACB)—to qualify a referendum to repeal HB 6. (*Id.*) Under Ohio law, OACB had 90 days after enactment to gather approximately 265,000 signatures. (R.216, tr.,7475, 7492.)

19

16.  <u>Borges contacts officials who could impact the referendum.</u>

Before collecting the requisite signatures, OACB needed Attorney General Yost and the Ballot Board, of which Secretary of State Frank LaRose was a member, to approve the petition's language. (R.212, tr.,6872.) The day HB 6 passed, Cespedes texted Borges: "Need [you] on this referendum thing ASAP. Please get to Yost." (R.303, Ex.608A,12515.) Borges responded: "Yeah, no problem." (*Id.*,12516.) Borges added: "LaRose is expecting us to be publicly supportive of him. Apparently, the petitioners are going to call on him to step down from the ballot board . . . because of his 'conflicts.' He can be our friend in this process, so let's be prepared to speak up for him." (*Id.*)

The day after HB 6 passed, Dowling texted FES Executive Chairman John Kiani that he was "very concerned about the referendum" and asked who "was on point" for FES. (R.302, Ex.601C,12462.) Kiani mentioned Cespedes and Borges, specifically calling out Borges's close relationship with Dave Yost. (*Id.*,12459.)

17.  <u>OACB hires a signature-collection company.</u>

OACB hired Advanced Microtargeting (AMT), "one of the largest voter contact firms in the country," to collect signatures and qualify the

referendum. (R.216, tr.,7490–92.) AMT's CEO, Michael Roberson, came to Ohio to oversee the process. (*Id.*,7493.) AMT hired Tyler Fehrman to serve as project manager in Columbus—a "very important role" because Columbus was the "main hub." (*Id.*,7501–02.)

18. <u>FirstEnergy pays Householder to preserve the bailout.</u>

Company executives were initially "very concerned about the referendum." (R.302, Ex.601C,12462.) But that changed following conversations with Householder in July 2019 (*id.*, Ex.601D,12466, Ex.601E,12468; R.303, Ex.734,12613), after which million-dollar payments again began pouring into Generation Now from FirstEnergy. (R.302, Ex.15,12253.) Following those communications, executives believed the referendum was in "excellent hands" because of Householder's "personal involvement." (*Id.*, Ex.601C,12458, Ex.601D, 12466.)

On July 29, six days after HB 6 passed, Householder personally assured Kiani that "he would do everything in his power to help defeat the referendum," that the company was "in good hands [ ] with Generation Now," and that, "if anything were to go wrong, [ ] he would be prepared to introduce new legislation." (R.211, tr.,6846.) In return,

21

Householder and Kiani agreed to continue the "same arrangement" as
before, with FirstEnergy paying Householder through Generation Now.
(*Id.*,6849–50.)

As the "objective switched from passing legislation to now
defending legislation," Generation Now continued to manage the
operation, and FirstEnergy continued to secretly fund it. (*Id.*,6844.) As
before, the money came from FirstEnergy and Partners for Progress
accounts—$38 million between August and October 2019. (R.302,
Ex.15,12253.) Cespedes knew that Householder and his team had no
experience defeating ballot campaigns, but the company agreed to pay
Householder during this period because, as Speaker, he would "provide
new legislation . . . if necessary." (R.211, tr.,6848–50.)

Whenever Householder needed more money, he contacted Jones
directly or Longstreth contacted Cespedes or Dowling. (R.303,
Ex.639A,12602, Ex.640K,12607, Ex.640G,12605.) After hitting the
Generation Now account, the money was transferred to a web of entities
and accounts and then used to fund Householder's political operation,
defeat the referendum, and enrich Householder and his team. (*E.g., id.,*
Ex.812,12653 (Householder payments on Florida home), Ex.819,12655

22

(Householder credit card payments), Ex.823,12656 (payments to Longstreth), *id.*, Ex.834,12657 (payments to Clark), *id.*, Ex.835,12658 (payments to Generation Now employees).)

19.  Borges receives payment from Generation Now.

Less than two weeks after HB 6 passed, Borges texted another political operative that "Generation Now (Householder)" wanted him "to help run part of the anti-referendum campaign" and that it was a "[p]otentially very lucrative" project. (R.302, Ex.605D,12488–89.) The next day, Borges created a new company—17 Consulting Group LLC— to receive money from FirstEnergy via Generation Now. (R.217, tr.,7697–98; R.302, Ex.132,12258.) Borges, Cespedes, Clark, and Longstreth coordinated the financial arrangement with Householder and FES executives. (R.212, tr.,6862–64, 6857–59; R.302, Ex.605B, 12471, Ex.605J,12505 (Cespedes text to Borges: "GenNow received their wire from FES. Keep an eye out for the 200k").) Borges then sent Longstreth wiring instructions for his 17 Consulting account. (R.302, Ex.605G,12497.) On August 8, Borges received the first wire from Generation Now in the amount of $400,000. (R.201, tr.,5670–71; R.302,

23

Ex.133,12332.) That same day, Borges transferred $100,000 to his personal account. (*Id.*, Ex.134,12333.)

During this period, Cespedes spoke to Borges daily and "shared information with [Borges] as [he] received it." (R.212, tr.,6865.) Borges knew the money he received was FirstEnergy money flowing to Householder through Generation Now. (*Id.*,6858–59; 6862–63; 7026; R.302, Ex.605B,12471, Ex.605D,12488, Ex.605G,12497.) And he knew why FirstEnergy was paying Householder: because Householder was uniquely positioned as Speaker to ensure that the bailout was preserved—either by defeating the referendum or by passing alternate legislation. (R.211, tr.,6846–50, 6865.)

20. <u>Borges helps devise a multi-prong plan to preserve the bailout.</u>

During the referendum period, Borges participated in strategy sessions involving Cespedes, Householder, and company executives. (R.212, tr.,6858, 6864; R.302, Ex.605B,12471, Ex.605H,12502, Ex.636F,12494.) Together, they devised a multi-prong plan to preserve the bailout that included: pressuring state officeholders to take official action adverse to the referendum campaign; preparing alternate legislation in case the referendum succeeded; and thwarting the

signature-collection effort by, among other things, bribing AMT manager Fehrman for inside information.

### a. Pressuring Attorney General Yost

Borges and Householder sought to influence Attorney General Yost to: (1) reject the petition language so that OACB would have less time to secure signatures; and (2) interpret the legislation, or parts of it, as a "tax" not subject to referendum. (R.212, tr.,6865–66, 6870.) Given his close relationship with Yost, Borges was the "point of contact." (R.212, tr.,6866.) Cespedes coordinated the "two-prong approach." (*Id.*,6867–70; R.303, Ex.608B,12517, Ex.608C,12519, Ex.737,12618 (text messages and phone records showing coordination between Cespedes, Borges, and Householder).) Cespedes and Borges also pressed Secretary of State LaRose to reject the language and interpret the legislation as a tax. (R.212, tr.,6872.)

On July 29, OACB submitted the petition language to Yost, who had ten business days to approve or reject it. (R.202, tr.,5699; R.216, tr.,7493.) Borges and Householder worked together to pressure Yost to reject the language. (R.212, tr.,6866–70; R.303, Ex.606A,12510, Ex.737,12618.) Yost rejected the language on August 12, the last day of

the ten-day period. (R.202, tr.,5700.) Borges alerted company executives: "Yost rejecting the summary language. Said [i]t will be announced in 2 hours." (R.303, Ex.607A,12512.)

OACB submitted a revised petition on August 16, which Yost ultimately approved two weeks later. (R.202, tr.,5700.) By that time, OACB had only 54 of the original 90 days remaining to collect more than a quarter-million valid signatures. (R.216, tr.,7495.) The delay proved to be a "significant impediment." (*Id.*)

### b. Bribing Fehrman

Cespedes and Borges sought to discover how many signatures AMT was collecting so that they could monitor the opposition's progress and allocate their resources accordingly. Borges came up with a "clever" idea. (R.212, tr.,6899.) Borges told Cespedes that he was personally acquainted with Fehrman, who was "working for the petitioners" seeking to repeal HB 6, and suggested bribing him for inside information about the signature count. (*Id.*,6888.) As a member of AMT management, Fehrman had access to the number of signatures collected. (*Id.*,7502.) AMT instructed Fehrman to "protect[ ]" the signatures, and Fehrman "ensure[d] that they were locked up at the

26

end of the day . . . [and] never out of [his] sight before [being] locked up." (R.224, tr.,8124.)

Just a few days after Yost and the Ballot Board approved the revised petition, Borges asked Fehrman to meet for coffee. (*Id*.,8125.) Fehrman agreed. When they met, the conversation started off "friendly" but "turned pretty quickly." (*Id*.) Borges knew that Fehrman had been struggling financially and promised to relieve his debts in exchange for signature-count information. (*Id*.,8125–26.) Fehrman did not want to "betray [his] team" and felt "shaken." (*Id*.,8124, 8196.) He rejected the offer later that day, texting Borges: "I would love to have [my debts] wiped out, to be debt-free and not have to worry . . . but I can't put a price tag on my integrity or my word." (R.303, Ex.621B–D,12570–72.) Borges responded: "[N]o matter what, don't ever tell anyone about our conversation from earlier." (*Id*.,12572.)

Fehrman told a friend about the conversation, and his friend recommended that he contact the FBI. (R.224, tr.,8129.) Fehrman met with a special agent about Borges's solicitation and agreed to cooperate. (*Id*.,8130–31.)

Under FBI direction, Fehrman reached out to Borges. Although Borges was suspicious at first, he ultimately re-engaged with Fehrman. (*Id*.,8131–32). Fehrman's "value was very singular" because "he could [ ] continue to work for the [signature-collection] effort and provide . . . real-time information as to how many signatures they were gathering." (R.212, tr.,6895.) When Kiani heard about the Fehrman plan, he instructed Cespedes and Borges to "do whatever it takes to get it done." (*Id*.,6900.)

During a series of meetings with Fehrman, which Borges did not know were recorded, Borges spoke candidly. He characterized the relationship between Householder, FirstEnergy, and his firm as an "unholy alliance." (R.303, Ex.615C,12538.) He said: "The only people that are on my side is, is this fucking company," and "[e]verybody else in the universe is on your side." (*Id*.,12537.) He continued: "Unless you're somehow affiliated directly with FirstEnergy, work for [my firm], or want to suck up to Larry [Householder], you're on your side." (*Id*.,12538.) Borges also described the money FirstEnergy was pouring into Generation Now as "fucking Monopoly money." (*Id*.,

28

Ex.616C,12554.) And he pitched to Fehrman that if "people are going to get fat off this, . . . [w]hy the fuck not us." (*Id.*, Ex.615C,12538.)

Borges paid Fehrman $15,000 in exchange for signature-count information and promised a second payment of $10,000 at the signature deadline. (R.224, tr.,8153.) Fehrman gave the check to the FBI. (*Id.*,8153.) The check was drawn from Borges's 17 Consulting account, which was solely funded by Generation Now. (R.302, Ex.132,12319, Ex.133,12332.) Borges worried that Fehrman would disclose the bribe, warning him: "If I get a call from [a local reporter], I'm going to blow your house up." (R.303, Ex.616C,12551.)

After making the payment, Borges repeatedly requested the signature count from Fehrman. The requests were similar to this: "Any idea how many total signatures you guys have? We were told 80,000 today. Any intel you have would make me a hero. Thanks." (*Id.*, Ex.622S,12573.) On that occasion and others, Fehrman "came up with excuses" and avoided answering. (R.224, tr.,8186–87.) Borges never received the information he wanted and never made the second payment.

29

### c.  *Thwarting the signature-collection effort*

Generation Now funds were also used to stymie the signature-collection effort in other ways. Clark spearheaded a "buyout campaign" aimed at depriving OACB of signature-collection firms. (R.212, tr.,6906–07.) Borges and Cespedes knew about it from "[their] conversations with [ ] Clark." (*Id.*) The buyout campaign also targeted signature collectors working for AMT. (*Id.*, 6906.) Collectors were offered cash and plane tickets if they stopped their work. (R.216, tr.,7525–29.)

Borges, for his part, hired consultants to do opposition research on—and create media stories about—the signature collectors. (R.212, tr.,6892–93.) He paid the consultants from his 17 Consulting bank account. (R.302, Ex.134,12333.) Borges also used the money to hire private investigators to track Fehrman and other signature collectors, which allowed the anti-referendum team to "create disturbances," deterring collectors from obtaining signatures and voters from signing the petition. (R.216, tr.,7499; R.302, Ex.134,12333; R.303, Ex.626B,12574, Ex.627C,12575.)

The aggressive tactics worked. Although AMT had "qualified hundreds of initiatives" over the years, its CEO, Roberson, had "never seen anything like" what occurred. (R.216, tr.,7496.) AMT's employees were "stalked," "intimidated," "harassed," and even "assaulted." (*Id.*,7497.) Roberson likened the canvassing turf to "a war zone." (*Id.*)

### d. Drafting new legislation

Amid these aggressive efforts to defeat the ballot campaign, Householder had new legislation prepared. Householder discussed the plan with Cespedes and company executives. (R.211, tr.,6845–46; R.205, tr.,5964–65.) Jones told Dowling that Householder "seemed pretty confident in his referendum strategy" and his "plan[] to pass [the bailout] as a tax in a new bill" if OACB obtained the necessary signatures. (R.303, Ex.634A,12577, Ex.634B,12580 (Jones text: "Just spoke to the big guy. He's got the 'tax' bill ready to go"), Ex.634D,12585 (Jones text: "For what it's worth, LaRose and Householder think it's game over . . . and Householder has [a] 'quick fix' anyway.").) Householder also proposed drafting the legislation across multiple bills because it would be "much more difficult to challenge." (R.211, tr.,6846.)

Householder had his policy advisor draft legislation characterizing HB 6 as a "tax" and draft multiple pieces of legislation relating to HB 6 "in case [it] was subject to referendum." (R.217, tr.,7551–58; R.303, Ex.635A,12586–12592.) As Borges explained on a recorded call, Householder was ready to "introduce [ ] new . . . legislation and start this whole goddamn process over again." (R.304, Ex.620D,12672.)

21. <u>Borges receives $1.6 million from FirstEnergy through Generation Now to fund the plan.</u>

Generation Now wired $1.62 million of the $36 million it received from FirstEnergy during this period to Borges's 17 Consulting account via nine wire transactions in amounts over $10,000. (R.302, Ex.132,12258.) Borges and Cespedes created—and then revised—a spending budget for the money, which included funds to bribe Fehrman and to contribute to elected officials who had "helped [ ] significantly." (R.212, tr.,6872–74; R.302, Ex.602I,12470, Ex.602G,12469.)

Borges and Cespedes also paid themselves hundreds of thousands of dollars from the 17 Consulting account. Borges wrote himself $366,000 in checks, which he deposited into a personal account, and used $15,000 of that to make contributions to Yost and LaRose. (R.302, Ex.134,12333; R.304, Ex.801C,12676–78, Ex.801I,12679.)

22. <u>The ballot referendum fails.</u>

On October 21, 2019, Dowling alerted Jones that OACB was "bringing signatures to [the] Secretary of State today" and wondered whether the campaign had collected "enough valid signatures." (R.303, Ex.634C,12582.) Jones responded: "Larry is ready to turn in new legislation immediately if they turn in the signatures." Jones continued: "LH says it will NEVER hit the ballot . . . ." (*Id.*, 12583.)

OACB failed to collect enough signatures. (R.216, tr.,7506.) On October 22, HB 6 went into effect. (R.194, tr.,4857.)

II. *Federal Proceedings*

A federal grand jury returned a single-count indictment, charging Householder, Longstreth, Clark, Cespedes, Borges, and Generation Now with participating in a RICO conspiracy in violation of 18 U.S.C. § 1962(c), (d).[4] (R.22, indictment,1247–1289.) The indictment alleged

---

[4] In 2021, FirstEnergy Corp. entered into a Deferred Prosecution Agreement, agreeing, among other things, that it had "paid millions of dollars to [Householder] through his 501(c)(4), Generation Now, in return for [him] pursuing nuclear legislation for [its] benefit" and that it had "[paid] millions of dollars to [Householder] through . . . Generation Now in return for and in connection with [his] efforts to defeat the ballot referendum . . . ." (S.D.Oh. 1:21-cr-86, R.3.) The government did not introduce the agreement at trial.

33

that the defendants constituted an enterprise, as defined under

18 U.S.C. § 1961(4), and conspired to engage in a pattern of

racketeering activity consisting of multiple acts of the following

offenses: public official honest services wire fraud and private honest

services wire fraud (18 U.S.C. §§ 1343 & 1346); extortion under color of

official right (18 U.S.C. § 1951); the Travel Act (18 U.S.C. § 1952);

money laundering (18 U.S.C. § 1956); engaging in monetary

transactions in property derived from specified unlawful activity

(18 U.S.C. § 1957); and state law bribery (Ohio Rev. Code § 2921.02).

The indictment alleged that the enterprise's purpose was to grow and

preserve Householder's political power, enrich the enterprise and its

members and associates, and conceal those activities. (*Id.*).

Defendants Longstreth, Cespedes, and Generation Now pleaded

guilty. Clark died, and the case against him was dismissed. Borges and

Householder proceeded to trial.

1. <u>Trial Proceedings</u>

The government introduced approximately 1,000 exhibits

(including recordings, text and email messages, and bank records) and

called approximately twenty witnesses, including: FBI special agents; a

FirstEnergy representative; co-defendants Longstreth and Cespedes; employees of Generation Now; Fehrman; the AMT CEO and an AMT consultant; a forensic accountant; current and former state representatives; the energy policy advisor for then-Speaker Householder; and subject-matter experts on energy policy, tax-exempt organizations, and ballot measures.

The district court denied Borges's motions for judgment of acquittal. (R.224, tr.,8201; R.229, tr.,8816–17.)

2. <u>Jury Instructions</u>

The district court instructed the jury that RICO conspiracy required proof that: (1) an enterprise existed; (2) the enterprise was engaged in, or its activities affected, interstate commerce; (3) the defendant was employed by or associated with the enterprise; and (4) the defendant conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. (R.260, inst.,10596.) The court then instructed the jury on the elements of each type of racketeering activity alleged and explained that the verdict "must be unanimous as to which type or

types of predicate racketeering activity a defendant agreed would be committed." (*Id.*,10619.)

3. <u>Closing Arguments and Verdict</u>

In closing, the government summarized the evidence establishing the existence of the enterprise and Borges's association and employment with it. The government then broke down the "dozens" of racketeering acts into three categories: (1) public official bribery (18 U.S.C. § 1343; 18 U.S.C. § 1951; Ohio Rev. Code § 2921.02); (2) private citizen bribery (18 U.S.C. §§ 1343, 1346; 18 U.S.C. § 1952); and (3) money laundering (18 U.S.C. § 1956; 18 U.S.C. § 1957). The government argued that Borges was responsible for racketeering acts across all three categories.

As to public official bribery, the government explained that Borges knew about the overarching bribery scheme, "joined the conspiracy to further its purposes," and, in doing so, agreed that Householder would continue to take official action to preserve the bailout in exchange for FirstEnergy money during the referendum phase. (R.238, tr.,9467, 9475, 9482, 9516–18, 9537.) The government highlighted that Householder's pressuring Attorney General Yost (with assistance from

36

Borges) and preparing alternate legislation designed to be referendum-proof—all in exchange for FirstEnergy money—was part of the "unholy alliance." (*Id.*,9516–18, 9521, 9537, 9636–38.)

As to private citizen bribery, the government observed that Borges's bribe of Fehrman—which constituted both private honest services fraud and a violation of the Travel Act—amounted to "one act." (R.238, tr.,9481.) The government explained that if Borges bribed Fehrman while also "agreeing that Householder would accept one bribe from FirstEnergy Solutions," that would establish the requisite two racketeering acts. (*Id.*,9481–82.)

As to money laundering, the government argued that Borges knowingly received, and then distributed, bribery proceeds in multiple transactions over $10,000 to further the conspiracy. (*Id.*,9535; R.239, tr.,9637–38.)

The jury found Borges and Householder guilty.[5]

---

[5] Householder's appeal (No. 23-3565) is proceeding on a different schedule. Householder's brief raises largely distinct issues, with limited overlap.

4. <u>Post-Trial Proceedings</u>

After the Supreme Court decided *Ciminelli v. United States* and *Percoco v. United States*, Borges moved for leave to file a belated post-trial motion, arguing that those cases were relevant to the private honest services fraud predicate. (R.258, motion,10563.) The district court disagreed, finding that "neither Supreme Court case ha[d] any bearing on [Borges's] conviction . . . ." (R.265, order,10656.)

This appeal followed.

## SUMMARY OF ARGUMENT

The jury rationally convicted Borges of RICO conspiracy because he conspired to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity that involved at least two legally valid predicate acts. Borges's sufficiency challenge fails because overwhelming evidence establishes that he committed or participated in many such acts. Borges's legal challenges, which relate only to the predicates underlying the Fehrman bribe—the Travel Act and private honest services fraud—also fail. Borges cannot identify any indictment defect or instructional error as to these predicates. And any such legal error would be harmless, in any event.

Borges also cannot establish any erroneous evidentiary rulings, let alone that those rulings affected the outcome of the trial.

# ARGUMENT

I.  **The evidence showed that Borges conspired to participate
    in the conduct of the enterprise's affairs through a pattern
    of racketeering activity that involved at least two legally
    valid predicate racketeering acts.**

The jury convicted Borges of RICO conspiracy. Borges challenges

the legal sufficiency of the indictment, the factual sufficiency of the

evidence, and the jury instructions.[6] These challenges all relate to the

"pattern of racketeering activity" element, which required the

government to prove that Borges "knowingly became a member of the

conspiracy, with the intent to conduct or participate, directly or

indirectly, in the conduct of the affairs of the enterprise through a

'pattern of racketeering activity.'" (R.260, inst.,10601); 18 U.S.C.

§§ 1962(c)–(d); *United States v. Iossifov*, 45 F.4th 899, 915 (6th Cir.

2022). A "pattern" requires "at least two [predicate] acts[.]" 18 U.S.C.

§ 1961(5).

---

[6] Borges organizes his brief by type of alleged error. Because Borges's
legal and factual arguments are "chisel[ed] . . . from the same flawed
stone," *see United States v. Phillips*, 872 F.3d 803, 807 (6th Cir. 2017),
the government adopts a different organization.

"Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts." *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008). It "merely requires proof that the defendant 'intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (quoting *United States v. Saadey,* 393 F.3d 669, 676 (6th Cir. 2005)); *United States v. Rich*, 14 F.4th 489, 492 (6th Cir. 2021).

In this case, Borges personally committed many racketeering acts in furtherance of the conspiracy. These acts, alone, satisfy the pattern element. *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022) ("when [a defendant] does commit predicate acts, that is sufficient proof that he agreed to commit them") (quotation omitted)). Borges focuses his appeal on just one of these acts, the Fehrman bribe, contending that his actions did not violate the Travel Act or the private honest services fraud statute. For the reasons that follow, Borges cannot show any error as to the Fehrman bribe. But even if he could, satisfaction of the "pattern" element does not depend on the Fehrman bribe because

41

Borges knowingly agreed to facilitate a criminal endeavor involving racketeering acts of money laundering and public official bribery and, in fact, committed or participated in the commission of these acts. *See Rich,* 14 F.4th at 492.

### A. The Fehrman Bribe Violated the Travel Act and the Private Honest Services Fraud Statutes.

The government argued that Borges's bribe of Fehrman amounted to one racketeering act that violated both the Travel Act and the private honest services statute. (R.238, tr.,9480–81.) Borges cannot show any error as to either theory.

#### 1. The Travel Act

The Travel Act criminalizes using "any facility in interstate or foreign commerce, with intent to: . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," to include, "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952 (a), (b)(i)(2). The indictment identified bribery, in violation of Ohio Revised Code § 3517.22(A)(2), as the "unlawful activity." (R.22, indictment,1257.) That statute provides that no person with intent to affect the outcome of a ballot referendum campaign may:

Case: 23-3566   Document: 37   Filed: 05/23/2024   Page: 53

(A)(2) Promise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue, for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization.

Ohio Rev. Code § 3517.22(A)(2).

Borges argues that application of the Ohio bribery statute violated principles of federalism and was not supported by sufficient evidence. Both arguments lack merit.

> ### i. The Travel Act predicate did not constitute surplusage, nor did its application violate principles of federalism.

Before trial, Borges filed a motion under Federal Rule of Criminal Procedure 7(d), arguing that the Travel Act predicate should be stricken from the indictment as surplusage because its application to a state statute governing inherently intrastate activity violated federalism principles. (R.104, motion,1750–51.) The district court disagreed. (R.284, order,11164–67.)

The district court did not abuse its discretion in denying the motion to strike because the Travel Act predicate met the definition of racketeering activity and was conduct the government planned to prove

43

(and did prove) at trial. *See United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993). In addition, Borges cannot show that applying the Travel Act here poses any constitutional concern.

Congress enacted the Travel Act "to aid state and local governments which were no longer able to cope with the increasingly complex and interstate nature of large-scale, multiparty crime." *Perrin v. United States*, 444 U.S. 37, 41 (1979). Congress did so by employing its Commerce Clause power "to prohibit activities of traditional state and local concern that also have an interstate nexus." *Id*. at 41. By defining "unlawful activity" to include certain state offenses, Congress made clear its intent to "add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." *Id*. at 42.

Relying on *Rewis v. United States*, 401 U.S. 808 (1971), Borges maintains that applying the Travel Act to "a unique statute in Ohio's election laws" would violate principles of federalism. (Br.,37.) Borges's reliance on *Rewis* is misplaced. In *Perrin*, the Supreme Court rejected similar "[r]eliance on the federalism principles articulated in *Rewis* to dictate a narrow interpretation of 'bribery.'" 444 U.S. at 50. As *Perrin*

44

pointed out, the concern in *Rewis* was the showing necessary to satisfy the Travel Act's "interstate commerce element." *Id*. at 49–50. That concern was not present in *Perrin*, nor is it present here.[7]

*Perrin* held that, "so long as the requisite interstate nexus is present, the [Travel Act] reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement." *Id*. at 50. Contrary to Borges's suggestion (Br.,37–40), nothing in *Perrin* suggests that the Travel Act applies to certain state bribery statutes—like the commercial bribery statute at issue there—but not others. The Act's "sparse legislative history" actually indicates the opposite: that bribery broadly covered "payments to private individuals to influence their actions." *See Perrin*, 444 U.S. at 45–46. Application of the Travel Act to the Ohio bribery statute was proper.

---

[7] The jury instructions required that "[t]he defendant or co-conspirator knowingly used or caused to be used a facility in interstate commerce." (R.260, inst.,10615.) Borges does not challenge that instruction or the corresponding evidence.

*ii. Sufficient evidence supported the Travel Act predicate.*

The district court instructed that unlawful activity for purposes of the Travel Act included bribery under state law. The instruction tracked the Ohio statute, including its references to providing a benefit in order to influence "any person who was employed by or was an agent of a committee in advocacy or in opposition to the adoption of any ballot proposition or issue." (R.260, inst.,10615.) Borges did not object to this instruction or request any definition of "employed by" or "agent" for this purpose. Nor did Borges raise any argument on this point via a pretrial motion or to the jury at trial.

Borges now argues, however, that the government presented insufficient evidence to support the Travel Act predicate because Fehrman was not an "employee or agent" of the ballot campaign. (Br.,18–22.) This Court reviews a sufficiency challenge de novo, asking "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Borges cannot meet that "heavy burden." *United States v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021).

46

Borges's bribe of Fehrman falls squarely within the Ohio statute's prohibition. Ohioans Against Corporate Bailouts was the committee formed to defeat HB 6 through a ballot referendum. OACB hired AMT to obtain the requisite signatures. (R.216, tr.,7492.) Borges paid Fehrman, a project manager for AMT, $15,000 to influence him to disclose real-time signature-count information that the enterprise could use to defeat the ballot campaign. A rational jury could conclude that AMT and, in turn, project manager Fehrman, were "employed by" or acting as "agent[s] of" OACB in connection with the signature effort. *See* Ohio Rev. Code § 3517.22(A)(2).

Borges resists this commonsense conclusion. Borges observes that, in general, an agency relationship requires "the right to control the mode and manner of doing the work contracted for," whereas an independent contractor relationship results "if the hiring party 'is interested merely in the ultimate result to be accomplished.'" (Br.,20–21.) Borges then argues that OACB hired AMT only as an independent

47

contractor and that Fehrman was neither an employee nor an agent of

OACB.[8]

This argument fails on several fronts. As an initial matter, the

statute's use of the term "agent" does not require a general agency

relationship for all purposes. To the government's knowledge, Ohio

courts have not interpreted this term within the context of this statute.

The statute's purpose, however, is to protect the integrity of issue

campaigns. *See* Ohio Rev. Code § 3517.22(A)(2). In this context, "agent"

naturally encompasses individuals with "duties" to, and who act on

behalf of, a committee, *see id.*, whether or not such individuals would be

considered agents for other purposes.

In any event, even using Borges's own formulation of what

"agency" means under the statute, the evidence was sufficient to permit

a rational jury to conclude that Fehrman fell within it. Borges cannot

point to a single witness who testified that the relationship between

OACB and AMT was as hands-off as he now portrays.

---

[8] "Under the Restatement (Second) of Agency, which Ohio has adopted,
an independent contractor may also be an agent.*" Soberay Mach. &
Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 767 (6th Cir. 1999).

Borges claims that AMT CEO Roberson's testimony showed that "[AMT] exercised exclusive control over the manner in which the signature collection effort was organized, staffed, and executed." (Br.,21.) In fact, Roberson's testimony indicated that AMT communicated and coordinated with OACB about how to qualify the referendum. Roberson testified, for example, that when the opposition's aggressive tactics impacted AMT's signature-collection efforts, he had a "conversation with [OACB] to try to determine how to deal with th[e] environment."[9] (R.216, tr.,7497.) Roberson explained that "[OACB] wanted [AMT] to keep going" and "hire [ ] additional sub-vendors." (*Id.*, 7511.) As a result, and at OACB's request, AMT continued to collect signatures and brought in other sub-vendors to assist. (*Id.*,7497.)

Additional evidence illustrated OACB's active involvement. In a recorded conversation, Fehrman referenced an email from OACB warning AMT employees that the opposition was using fake interview requests to infiltrate the team. (R.303, Ex.617B,12564.) In addition,

---

[9] While Borges is right that Roberson did not have direct contact with "the funders" of the repeal effort (Br.,21), he did have regular contact with the committee—the party that matters for purposes of the statute. (R.216, tr.,7513.)

Fehrman's duties specifically included communicating with OACB. (R.216, tr.,7502.)

The evidence did not establish that OACB was "interested merely in the ultimate result to be accomplished." (*See* Br.,21.) To the contrary, the evidence supported the conclusion that OACB retained the right to control the mode and manner of work AMT performed. And in light of this evidence, which must be interpreted in the light most favorable to the government, *see Jackson*, 443 U.S. at 319, a rational jury could have found that Fehrman was "employed by" or an "agent of" OACB.

### 2. *Private Honest Services Fraud*

Borges articulates three reasons why his bribe of Fehrman could not have been properly treated as private honest services fraud: (1) the indictment failed to allege, and the jury instructions failed to require, that the bribe was "offered in exchange for a recognized property interest," and a rational jury could not have found such an interest; (2) the jury instructions should not have used this Circuit's foreseeability-of-economic-harm standard given intervening precedents, nor could a rational jury have found that standard satisfied; and (3) the evidence

was insufficient to establish that Fehrman owed a fiduciary duty to his employer. Each argument fails.

### i. Property Interest

Relying on *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), Borges argues that private honest services fraud "depend[s] upon the property rights of the victim" and requires that the bribe be "offered in exchange for a recognized property interest." (Br.,27, 42.) Borges maintains that the district court should have struck the private honest services predicate from the indictment for failing to allege such an interest. He alternatively argues that the district court erred by failing to instruct the jury that "an employee's fiduciary duty to his employer is limited to protecting" a recognized property interest such as confidential business information. (Br.,47.) Finally, Borges argues that a rational jury could not have found that the signature-count information constituted confidential business information.

### a. Indictment

Borges argues that the district court should have struck the private honest services predicate from the indictment because it was insufficient as a matter of law. (R.104, motion,1734–49; R.284,

order,11160–63.) He cannot show any error because the predicate met the definition of racketeering activity and was legally sufficient.

A scheme or artifice to defraud under 18 U.S.C. § 1343 includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. This is in contrast to a fraudulent scheme "for obtaining money or property." 18 U.S.C. § 1343. Section 1346 does not define "honest services," but in *Skilling v. United States,* 561 U.S. 358, 400 (2010), the Supreme Court clarified the provision's scope. *Skilling* upheld the statute against a constitutional vagueness challenge, limiting its application to "bribery or kickback schemes" involving the breach of a fiduciary duty. *Id.* at 407.

*Skilling* reached that result after reviewing the history of the honest-services doctrine and contrasting honest-services fraud with traditional fraud. *Id.* at 399–402. The Court highlighted that honest-services fraud does not require a deprivation of money or property. *Id.* Instead, it requires a breach of fiduciary duty through bribery. Honest-services fraud thus lacks the symmetry of traditional fraud, where the victim's loss of money or property mirrors the defendant's gain. *Id.* at 400.

52

Relying on this Court's decision in *Frost*, Borges contends that honest-services fraud requires that the bribe be "offered in exchange for a recognized property interest of the employer." (Br.,27, 42.) But *Frost* never said that. In *Frost*, professors helped graduate students obtain fraudulent degrees in exchange for the students steering government research contracts to the professors. In that context, this Court held that the professors had a fiduciary duty to protect the university's property—degrees—and that they breached that duty. *Frost*, 125 F.3d at 367. Nothing in *Frost* suggested, however, that a breach of fiduciary duty must always involve deprivation of a traditional property interest, a proposition that would make § 1346 redundant with § 1343. Instead, after having determined that the professors had a fiduciary duty, the Court turned to the question of "when" a breach by a private fiduciary violates the statute. *Id.* at 367. The Court's answer to that question focused not on deprivation of property but on the foreseeability of economic harm, requiring "the prosecution [to] prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim." *Id.* at 369.

53

While *Frost* described the offense as "dependent upon the property rights of the victim," context makes clear that the dependence took the form of a foreseeability-of-economic-harm requirement—a more demanding standard than the materiality requirement adopted by some courts. *Id.* at 368–69. Indeed, this Court has never interpreted *Frost* as imposing a free-standing property requirement. *See United States v. Douglas*, 398 F.3d 407, 419 (6th Cir. 2005) (quoting *Frost* and holding that the offense required a breach of fiduciary duty and foreseeability of economic harm). Moreover, even if *Frost* could be interpreted to have incorporated a separate property requirement as a limiting principle, such a limitation would not survive *Skilling*, which implemented distinct limitations, but understood the honest services provision to apply even where "the betrayed party suffered no deprivation of money or property." 561 U.S. at 400; *see also Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (§ 1346 bars fraudulent schemes "'to deprive another of the intangible right of honest services'—regardless of whether the scheme sought to divest the victim of any property").

Finally, even if this Court interpreted honest-services fraud in the way Borges proposes, requiring the government to prove that a breach

54

of fiduciary duty infringed on "the property rights of the victim," that would be an evidentiary burden to be proven at trial and not an appropriate basis for striking the predicate from the indictment. *Cf. Douglas*, 398 F.3d at 419 (*Frost* did not set forth the elements of the offense). Borges, in any event, does not identify any prejudice related to the alleged omission of any such "property" requirement from the indictment. *See United States v. Cor-bon Custom Bullet*, 287 F.3d 576, 580 (6th Cir. 2002). And the government's evidence at trial was sufficient to satisfy any such property element for the reasons explained below.

### b. Jury Instructions & Evidence

Based on the same flawed premise that private honest services fraud requires proof that the breach of fiduciary duty implicated a property interest, Borges argues that the district court erred when it declined to issue an instruction requiring such a showing. (Br.,III.B.) The relevant instruction defined the breach of duty as a quid pro quo bribery scheme involving "the actual, intended, or solicited exchange of a thing of value in exchange for the employee improperly providing *information that the employer intended to keep secret*" and required the

jury to find that the defendant foresaw, or should have foreseen, that the employer might suffer economic harm as a result of the breach. (R.260, tr.,10611–12 (emphasis added).)

Borges had requested language requiring that the breach of fiduciary duty involve "confidential business information" because such information has "long been recognized as property." (Br.,23, 47–48.) A district court abuses its discretion in declining to give a requested instruction only if the instruction was: (1) a correct statement of the law; (2) not substantially covered by the charge actually delivered to the jury; and (3) concerned a point so important in the trial that the failure to give it substantially impaired the defendant's defense. *United States v. Anderson*, 67 F.4th 755, 764 (6th Cir. 2023). Borges cannot show that the court's failure to use his wording was error, let alone reversible error.

As a preliminary matter, Borges cannot show that his requested instruction was a correct statement of law because, as explained above, honest services fraud does not require proof of a "traditionally recognized property interest" like confidential business information. Borges's reliance on the definition of confidential business information

56

from *Carpenter v. United States,* 484 U.S. 19 (1987), a traditional fraud case that concerned payments by a business competitor in exchange for trade secrets and confidential information, is thus inapposite.

Borges's reliance on *Ciminelli v. United States,* 598 U.S. 306 (2023), which the Supreme Court decided after his conviction, does not help him either. *Ciminelli* was already Sixth Circuit law at the time of trial. *See id.*, 598 U.S. at 313 n.3 (citing *United States v. Sadler*, 750 F.3d 585, 590–592 (6th Cir. 2014)). Because Borges never argued that the jury instructions here conflicted with *Sadler*, this Court would review any argument based on *Ciminelli* for plain error. *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021).

Any argument based on *Ciminelli* fails at the outset. *Ciminelli* and *Sadler* addressed whether the "right to control" theory was a valid basis of liability under 18 U.S.C. § 1343 for "obtaining money or property" through fraud. The government never argued, and the jury was never instructed, that Borges could be convicted based on this theory. Indeed, the situation here was quite distinct from that in *Ciminelli*: the claim there was that the scheme deprived the victim-business of information unknown to it that it might have found valuable

57

in making economic decisions; the claim here, in contrast, was that the defendant's scheme sought access (by bribing an employee) to signature information that the victim had itself developed as part of its business. And the Court's concern in *Ciminelli* that applying § 1343 to non-disclosure of "mere information" would sweep in "almost any deceptive act"—like an undisclosed conflict of interest (*see id.* at 315)—is not present here. *See Skilling*, 561 U.S. at 409–10 (§ 1346 does not include liability for "conflict of interest" or "undisclosed self-dealing"). Borges can show no instructional error, let alone plain error, based on *Ciminelli.*

In any event, Borges fails to explain what difference the jury would have perceived between the language in the provided instruction, which required the breach of fiduciary duty to involve the improper disclosure of information "the employer intended to keep secret" and his suggested "confidential business information."[10] The evidence established that the signature-count information was obtained by AMT

---

[10] Borges acknowledged below that the "intended to keep secret" phrasing "actually better define[d] the scope than just simply leaving it at improper disclosure of business information." (R.237, tr.,9365.)

pursuant to its contract, constituting the value and service AMT was obligated to provide. (*See* R.216, tr.,7492.) The evidence further showed that no one "outside of AMT management" had access to the real-time signature count and that AMT implemented "around-the-clock security" to protect the signatures. (*Id.*, tr.,7497–7506; *see also* R.224, tr.,8124.) AMT protected this information because its disclosure could harm the company's ability to perform under the contract. (R.216, tr.,7503–04.)

Any error in declining to give Borges's requested instruction was thus harmless because the evidence established that the signature-count information was "confidential business information," as the Supreme Court has defined it. *See Carpenter*, 484 U.S. at 25 ("confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit"). Borges's related sufficiency challenge (Br.,I.B.1) fails for the same reasons.

### ii. *Frost*'s Foreseeability-of-Harm Standard

Borges also argues that the district court erred by instructing that the government needed to prove that he "foresaw, or reasonably should have foreseen, that [AMT] might suffer economic harm as a result of the

intended or solicited breach of fiduciary duty." (R.260, inst.,10611). But Borges himself proposed this very instruction. (*Compare* R.174, inst.,4063 *with* R.260, inst.,10611.) The invited-error doctrine thus precludes relief unless Borges can show that the interests of justice demand otherwise. *See United States v. Barrow*, 118 F.3d 482, 490–94 (6th Cir. 1997). They do not. Nor would Borges be entitled to relief under a lesser standard.

As Borges acknowledges, the foreseeability-of-harm standard comes straight from this Court's decision in *Frost*. And *Percoco v. United States,* 598 U.S. 319 (2023)—which concerned whether a private citizen with influence over government decision-making could be convicted for public official honest services wire fraud—did not impact *Frost*. The jury here was instructed regarding a private citizen's (Borges's) involvement in private honest services fraud through bribery; and a public official's (Householder's) involvement in public official honest services fraud through bribery. The government never argued, and the jury was never instructed, that Borges's conduct as a private citizen constituted public official honest services fraud—the *Percoco* theory.

60

Borges also suggests that *Frost*'s foreseeability-of-harm standard is insufficient given *Skilling* but does not explain why. (Br.,49.) If anything, *Skilling* suggests that *Frost*'s requirement of foreseeable economic harm may be unnecessary given that the statute now applies only to cases involving bribes and kickbacks (as to which the jury here was properly instructed). *See* 561 U.S. at 400.

Finally, contrary to Borges's contention (Br.,I.B.3), sufficient evidence satisfied the *Frost* foreseeability standard. AMT never publicly disclosed the real-time signature count, limited access to the information to management, and instructed employees to protect the information. (R.216, tr.,7502–04; R.224, tr.,8124.) AMT did so because the signature-count could be used to "interfere with the campaign" and defeat the collection effort. (*Id.*,7502–04.) Indeed, that was precisely why Borges was willing to bribe Fehrman for the information.

The signature-collection effort ultimately did fail. AMT CEO Roberson testified that the failure was "costly" and bad for the company's reputation. (R.216, tr.,7497–7508 (explaining that "your reputation in this business or any business is everything" and that

"[h]aving a track record of success [ ] helps when you're trying to develop new business and trying to get hired on new projects").)

Given this evidence, which must be interpreted in the light most favorable to the government, *see Jackson*, 443 U.S. at 319, a rational jury could certainly conclude that Borges foresaw, or should have reasonably foreseen, that Fehrman's disclosure of the signature-count information might cause AMT economic harm.

### iii. Fiduciary Duty

Finally, Borges argues that the evidence was insufficient to establish that Fehrman owed a fiduciary duty to AMT. (Br.,I.B.2.) But the evidence established—and Borges does not dispute—that Fehrman was an employee of AMT. And *Skilling* made clear that "[t]he existence of a fiduciary relationship, under any definition of that term," is "usually beyond dispute" in an "employee-employer" relationship.[11]

---

[11] *Skilling* did not suggest that the scope of the duty must be defined by Ohio law. On the contrary, *Skilling* said that its limitation of honest services fraud to bribery and kickback schemes "establish[ed] a uniform national standard." 561 U.S. at 411 (quotation omitted); *accord Frost,* 125 F.3d at 366. The record nevertheless establishes that AMT placed "special trust or confidence" in Fehrman—who was granted access to the signature-count information and entrusted with protecting it—such that a fiduciary duty existed under Ohio law. *See Stone v. Davis*, 66 Ohio St.2d 74, 78 (1981).

*Skilling*, 561 U.S. at 407, n.41; *see also, e.g., United States v. Nouri*, 711 F.3d 129, 138 n.1 (2d Cir. 2013) (challenge to instruction that employee owed duty of honest services to his employer was "meritless" because "the existence of a fiduciary relationship between an employee and employer is beyond dispute" (internal quotation marks omitted)).

The record here reinforces that conclusion. AMT obtained the signature-count information pursuant to its contract, restricted access to the information, instituted procedures to protect the information, and instructed Fehrman to protect the information from disclosure. (*See, e.g.*, R.216, tr.,7502–03; R.224, tr.,8124, 8196 (Fehrman testifying that he was instructed "to protect" the signatures, including by "loc[king] [them] up at the end of the day," and that disclosing the signature-count information would have amounted to a "betray[al]").) There can be no serious question that the evidence adduced at trial was sufficient to establish a fiduciary duty. *See Jackson*, 443 U.S. at 319.

### B. There Was Sufficient Evidence to Support the "Pattern" Element, Wholly Apart from the Fehrman Bribe.

Although Borges trains his focus on the Fehrman bribe, his RICO conspiracy conviction does not depend on it because sufficient evidence supported other racketeering acts. *See Griffin v. United States*, 502 U.S.

46, 56–60 (1991) (multi-object conspiracy conviction should be affirmed if the evidence is sufficient to support conviction as to any one of the objects); *see also, e.g., United States v. Browne*, 505 F.3d 1229, 1260–61 (11th Cir. 2007) (applying *Griffin* in RICO context). In addition to arguing that Borges's bribe of Fehrman violated the Travel Act and the private honest services fraud statute, the government argued that the pattern of racketeering activity included money laundering and public official bribery offenses. *See e.g., United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015) (a RICO conspiracy charge "need not specify the predicate racketeering acts that the defendant agreed would be committed" and "the jury need only be unanimous as to the types of racketeering acts that the defendant[] agreed to commit"); *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) (same).

     *i.  Money Laundering*

Borges challenges the sufficiency of the evidence related to the money-laundering predicates, which involved Longstreth's transfer of public official bribery proceeds into Borges's 17 Consulting account and Borges's distribution of those proceeds. Borges argues that the FirstEnergy-through-Generation-Now payments from Longstreth "did

not involve the proceeds of bribery." (Br.,33–35.) His argument turns on the fact that Borges began receiving Generation Now money after Householder received his last payment in exchange for passing HB 6 in July 2019. (*Id.*,34.) Borges misunderstands both the legal and factual basis for the money-laundering racketeering acts.

The money-laundering statute at issue is 18 U.S.C. § 1957, which criminalizes engaging in monetary transactions in property derived from specified unlawful activity; it is not concealment money laundering under 18 U.S.C. § 1956. (R.238, tr.,9532, 9535; R.260, inst.,10618.) And the § 1957 predicate acts were based on Householder's bribery proceeds from FirstEnergy, including the proceeds from the referendum-period bribery agreement to perform new official action to preserve the bailout—Householder pressuring Yost and preparing alternate legislation—in return for $38 million in additional payments into Generation Now. (*See* R.238, tr., 9506, 9516–18, 9521, 9532, 9535 (explaining basis for money-laundering predicates in closing argument).)

Money laundering under § 1957 requires that: (1) the defendant engaged in a monetary transaction; (2) the defendant knew the

transaction involved criminally derived property; (3) the property had a value greater than $10,000; (4) the property was derived from specified unlawful activity (here, public official bribery); and (5) the transaction occurred in the United States. *United States v. Rayborn*, 491 F.3d 513, 517 (6th Cir. 2007); (R.260, inst.,10616, 10618). The uncontradicted evidence established that Borges knew about the overarching bribery scheme, including the bribery acts before and after the passage of HB 6, and that he agreed to receive bribery proceeds into his 17 Consulting account and then distribute those proceeds in coordination with co-conspirators.

By providing Longstreth with wiring instructions for his 17 Consulting account, Borges assisted in the transfer of FirstEnergy-through-Generation Now money into his account. (*E.g.*, R.302, Ex.605G,12497–98.) Longstreth wired $1.62 million into Borges's account via nine transactions over $10,000. (*Id.*, Ex.133,12332.) This money fully funded Borges's account. Borges then engaged in more than a dozen outgoing transactions of over $10,000 to further the conspiracy. This included the $15,000 payment to Fehrman. (*Id.*, Ex.134,12333.) Borges does not challenge these transactions, nor could he.

Borges also cannot dispute that, in agreeing to receive and distribute those bribe payments from Generation Now, he was agreeing to receive and distribute the proceeds of public official bribery. (*See id.*, Ex.605B,12471, Ex.605C,12485, Ex.605E,12490, Ex.605F,12494 (texts with Borges discussing payments from FirstEnergy to Generation Now to 17 Consulting); Ex.15,12253 (FirstEnergy payments into Generation Now); Ex.133,12332 (100% of funds into 17 Consulting came from Generation Now).) The jury heard overwhelming evidence that FirstEnergy repeatedly paid Householder in return for official action related to the passage and preservation of the bailout. In particular, after HB 6 passed, the companies paid Householder over $38 million for the anti-referendum effort because Householder promised to use his position as Speaker "to help defeat the referendum" and to prepare alternate legislation in the event the referendum succeeded. (R.211, tr.,6845–50; R.217, tr.,7551–53; *id.*, 7701–03; *see also*, R.303, Ex.634A,12577 (Jones text: Householder's "referendum strategy" included "plans to pass it as a tax in a new bill if they get enough signatures"), Ex.634B,12580 (Jones text: "He's got the 'tax' bill ready to go"); R.302, Ex.601C,12642, Ex.601D,12466.) This constituted public

67

official bribery. *See* 18 U.S.C. § 1951; 18 U.S.C. §§ 1343, 1346; Ohio Rev. Code § 2921.02; *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (bribery requires "a public official agree[ing] that payments will influence an official act"); *McDonnell v. United States*, 579 U.S. 550, 574 (2016) (defining "official action").

The undisputed evidence established that Borges knew that Generation Now was funded by public official bribery. Cespedes testified that Borges knew the history of Householder's corrupt relationship with FirstEnergy because he told Borges about it. Cespedes described to Borges the $400,000 bribe payment that was handed to Householder at the October 2018 meeting (R.211, tr., 6788; R.302, Ex.291B,12352), and the $15 million in bribes paid to Householder through Generation Now in the spring of 2019 (R.211, tr., 6826–28; R.302, Ex.461D,12400). Cespedes further testified that Borges knew that this corrupt relationship continued after the passage of HB 6, when the company agreed to make additional payments in return for new official action by Householder to preserve the bailout. (R.212, tr.,6857–68 (testimony that Cespedes explained to Borges the nature of the bribery agreement, including new legislation by Householder, when

68

Borges agreed to receive Generation Now money).) Cespedes described this referendum-period agreement for additional payments in return for new official action as a continuation of the "same arrangement" that was in place before HB 6 passed. (R.211, tr.,6848–50.)

Documentary evidence corroborated Cespedes's testimony. Text messages and recordings reflected Borges's knowledge of the massive flow of money—which he called "Monopoly money"—from FirstEnergy to Householder through Generation Now. (R.302, Ex.605B,12471, Ex.605D,12488, Ex.605G,12497–98; R.303, Ex.616C,12544.) Borges's communications also reflected his knowledge of Householder's promise to perform official action in exchange for FirstEnergy money. In fact, Borges helped Householder deliver on that promise: text messages and toll records showed Householder and Borges working together to pressure Yost to take action adverse to the ballot referendum. (R.303, Ex.608B,12517–18, Ex.608C,12519–20, Ex.737,12618.) In addition, the jury heard Borges's recorded statement that Householder introducing "a new piece of legislation" was the "more likely" outcome of their anti-referendum effort. (R.304, Ex.620D,12672; *see also* Ex.636F,12593 (texts with FES executives and Borges discussing "new legislation").)

69

With this knowledge, Borges characterized Householder's corrupt relationship with FirstEnergy and his own firm as an "unholy alliance." (*Id.*, Ex.615C,12521.)

Based on this evidence, a rational jury could conclude that Borges conspired to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity that included money laundering. Borges assisted Longstreth in committing multiple § 1957 racketeering acts through transfers of FirstEnergy-to-Generation-Now bribery proceeds into Borges's 17 Consulting account. And Borges, himself, committed multiple § 1957 racketeering acts when he then distributed the bribery proceeds through monetary transactions over $10,000 in furtherance of the conspiracy.

### ii. *Public Official Bribery*

Based on this same evidence, the jury could also rationally conclude that Borges conspired to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity that included public official bribery. Borges joined the conspiracy knowing that FirstEnergy was making bribe payments to Householder in exchange for official action, and he agreed to further the conspiracy

70

with that knowledge. That, on its own, is sufficient. *See Rich*, 14 F.4th at 492 (evidence that defendant ""knew about and agreed to facilitate the scheme . . . was sufficient to support a conviction under § 1962(d)"" (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997))). Here, however, Borges actually assisted Householder in his taking of official action—*i.e.*, pressuring Yost—in exchange for FirstEnergy payments during the referendum period. This certainly proved Borges's agreement to facilitate a racketeering scheme involving the commission of public official bribery. *See id; Hills*, 27 F.4th at 1174 ("No formal agreement is necessary, . . . and . . . agreement can be inferred from the defendant's actions.").

> C. *Even if Borges Could Establish a Legal Error as to the Fehrman Bribe, the Error Would Be Harmless.*

Even if Borges could show an error in the district court's instructions regarding the Fehrman bribe or its denial of the motion to strike the language regarding that bribe from the indictment, the error would not require a new trial because this Court can conclude, beyond a reasonable doubt, that the jury would nevertheless have found him guilty. *Skilling*, 561 U.S. at 414 n.46 (directing harmless-error review pursuant to *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam), where

71

one object of conspiracy was legally invalidated).[12] Borges argues that because there was no special verdict as to the types of RICO predicates found by the jury, it is impossible to know whether the finding of a pattern of racketeering necessarily relied on the Fehrman bribe. That is not so.

As an initial matter, if only one legal theory regarding the Fehrman bribe were invalidated, the verdict could stand without further inquiry because any reliance on that bribe would be supported by the valid theory. *See Neder v. United States,* 527 U.S. 1, 18 (1999). During closing argument, Borges did not challenge the government's evidence related to the Travel Act; and the evidence as to both theories was overwhelming. Further, in convicting Borges, the jury necessarily found at least one racketeering act apart from the Fehrman bribe, as that bribe, on its own, would not constitute a "pattern of racketeering activity." (R.260, inst.,10603 (requiring "at least two acts" and explaining relationship and continuity requirements); R.238, tr.,9481

---

[12] The conspiracy conviction in *Skilling* was affirmed on remand based on a general verdict, despite invalidation of one of the objects of the conspiracy. *United States v. Skilling* (Skilling II), 638 F.3d 480, 482 (5th Cir. 2011) (applying *Neder*, 527 U.S. at 18).

(government arguing that Fehrman bribe amounted to "one act").) One valid theory would thus suffice to support any reliance on the Fehrman bribe and, as explained in section I.B, sufficient evidence supported numerous other racketeering acts.

In fact, even if both theories regarding the Fehrman bribe were held legally flawed, the error would still be harmless. Given the instructions and the evidence, no rational jury could have found Borges guilty of the charged RICO conspiracy without finding at least two legally valid racketeering acts other than the Fehrman bribe, thus establishing a pattern of racketeering even without reliance on that act. *See Neder,* 527 U.S. at 13–14; *United States v. Jefferson*, 674 F.3d 332, 361–63 (4th Cir 2012) (finding alternative-theory error harmless and observing that, "if the evidence that the jury necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed" (internal quotations and citation omitted)); *United States v. Freeman*, 70 F.4th 1265, 1283 (10th Cir. 2023) (finding

73

instructional error harmless where jury necessarily found element beyond a reasonable doubt based on other instructions).

First, the jury could not have convicted Borges of RICO conspiracy without finding two predicates other than the Fehrman bribe. The jury found that Borges "was connected to the enterprise in some meaningful way," "that [he] knew . . . the general nature of its activities," that "he knew the conspiracy's main purpose," and that he "voluntarily joined it intending to help advance or achieve its goal." (R.260, inst.,10600, 10602.) On the evidence presented, the jury could not reasonably have made these findings without also concluding that Borges intended to participate in the affairs of the enterprise through a pattern of racketeering activity centrally characterized by public official bribery and money laundering—*i.e.*, Householder taking official action to preserve the bailout in exchange for continued payments by FirstEnergy through Generation Now. (R.238, tr.,9469–70, 9475–76 ("[T]he evidence relating to the enterprise, it overlaps with the . . . racketeering activity, the bribery and money laundering and concealment.").) And the jury certainly could not have found Borges guilty of RICO conspiracy without also concluding that he agreed to the

74

commission of multiple money laundering predicates by receiving and distributing bribery proceeds in furtherance of the conspiracy's effort to defeat the referendum. If the jury did not believe that was so, it could not rationally have found Borges guilty of joining the conspiracy in the first place, as that was the only theory presented. This sets the case apart from *Callanan v. United States*, 881 F.2d 229, 235 (6th Cir. 1989), where this Court concluded that the jury could "rationally" have convicted of Attorney Callanan of RICO conspiracy without finding two valid predicates.[13]

Moreover, that the jury must have found at least two predicates apart from the Fehrman bribe is clear from the interrelation of the various predicates. As noted above, the Fehrman bribe could at most have been treated as "one act" by the jury, so that the jury necessarily found at least one other racketeering act. (R.238, tr.,9481; R.260, instr.,10603.)[14] But a finding that Borges agreed to the commission of

---

[13] In addition, *Callanan* predated the Supreme Court's decisions in *Neder* and *Hedgpeth*, and seemingly applies a more demanding form of harmless-error review than those cases hold applicable.
[14] The private honest services and Travel Act predicates did not qualify as specified unlawful activity for purposes of the money laundering predicates. (R.260, inst.,10615, 10618.)

any of the other applicable predicate offenses would necessarily have led to the same conclusion as to multiple *other* predicate acts. (*Id.*,10605–06, 10609, 10614, 10616–18.) For example, a finding of a pattern including commission of money laundering based on one of the bank transactions—*e.g.*, Longstreth's first transfer of $400,000 in bribery proceeds from Generation Now to 17 Consulting—would necessarily require the same conclusion as to the other transactions.[15] There was simply no rational evidentiary basis for the jury to have treated various transfers differently in that regard, and no argument to that effect. Similarly, a finding of a pattern including public official bribery would have also required the jury to conclude that Borges knew that the Generation Now money constituted bribery proceeds such that the transactions involving those proceeds violated § 1957. For this reason too, any legal error as to the Fehrman bribe was harmless.

Finally, Borges does not—and could not—argue that the district court's refusal to strike the predicates based on the Fehrman bribe from the indictment or exclude them from the instructions impacted the trial

---

[15] All nine transfers from Generation Now into 17 Consulting and more than a dozen distributions from 17 Consulting exceeded $10,000. (R.302, Ex.133,12332, Ex.134,12333.)

outcome through admission of otherwise inadmissible evidence.
Whether or not an independent racketeering act, the Fehrman bribe
was strong evidence of Borges's association with the enterprise and
participation in the conspiracy.

## II.  The district court's evidentiary rulings were not erroneous and were harmless, in any event.

### A.  Evidence Regarding Use of Attorneys

Borges argues that the district court improperly excluded evidence
that "HB 6 proponents routinely consulted with legal counsel in the
ordinary course of organizing their fundraising activities." (Br.,54.)
Although counsel for both defendants argued in favor of admission of
certain attorney-evidence during trial (R.206, tr.,6262–65; R.212,
tr.,6991–92), Borges did not lodge specific objections to the six instances
identified in his brief. (Br.54 (citing R.191, tr.,4609; R.206, tr.,6261–67;
R.208, tr.,6529–32, 6548–49; R.212, tr.,6935–36, 6991–92; R.219,
tr.,7836–37).) His argument fails, regardless of the standard this Court
applies. *See United States v. Paulus*, 894 F.3d 267, 279–80 (6th Cir.
2018) (preserved evidentiary challenges reviewed for abuse of
discretion; unpreserved challenges reviewed for plain error).

Borges did not pursue an advice-of-counsel defense (R.191, tr.,4519–20, 4603, 6264), nor could he.[16] The government thus objected to defense counsel's repeated attempts to improperly present a pseudo advice-of-counsel defense. In response, the district court cautioned against presenting evidence supporting the inapplicable defense. (R.206, tr.,6263–64; R.212, tr.,6991–92.)

The district court was justifiably concerned about an attempt to backdoor the inapplicable defense. Defense counsel referenced Borges's consultation with attorneys multiple times during opening statement, even after the court had addressed the issue. (R.191, tr.,4517–20, 4589–90, 4603, 4609.) Both defendants then repeatedly attempted to introduce evidence of attorney involvement throughout trial. For example, prior to cross-examining a government witness, Borges's counsel argued that the jury should hear that an individual mentioned in a text exchange was "a prominent election lawyer," reasoning: "I don't know that it necessarily means we are saying the advice of

---

[16] "'The advice of counsel defense is only applicable where it may negate willful violation of the law.'" *United States v. Bruner*, 616 F. App'x 841, 846 (6th Cir. 2015) (quoting *United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir. 2005)).

counsel, but we are also trying to clear up any misconception that he might just be another lobbyist or . . . a political operative." (R.212, tr.,6991–92.) Yet defense counsel declined the district court's invitation to clarify that the individual was not a lobbyist. (*Id.*)

Counsel's repeated attempts to highlight attorney involvement, and equivocation when asked to explain its relevance, shows that the district court's concerns were justified: Borges wanted to introduce co-conspirators' use of attorneys to suggest that their conduct was sanctioned by counsel, while disclaiming reliance on an inapplicable advice-of-counsel defense. Allowing Borges to do this would have been improper. Whether HB 6 proponents sought legal advice about "fundraising" (Br.,54) was irrelevant to whether Borges agreed to further an enterprise engaged in acts of bribery and money laundering, particularly absent evidence of "full disclosure of all pertinent facts to counsel." *United States v. Lindo*, 18 F.3d 353, 356–57 (6th Cir. 1994); *see Ragsdale*, 426 F.3d at 778 ("Testimony that [defendant's] business partner allegedly consulted an attorney . . . is not relevant when it is entered for the sole purpose of supporting an unassertable defense."). Allowing evidence supporting the inapplicable advice-of-counsel defense

79

would have confused the issues and misled the jury. *See* Fed. R. Evid. 403.

To be clear, however, the district court never ordered an "absolute ban" on evidence of attorney involvement, as Borges suggests. (Br.,53.) For example, the district court resolved one government objection by ordering the redaction of a header stating the document contained "attorney-client privileged" material, with the parties' consent. (R.206, tr.,6261–67.) In another instance, the district court allowed evidence sought by Householder through testimony rather than exhibit, without objection by Borges. (R.208, tr.,6529–32.) Twice, the district court overruled government objections and allowed evidence of attorney involvement. (R.212, tr.,6935–36; R.219, tr.,7836–38.) The district court's handling of this issue was not an abuse of discretion, nor did it affect the outcome of trial. Indeed, Borges does not—and cannot— explain how evidence of "the routine retention and use of attorneys" by co-conspirators would have in any way undermined the overwhelming evidence of his guilt.

*B. Testimony by AMT Witnesses*

Borges argues that testimony from two AMT witnesses was not based on personal knowledge, as required by Federal Rule of Evidence 602. (Br.,55.) This testimony was challenged on hearsay and other grounds but not based on Rule 602. (R.216, tr.,7498, 7525.) Plain-error review therefore applies. *See United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989). Borges can show no error, let alone plain error.

Rule 602 provides that "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." "[T]he threshold for admitting testimony under Rule 602 is low[,]" and "[t]estimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990).

The AMT CEO and an AMT consultant testified about the aggressive tactics used to disrupt AMT's work. Both witnesses had roles overseeing and managing the signature-collection efforts, and they testified based on their personal knowledge of these tactics and the

81

steps they took in response. (R.216, tr.,7498–7500; 7522, 7525.) That more than suffices under Rule 602. Borges can show no prejudice, in any event, given that the challenged evidence was cumulative to other unchallenged evidence (R.224, tr.,8139, 8151), and given the overwhelming evidence of his guilt.

### C. Evidence that Co-Conspirators Pleaded Guilty

On direct examination and with a proper limiting instruction, a prosecutor may elicit evidence that a co-conspirator pleaded guilty so that the jury "will have appropriate facts on hand to assess the witness's credibility." *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996). The district court allowed the government to do that here with respect to Cespedes and Longstreth, both of whom pleaded guilty and cooperated with the government.[17] Borges argues that admission of such evidence was improper because he promised to forgo attacking the witnesses' credibility on that basis.[18] He is wrong. *See, e.g., United*

---

[17] The government only introduced the fact of their guilty pleas, not the agreements themselves.

[18] Borges cites *United States v. Clark*, No. 1:19-cr-148, 2020 U.S. Dist. LEXIS 28815 (N.D. Ohio Feb. 20, 2020), and *United States v. Parker*, No. 80-5093, 1980 U.S. App. LEXIS 11061 (6th Cir. 1980). (Br.,56–57.) Both are distinguishable and neither supports reversal, in any event. *See Clark*, 2020 U.S. Dist. LEXIS 28815, at *32–

*States v. Universal Rehab. Servs.*, 205 F.3d 657, 666–67 (3d Cir. 2000) (en banc) (evidence of witness's guilty plea admissible even when defendants offered to stipulate that they would not challenge witness's credibility); *United States v. Montani*, 204 F.3d 761, 766 (7th Cir. 2000) (same).

A jury cannot properly assess a co-conspirator's credibility without knowledge of his guilty plea. *Universal Rehab.*, 205 F.3d at 666–67; *Montani*, 204 F.3d at 766. And a promise not to impeach based on a plea agreement cannot remove the relevance of a co-conspirator's guilty plea because "impeachment is presumed" where a witness testifies about crimes in which he has participated. *Montani,* 204 F.3d at 767. Where a witness's "integrity and character for truthfulness [will] be questioned," the government "has a right to bring out evidence explaining to the jury the reasons for and extent of [a cooperating witness's] bias." *Id.* at 767.

---

35 (because co-conspirators did not independently testify about facts relating to the conspiracy, allowing evidence of plea agreements "risk[ed] that the jury would accept the [ ] pleas as evidence of a conspiracy;" but finding error harmless); *Parker*, 1980 U.S. App. LEXIS 11061, at *1–2 (finding error harmless in light of curative instruction, where government, on cross-examination, elicited that defense witness pleaded guilty to same indictment).

Such evidence is also necessary to "counteract the possibility that the jury might believe [the defendants] were being selectively prosecuted." *Universal Rehab.*, 205 F.3d at 666–67. If the government could not elicit the basic facts of a co-conspirator's guilty plea on direct examination, the jury would be left to speculate about why the defendants on trial were singled out for prosecution.

Borges cannot show any abuse of discretion, nor can he show that this evidence materially affected the verdict, in any event. The district court issued a limiting instruction prohibiting the jury from considering evidence that the co-conspirators pleaded guilty as substantive evidence of the defendants' guilt. (R.260, inst.,10626 (quoting Sixth Cir. Inst. 7.08(3))); *Montani*, 204 F.3d at 767 (any prejudice cured by instruction). In addition, both Cespedes and Longstreth testified for hours about the facts underlying the guilty pleas—specifically, their participation in the conspiracy with Borges.

## D. No Cumulative Error

Finally, Borges argues that the cumulative effect of these evidentiary rulings requires reversal. (Br.,58.) As a preliminary matter, because none of the challenged rulings were erroneous, a cumulative-

84

error analysis is unnecessary. *United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009). But even assuming error, Borges cannot prove the "that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). That is particularly true given that the challenged rulings did not impact the heart of the evidence: that Borges knew the payments he received from Generation Now were the proceeds of Householder's bribery agreement with FirstEnergy; and that Borges used the bribe proceeds to further the conspiracy.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street
Cincinnati, Ohio 45202
(513) 684-3711
Alexis.Zouhary@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation specified in this Court's May 7, 2024 order. The brief contains 14,997 words of Century Schoolbook (14 pt) proportional type. Word for Microsoft 365 is the word-processing software that I used to prepare this brief.

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
| --- | --- | --- |
| 22 | indictment | 1247–1289 |
| 104 | motion | 1734–1753 |
| 161 | order | 3914–3937 |
| 191 | transcript | 4512–4677 |
| 194 | transcript | 4713–4926 |
| 198 | transcript | 5146–5352 |
| 199 | transcript | 5353–5494 |
| 201 | transcript | 5500–5692 |
| 202 | transcript | 5693–5825 |
| 205 | transcript | 5939–6065 |
| 206 | transcript | 6066–6269 |
| 208 | transcript | 6474–6638 |
| 211 | transcript | 6642–6853 |
| 212 | transcript | 6854–7037 |
| 214 | transcript | 7113–7264 |

| 216 | transcript | 7415–7542 |
|-----|------------|-----------|
| 217 | transcript | 7543–7736 |
| 219 | transcript | 7804–7980 |
| 224 | transcript | 8110–8258 |
| 228 | transcript | 8386–8612 |
| 229 | transcript | 8613–8818 |
| 237 | transcript | 9342–9462 |
| 238 | transcript | 9463–9618 |
| 239 | transcript | 9619–9662 |
| 258 | motion | 10563–10565 |
| 260 | jury instructions | 10572–10645 |
| 265 | order | 10650–10657 |
| 284 | order | 11157–11167 |
| 286 | transcript | 11226–11284 |
| 302 | notice | 12149–12506 |
| 303 | notice | 12507–12658 |
| 304 | notice | 12659–12679 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Borges by filing with the Court's CM/ECF system this 23rd day of May, 2024.

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY