IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**UNITED STATES OF AMERICA,**          :

          **Plaintiff-Appellee,**          :

**vs.**                                    :          **Case No. 23-3566**

**MATTHEW BORGES,**                      :

          **Defendant-Appellant.**          :

Direct Appeal from a Criminal Judgment
Entered In the United States District Court for the
Southern District of Ohio (Cincinnati)
Docket No.1:20-cr-00077-4
(Timothy S. Black, District Judge)

---

# REPLY BRIEF OF DEFENDANT-APPELLANT

---

DENNIS C. BELLI
536 South High St. Fl. 2
Columbus, Ohio 43215-5785
Phone:(614) 300-2911
Fax: (888) 901-8040
Email: bellilawoffice@yahoo.com
ATTORNEY FOR DEFENDANT-
APPELLANT MATTHEW BORGES

# <u>TABLE OF CONTENTS</u>

REPLY ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    What Pressure? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Laundering Post-Bribe Proceeds Activity is not a Crime . . . . . . . . . . . 5

    Bootstrapping Has Its Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    The Government's *Bouie* Problem  . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Shoehorning Bad Facts also Has Its Limits . . . . . . . . . . . . . . . . . . . . . 16

    The Government's *Marks* Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    The Fuzzy Logic of the Government's Harmlessness Theory . . . . . . . 22

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Cases:**

*Bouie v. City of Columbia,* 378 U.S. 347 (1964) . . . . . . . . . . . . . . . . . . . . . .  13

*Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989) . . . . . . . . . . .  23-24

*Carpenter v. United States*, 484 U.S. 19 (1987) . . . . . . . . . . . . . . . . . . . . .  18

*Curtis v. State*, 148 N.E. 834 (Ohio 1925). . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Gillum v. Industrial Com*., 48 N.E.2d 234  (Ohio 1943) . . . . . . . . . . . . . . .  15

*Marks v. United States*, 430 U.S. 188 (1977). . . . . . . . . . . . . . . . . . . . . . . .  18

*McDonnell v. United States*, 579 U.S. 550 (2016). . . . . . . . . . . . . . . . . . . . .  4

*Perrin v. United States*, 444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Skilling v. United States*, 561 U. S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . .  19

*Snyder v. United States*, No. 23-108, 2024 WL 3165518 (U.S.S.C. June 26, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 12

*State v. Knight*, 749 N.E.2d 761 (Ohio App. 2000) . . . . . . . . . . . . . . . . . . . .  7

*United States v. Ali*, 557 F.3d 715 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . .  17

*United States v. Alkaabi,* 223 F. Supp. 2d 583 (D.N.J. 2002) . . . . . . . . . . . .  17

*United States v. Bolos,* Nos. 22-5486/5605, 2024 WL 2947960 (6th Cir. June 12, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*United States v. Douglas*, 398 F.3d 407 (6th Cir. 2005) . . . . . . . . . . . . . . . .  20

*United States v. Ferber*, 966 F. Supp. 90 (D. Mass. 1997) . . . . . . . . . . .  10-12

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) . . . . . . . . . . . . . . .  18-19

*United States v. Kragness*, 830 F. 2d 842 (8th Cir. 1987) . . . . . . . . . . . .  22-23

*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) . . . . . . . . . . .  13-14

*United States v. Taylor*, 993 F.2d 382 (4th Cir. 1993) . . . . . . . . . . . . . . . . .  7

*Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1988) . . . . . . . . . . . . . . . .  3

**Statutes:**

Ohio Revised Code §2921.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Ohio Revised Code §3517.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

18 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 21

**Other Authorities:**

Oziel, Lauren M., What Are Federal Corruptions Prosecutions For?, Yale Law
Journal Forum 594 (Feb. 16, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

# REPLY ARGUMENT

The Department of Justice ("DOJ") used a racketeering statute to prosecute the former House Speaker of the Ohio General Assembly, Larry Householder, for accepting millions of dollars from a utility company allegedly in exchange for legislation authorizing a customer-funded subsidy of two failing nuclear plants. Whether the circumstances warranted federal intervention in the affairs of state governance is a question for Householder's capable attorneys to address. Defendant-Appellant Matthew Borges ("Borges") has no hound in that fight.

The equities weigh differently for Borges. He was a lobbyist, not a politician. He did not accept money to facilitate the passage of HB 6. He held no public office and had no ability to engage in official action. After passage of HB 6, Borges worked as a private actor to defeat an effort by a group (funded by natural gas-utility interests) to repeal the legislation. The gravamen of his wrongdoing was offering a payment to an employee of a private corporation for so-called "inside" information.

The government insists this payment contravened a never-cited state statute. Borges has explained why his conduct was outside its scope.

The DOJ used this alleged misdemeanor violation to justify its decision to prosecute Borges for violating one of the most serious laws in the federal

criminal code – the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Rather than point to concrete evidence of high-level racketeering, it latches onto injudicious remarks made by Borges about entering into an "unholy alliance" and hoping to "get fat" off millions in "Monopoly money."

Putting aside the bombast and rodomontade, what did Borges actually do, or agree with others to do, to warrant his inclusion in the sweeping RICO conspiracy count? According to the government's brief, Borges "furthered the conspiracy by carrying out an aggressive plan to prevent HB 6 from being subject to referendum." (Appellee Brief, at 5)

And what did this "aggressive plan" entail? The government says Borges' wrongdoing was threefold. First, he assisted Householder in "pressuring" the Ohio Attorney General to reject the referendum language. Second, he opened a business bank account to distribute "bribe proceeds" to further the conspiracy. Third, he "bribed" a referendum campaign worker to provide him with statistics regarding the collection of voter signatures. (*Id.*) These contentions crater under close scrutiny.

### *What Pressure?*

The government proposes that "Borges actually assisted Householder in his taking of official action – i.e. pressuring [Dave] Yost [the Ohio Attorney

General] – in exchange for FirstEnergy payments during the referendum period. This certainly proves Borges' agreement to facilitate a racketeering scheme involving the commission of public official bribery." (Appellee Brief, at 71)

The record does not disclose when or how this remarkable tale about Borges "pressuring" Ohio's chief legal officer originated. The 48-page indictment goes into great detail about Borges' activity, but says nary a word about "pressuring" anyone.

The record also does not offer any insight as to what the "pressuring" consisted of. The prosecution did not call the Ohio Attorney General to the witness stand to defend the performance of his duties as the state's chief attorney during the referendum process.[1] This omission alone justifies an inference that his testimony would have contradicted the government's claim. *See Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988).

Instead, the prosecution relied on Juan Cespedes' second-hand account of those contacts. Sure, Cespedes' credibility was a matter for the jury to decide.

_____

[1]The Ohio Attorney General's rejection letter to the Ballot Committee is part of the public record in *Ohioans Against Corporate Bailouts v. LaRose*, S.D. Ohio No. 2:19-cv-04466, ECF#46-2. It lists 21 defects and inaccuracies in the summary language of the referendum petition. It is noteworthy that OACB's federal complaint did not challenge the legitimacy of the deficiencies identified by Attorney General Yost for rejecting the initial submission of the petition.

3

But Cespedes did <u>not</u> portray Borges' interactions with Yost as involving "pressuring" tactics.

Cespedes testified Borges was supposed to "convince or persuade" Yost that the referendum language "would not meet" statutory requirements. (Day 12 Tr., R. 212, Page ID##6866-67) Convincing and persuading public officials is what lobbyists do. *See* www.merriam-webster.com/dictionary/lobbyist (defining "lobbyist" as "one who conducts activities aimed at influencing or swaying public officials ")

The government's use of the descriptor – "pressuring" – is calculated. The district judge instructed the jurors that"official action" includes "using an official position *to exert pressure* on another official with the intent to *pressure* the official to perform an official act." (Day 23 Tr., R. 237, Page ID#9425, emphasis supplied) He cautioned that "setting up a meeting" or "calling another public official" "would not, standing alone, qualify as an official act." (*Id.*) These instructions track the language of the Chief Justice in the unanimous opinion reversing a bribery conviction of a Virginia governor in *McDonnell v. United States*, 579 U.S. 550, 574 (2016).

Characterizing Borges' lobbying activity as "pressuring" the state's chief lawyer is pure drivel. Borges did not hold an official position in state

government. He therefore had no bully pulpit from which to pressure anyone. The government did not claim, much less prove, that Borges' contacts with the Ohio Attorney General exceeded the normal activities of a lobbyist.

It is ironic that contemporaneous text messages indicate Cespedes had concerns about the underwhelming nature of Borges' efforts. (Gov. Ex. 606A, R. 303, Page ID#12510) Even counsel for the government conceded that Borges' enthusiasm for the task at hand was lukewarm when he told the jury, "[a]gain, Householder is asking if you, Matt Borges, have spoken with Dave Yost, today; he said, he hasn't." (Day 23 Tr., R. 238, Page ID#9517).

When viewed in a light most favorable to the government, Cespedes testimony proved nothing beyond "setting up a meeting" or "calling another public official" to advocate a client's position about the referendum. This conduct fell well short of proof of an " agreement to facilitate a racketeering scheme involving the commission of public official bribery."

### *Laundering Post-Bribe Proceeds is not a Crime*

The prosecution alleged that Householder violated Ohio's public official bribery statute by accepting funds deposited by FirstEnergy into various 501(c)(4) entities in exchange for passing HB 6. The government does not claim that Borges received any of that pre-HB 6 money.

Borges maintains that any funds deposited into his consulting business account after HB 6 had already passed was not bribe money. Case authority supports his position. The United States Supreme Court and the Supreme Court of Ohio are in agreement that the crime of bribery is complete  when money or other consideration is given to a public official with intent to influence him in the future discharge of his duties. *Snyder v. United States*, No. 23-108, 2024 WL 3165518, *3 (U.S.S.C. June 26, 2024) ("bribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act"); *Curtis v. State*, 148 N.E. 834, 835 (Ohio 1925) ("It is well settled by the authorities that the offense is complete upon the payment of the money.")

The government resists this logic by proposing that "after HB 6 passed, the companies paid Householder over $38 million for the anti-referendum effort because Householder promised to use his position as Speaker 'to help defeat the referendum' and prepare alternate legislation in the event the referendum succeeded." (Appellee Brief, at 67) The first part of this contention does not implicate official action; the second part lacks support in the indictment or the evidence.

Ohio Revised Code §2921.02(B) prohibits a public servant from soliciting or accepting something of value to improperly influence him in the discharge of

a "duty" as a public servant. The "duties" of a public servant are determined by consulting statutes, rules, or regulations, or by custom and usage. *State v. Knight*, 749 N.E.2d 761, 766 (Ohio App. 2000). The government's brief does not cite a legal source, nor evidence of custom or usage, to support its theory that the official duties of a House Speaker of the Ohio General Assembly include defending legislation after it has already been signed into law.

Trial testimony indicated that FirstEnergy financed the referendum opposition effort to protect its interest in preserving the legislative subsidy. The government reasons that the utility company had high hopes that Householder's personal involvement as House Speaker in the opposition effort would increase the chances of defeating the referendum.

However, "[a]ny payment to a public official, whether it be a legitimate campaign contribution or a bribe, is made because of the public office he holds." *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993). Therefore, "[p]roof that the money was paid to a public official 'because of his office' or was 'motivated by the public office involved' creates no standard," and is not, absent a promise or expectation of official action, evidence of a bribe. *Id.*

To be sure, the disbursements were unseemly, and may have violated rules or laws of corporate governance. Yet the fact remains the payments were not

7

made to influence Householder in the discharge of an official duty *as Speaker* of the Ohio House. It necessarily follows, then, that they were not bribes under the Ohio Bribery Statute.

The government's alternative contention – the payments also served as financial remuneration for Householder's contingency plan to re-introduce the HB 6 subsidy as a "tax" in the event the voter referendum succeeded (Appellee Brief, at 68-70) – is a red herring. Paragraphs 119 through 132 of the indictment contain a detailed recital of the payments made by FirstEnergy *after* passage of HB 6 and the *purpose* of those payments, *i.e.* to defeat the referendum. (Indictment, R. 22, Page ID##1281-86)

Paragraphs 119 through 132 do <u>not</u> allege the existence of a plan to introduce alternative legislation. The indictment does <u>not</u> allege that the payments were made in exchange for a promise or with an expectation that Householder would offer and pass such legislation.

Paragraph 125 plainly states that the precise purpose of the deposits to Borges' business account was to defeat the referendum:

> Householder's Enterprise also laundered money through Borges' 17 Consulting Group bank account to defeat the Ballot Committee. Between on or about August 2, 2019 and on or about October 21, 2019, Householder's Enterprise laundered approximately $1.6 Million in payments received by Generation

> Now from Energy Pass-Through and Company A Service Co.
> through Borges' 17 Consulting bank account to pay for services to
> defeat the Ballot Campaign, including a bribe payment to a Ballot
> Campaign insider for information and multiple payments to a private
> investigations firm.

(Indictment, R. 22, Page ID#1283)

At trial, the government did not call officers of FirstEnergy to testify that the post-HB 6 paymets were made for any purpose other than to defeat the referendum effort. The government's brief does not identify testimony or documentation that money flowing through Borges' business account was used to finance a plan to introduce alternative legislation.

In sum, the government did not produce any evidence that Borges engaged in transactions involving proceeds of specified unlawful activity (bribery), or that he agreed that others would engage in such transactions. Even under the accommodating *Jackson v. Virginia* standard, the evidence fell well short of proving that Borges committed, or agreed with others to commit, multiple money laundering violations.

### Bootstrapping Has Its Limits

The government asserts that "[c]ontrary to Borges's suggestion [], nothing in *Perrin* [*v. United States*, 444 U.S. 37 (1979)] suggests that the Travel Act applies to certain state bribery statutes – like the commercial bribery statute at

issue there – but not others." (Appellee Brief, at 45) One learned district judge, when squarely confronted with this issue, reached a contrary conclusion.

In *United States v. Ferber*, a jury found the defendant, a financial advisor and investment banker, guilty of Travel Act violations which were premised upon his acceptance of payments from a national brokerage company "for recommending their services to his Public Entity Clients." *Id.* 966 F. Supp. 90, 95 (D. Mass. 1997). The prosecution asserted that his conduct contravened the Massachusetts Gratuity Statute, which prohibits a "state, county or municipal employee" or a "person selected to be such an employee" from receiving something of value for "act within his official responsibility performed or to be performed by him." *Id.* at 103.

The district judge granted Ferber's motion for a post-verdict judgment of acquittal on the Travel Act counts. The jurist took judicial notice that local authorities "to a large degree, left implementation" of the Gratuity Statute to the state ethics commission "as a civil regulatory matter." *Id.* at 106. He emphasized that state authorities had never attempted to use the statute to pursue criminal charges "for gratuity violations against anyone similarly situated to Ferber." *Id.* at 105. He noted that "this was not a case where corruption within the state

government itself was causing the state to look the other way and therefore fail to pursue criminal prosecutions for such conduct." *Id.* at 107.

The judge acknowledged the decision in *Perrin*. Yet he felt *Perrin*'s justification for allowing federal prosecutors to use the Travel Act as a bootstrapping device for prosecuting mobsters for commercial bribery activity did not apply to Ferber's circumstances:

> The Supreme Court has made it clear that the offense charged as a Travel Act predicate must actually be criminal under state law. See *Perrin*, 444 U.S. at 50. Here, Massachusetts appears to have made a policy decision not to criminally prosecute [Gratuity Statute] violators in cases such as the one at bar. In addition, because Congress enacted the Travel Act to aid states in the enforcement of their laws, it would be contrary to that purpose for the federal government to attempt to aid Massachusetts in the enforcement of a law which Massachusetts has chosen not to enforce. Applying the Travel Act to the conduct in this case would result in the type of expansive reading of the Travel Act that would upset the delicate balance of power between the state and federal governments.

*Id.* at 106 (cleaned up).

The parallels between *Ferber* and Borges' case are compelling. The government concedes it is unable to locate a single Ohio court decision involving the application of the Ohio Anti-Infiltration Statute to an alleged bribe of a private-sector employee. (Appellee Brief, at 48) The Ohio scheme for enforcing the statute is far more restrictive than the one in Massachusetts. Ohio prosecutors

11

have no authority to initiate a criminal prosecution under the statute unless they receive the approval of the Ohio Elections Commission.

True, *Ferber* is a trial court ruling and not binding in this Circuit. However, it is consistent with recent Supreme Court precedent (cited in Borges' opening brief) placing limits on DOJ ambitions to police purely local activities. This Term's decision in *Snyder* can be added to that list. *Id.* 2024 WL 3165518, at *8 ("Congress does not lightly override state and local governments on such core matters of state and local government.")

The government's brief quotes *Perrin*'s admonishment that one of Congress' purposes was to "add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." (Appellee Brief, at 44, citing *Perrin*, 444 U.S. at 41). But what is missing in the government's dissertation is any assertion that Ohio authorities lacked resources to enforce the Anti-Infiltration Statute against Borges, or that they deliberately decided "to look the other way" due to political considerations.

*The Government's Bouie Problem*

The government's brief implicitly concedes Tyler Fehrman was not an "employee" of a "committee in advocacy or in opposition to the adoption of any ballot proposition or issue" within the ambit of the Ohio Anti-Infiltration Statute.

It proposes, however, that Fehrman qualified as an "agent" of Ohioans Against Corporate Bailouts ("OACB"). It reasons that the statute "does not require a general agency relationship for all purposes," and that "agent" "naturally encompasses individuals with 'duties' to, and who act on behalf of, a committee, [] whether or not such individuals would be considered agents for other purposes." (Appellee Brief, at 48)

Criminal statutes must give a person of ordinary intelligence fair notice of the conduct that is prohibited. *Snyder*, 2024 WL 3165518, at *8. In the seminal case of *Bouie v. City of Columbia*, the Supreme Court ruled that a denial of the Due Process right of fair warning "can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.* 378 U.S. 347, 352 (1964).

In *United States v. Salisbury*, this Court applied *Bouie* in a case involving an effort by the prosecution to expand the reach of a criminal statute prohibiting a person from voting and assisting others from voting "more than once." *Id.* 983 F.2d 1369 (6th Cir. 1993). A jury accepted the prosecution's theory that the defendant violated the statute by "punching" absentee ballots for elderly and infirm voters in a manner reflecting her political party's preferred candidates, and then having the voters sign the ballots.

13

The appellate panel reversed her conviction, reasoning that the plain statutory language prohibited a voter from "fill[ing] out two separate ballots on her own behalf during the same election," as well as "marking another person's ballot in addition to one's own or multiple other persons' ballots without consent." *Id.* at 1379. "Beyond this," said the panel, "it remains unclear [] whether [] an accused has actually voted on behalf of another if the accused has not physically marked the ballot [or] whether an accused can vote on behalf of another without consent where that other person signed the ballot form." *Id.* Citing *Bouie*, the panel said it would "decline to become legislators by attempting to retroactively expand the canopy of activities proscribed by the [statute's] multiple voting prohibition to include the conduct described in the instant case." *Id.* at 1380.

Ohio Revised Code §3517.02 is a narrowly and precisely drawn statute. "Agent" is a legal term with a specific meaning in Ohio jurisprudence.

Similar to the failed effort in *Salisbury* to persuade the Court to retroactively expand the meaning of voting "more than once," the government asks this Court to "retroactively expand the canopy of activities" prohibited by the Anti-Infiltration Statute by redefining the meaning of "agent" to include independent contractors and their employees. It should decline this invitation. If

the legislature had intended to expand the scope of the prohibitions in the statute to reach infiltration of private sector signature collection firms, it could have said so explicitly.

The government's brief makes much ado about testimony from Advance Micro Targeting's CEO indicating that "AMT communicated and coordinated with OACB about how to qualify the referendum," and "how to deal with" the aggressiveness of the opposition. (Appellee Brief, at 49) It suggests that AMT surrendered control to the committee by keeping these lines of communication open.

Not so. The Supreme Court of Ohio has pointed out that "[a]s a practical proposition, every contract for work to be done reserves to the employer a certain degree of control, at least to enable him to see that the contract is performed according to specifications." *Gillum v. Industrial Com*., 48 N.E.2d 234, 238 (Ohio 1943). The court said that a contracting party's exercise of a "certain degree of control" in regard to the performance of the contract for hire does not convert an independent contractor arrangement into one of principal/agent. *Id.*

The government does not explain how Fehrman's receipt of an email from OACB warning him about fake interview requests, or his other communications with the advocacy group, converted his employer's independent contractor status

15

to one of being an agent. To the extent that "any fair reader" would be left with a reasonable doubt about the application of the Anti-Infiltration Statute to independent signature gatherers, the rule of lenity requires that the issue be decided "not for the prosecutor, but for the presumptively free individual." *Snyder*, 2024 WL 3165518, at *11 (Gorsuch, J. concurring).

*Shoehorning Bad Facts also Has Its Limits*

It is no secret that efforts by the DOJ to use the federal criminal code as a fulcrum for pursuing local public corruption prosecutions have taken a pummeling in the Supreme Court. One reason for this dismal record is a general wariness on the part of the justices "of overcriminalization and federal infringement into state and local governance." Oziel, Lauren M., What Are Federal Corruptions Prosecutions For?, Yale Law Journal Forum 594 (Feb. 16, 2024). As one Sixth Circuit jurist colorfully put it, "the cases where convictions were vacated all involved prosecutors who attempted to shoehorn bad facts into the fraud statute and were rebuked on appeal." *United States v. Bolos,* Nos. 22-5486/5605, 2024 WL 2947960, at *5 (6th Cir. June 12, 2024).

The government asserts that if Borges is correct in his contention that *Frost* requires the prosecution to prove that "a breach of fiduciary duty infringed on 'the property rights of the victim,' that would be an evidentiary burden to be

16

proven at trial and not an appropriate basis for striking the predicate from the indictment." (Appellee Brief, at 55) The government's position confuses apples and oranges.

Borges agrees with the government's contention that  an indictment is not deficient for omitting the evidentiary basis for a charged offense. But here, the government *volunteered* the information by alleging in the indictment that Borges offered money to Fehrman in exchange for disclosure of "the total number of signatures the Ballot Campaign had collected." (Indictment, R. 22, Page ID#1283, at ¶¶126-27)

The voluntary disclosure of the nature of the alleged property interest opened the door to a defense motion to dismiss "on the ground that, as a matter of law, the undisputed facts did not give rise to the offense charged in the indictment." *United States v. Ali*, 557 F.3d 715, 720 (6th Cir. 2009). *See also United States v. Alkaabi,* 223 F. Supp. 2d 583, 588-91 (D.N.J. 2002) (granting pretrial motion to dismiss mail fraud counts on ground that interest specified in those counts – "maintaining the interest in [a] testing process – was not a traditional property right). The district court therefore had a duty to decide the issue prior to trial.

The court's failure to rule on the merits of the motion prejudiced Borges. The jury was permitted to base a verdict of guilty on evidence that Borges engaged in an act that does not constitute honest services fraud as a matter of law.

### The Government's Marks Problem

The government's brief asserts that "[n]othing in *Frost* suggested [] that a breach of fiduciary duty must always involve deprivation of a traditional property interest[.]" (Appellee Brief, at 53, citing *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)). As a fall back position, it contends that even if such proof is required by *Frost*, "the evidence established that the signature-count information was 'confidential business information,' as the Supreme Court has defined it." (*Id.* at 59, citing *Carpenter v. United States*, 484 U.S. 19 (1987)).

In *Marks v. United States*, the Supreme Court extended the principle in *Bouie* to a case involving a vague statute that had earlier been saved by judicial construction in order to satisfy due process concerns. *Id.* 430 U.S. 188, 195 (1977). The Court stated that a retroactive and unforeseeable judicial enlargement of the scope of the statute would have the same effect "as the new construction in Bouie." *Id.*

In *Skilling v. United States*, the Supreme Court observed that "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* 561 U. S. 358, 407 (2010). The *Skilling* court concluded that to avoid contravening constitutional limitations, the honest services statute, 18 U.S.C. §1346, "criminalizes only the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409. It expressly warned that "honest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks[.]" *Id.* at 411.

To avoid a *Marks* objection, the government needed to identify a paradigmatic bribe case that would have placed someone in Borges' circumstances on notice that paying money to an employee for raw data runs afoul of §1346. During the district court proceedings, the government insisted that *Frost* supplied the requisite notice. In this appeal, it reverses course, and now complains that "this Court has never interpreted *Frost* as imposing a free-standing property requirement." (Appellee Brief, at 54)

The government's rejoinder is an exercise in nit-picking. The reasoning in *Frost* makes it "as plain as a pikestaff" (to borrow a phrase from *Skilling*) that the government needed to prove that Borges paid Fehrman to violate his fiduciary

19

duty "to protect the property of his employer."*Id.* 125 F.3d at 367-68. Whether this requirement is described as a "free-standing" property element, or as a sub-element of proving breach of an employee's fiduciary duty to his employer, is a matter of nuance and semantics.

The government's reliance on *United States v. Douglas*, 398 F.3d 407 (6th Cir. 2005) for a contrary rule is misplaced. (Appellee Brief, at 54) In that case, the indictment alleged the defendants committed honest services fraud by violating their fiduciary duties as officers of a United Auto Workers union local. Those duties were derived from a federal labor management statute as well as the UAW Constitution.

In Borges' case, the prosecution was unable to cite a federal or state statute, or case precedent, imposing a fiduciary duty on Fehrman to protect anything his employer wished to keep secret. The government stubbornly refuses to accept the reality that a voter signature tally is not a protected property interest under federal or state law.

In essence, the government is asking the Court to hold that statistical data should be protected as property to the same extent as trade secrets or confidential business information. Even if the panel were willing to expand the ruling in

*Frost* in this manner, *Marks* forecloses its retroactive application for purposes of sweeping Borges' conduct within the scope of §1346.

*The Fuzzy Logic of the Government's Harmlessness Theory*

The government's brief asserts that "even if both theories regarding the Fehrman bribe were held legally flawed, . . . no rational jury could have found Borges guilty of the charged RICO conspiracy without finding at least two legally valid racketeering acts other than the Fehrman bribe, thus establishing a pattern of racketeering even without reliance on that act." (Appellee Brief, at 73)

The government's harmless error argument rests on an assumption that the jury necessarily understood that the $15,000 payment to Fehrman could only serve as one racketeering act. Therefore, the jury must have found that Borges committed, or agreed that a co-conspirator would commit, at least two non-Fehrman-related racketeering acts.

"Fuzzy logic" refers to a system of approximate reasoning with unclear or "fuzzy" boundaries. www.britannica.com/science/fuzzy-logic. The term aptly describes the government's approach to the issue of harmlessness in this appeal.

It is true that a violation of two or more criminal statutes arising from the same conduct, event, or occurrence counts as only one predicate act for purposes of satisfying RICO's pattern requirement. But does the average juror understand

21

this concept? An Eighth Circuit panel was unwilling to make this leap of faith in *United States v. Kragness*, 830 F. 2d 842 (8th Cir. 1987).

The RICO count in that case alleged that Defendant Caspersen's participation in a scheme to receive a shipment of marijuana from Mexico violated two federal controlled substances statutes – importation [Act 10(a)] and trafficking [(Act 10(b)]. On appeal from his RICO conviction, Caspersen argued that "the jury may have found the two predicate acts necessary to a RICO violation from what was actually only one act." *Id.* at 860.

The panel agreed with him that the general nature of the guilty verdict precluded a finding that the error was harmless:

> Although evidence of many other predicate acts was strong, we cannot know from the jury's general verdict of guilty which acts it found Caspersen had committed. There is a possibility that his conviction is based on a finding that he committed acts 10(a) and 10(b), but no others. As a practical matter, this seems most unlikely, but in a criminal case a conviction may not be upheld on the basis of speculation or inference, however strong, of this kind. It is the jury that must convict, not an appellate court. If the instructions leave open the logical possibility that the verdict is based on a legally insufficient predicate, the conviction cannot stand.

*Id.* at 861.

The district judge instructed Borges' jury that an agreement to engage in a "pattern of racketeering activity requires at least two acts of racketeering

activity." He defined "racketeering activity" as "any act of the following acts." He followed this statement with a list of seven federal and state criminal statutes. (Day 23 Tr., R. 237, Page ID##9417-19) Later in the charge, the judge reinforced the idea that the number of racketeering acts depends on the number of statutory violations rather than the number of events or occurrences. (*Id.* at 9441)

The government proposes that an isolated passage in the prosecutor's lengthy closing argument – that the Fehrman "bribe" was "one act" – cured any ambiguity on this point, and "sets the case apart from *Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989)." (Appellee Brief, at 73-74, citing Day 24 Tr., R. 238, Page ID#9481) Its brief neglects to mention, however, that the judge had instructed the jury that "[t]he lawyers may talk about the law during their arguments. But if what they say is different from what I say, you must follow what I say." (Day 23 Tr., R. 237, Page ID#9395)

In *Callanan,* the appellate panel concluded that Attorney Callanan's RICO conspiracy conviction could not be "saved" because it was unable to say "with confidence" that the jury "necessarily found" that he had agreed to the commission of two acts that legally qualified as racketeering activity under the RICO statute. *Id.* 881 F.2d at 235. The reasoning of *Kragness* is consistent with *Callanan*.

The government is responsible for any uncertainties regarding the jury's findings. It could have joined in the Defendants' request for interrogatories requiring the jury to specify the racketeering acts attributable to each defendant. Instead it stubbornly opposed the request. (Day 23 Tr., R. 237, Page ID#9386)

Borges's opening brief explains why the Travel Act and Honest Services Fraud theories of guilt were insufficient as a matter of law to submit to the jury, and should have been excised from the indictment and the jury instructions. The brief also explains why the literal wording of the Honest Services Fraud instruction permitted the jury to find him liable for committing, or agreeing to the commission of, an act that is not a crime. His argument that the post-HB 6 funds deposited into his consulting business account were not proceeds of specified unlawful activity (bribery) is bolstered by the recent Supreme Court decision in *Snyder*.

The fuzzy counter-arguments of the government fall far short of satisfying the harmless beyond a reasonable doubt standard. For these additional reasons, Borges asks this Court to reverse his conviction, and remand his case preferably for entry of judgment of acquittal, or alternatively, a new trial.

s/Dennis C. Belli
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been produced in 14-point Times New Roman font and consists of 5,151words. It therefore complies with the 6,500-word limit of Fed. R. App. P. 32 for reply briefs.

s/Dennis C. Belli
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I electronically filed this document with the Clerk of this Court using the ECF system, which will send notification and a copy of such filing to Alexis Zouhary, Assistant United States Attorney, Attorney for Plaintiff-Appellee United States of America.

s/Dennis C. Belli
DENNIS C. BELLI
ATTORNEY FOR DEFENDANT-
APPELLANT

25